IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GRACE OLECH, and PHYLLIS S.        )
ZIMMER, as Independent             )
Executor of the Estate of          )
Thaddeus F. Olech, Decedent,       )
                                   )
        Plaintiffs,                )
                                   )
    -vs-                           )
                                   )    No. 97 C 4935
VILLAGE OF WILLOWBROOK, an         )
Illinois municipal corporation,    )    Magistrate Judge Schenkier
GARY PRETZER, individually and     )
as President of Defendant          )
VILLAGE OF WILLOWBROOK, and        )
PHILIP J. MODAFF, individually     )
and as Director of Public          )
Services of Defendant VILLAGE      )    **DOCKETED**
OF WILLOWBROOK,                    )
                                   )    FEB 20 2002
        Defendants.                )

FILED
FEB 19 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

PLAINTIFFS' RESPONSE TO DEFENDANTS'
RULE 56.1(a)(3) STATEMENT OF MATERIAL
FACTS, INCLUDING PLAINTIFFS' STATEMENT OF
ADDITIONAL FACTS PURSUANT TO LOCAL RULE 56.1(b)(3)(B)

    NOW COME the Plaintiffs, GRACE OLECH, and PHYLLIS S. ZIMMER,

as Independent Executor of the Estate of Thaddeus F. Olech,

Decedent, by and through their attorney, JOHN R. WIMMER, and,

pursuant to Local Rule 56.1(b)(3), submit this response to

Defendants' Rule 56.1(a)(3) Statement Of Material Facts, which

response includes the Plaintiffs' statement of additional facts

pursuant to Local Rule 56.1(b)(3)(B).  The Plaintiffs have retained

the headings from Defendants' Rule 56.1(a)(3) Statement Of Material

Facts to make it easier to correlate the Defendants' statement and

the Plaintiffs' response, but, obviously, the Plaintiffs do not

agree with or endorse the statements in those headings.  In the

Plaintiffs' responses to the various paragraphs of the Defendants'

Rule 56.1(a)(3) Statement Of Material Facts, references to exhibits will be to the Exhibits To Plaintiffs' Response To Defendants' Rule 56.1(a)(3) Statement Of Material Facts, Including Plaintiffs' Statement Of Additional Facts Pursuant To Local Rule 56.1(b)(3)(B), and not to the exhibits submitted by the Defendants.

<u>Plaintiffs' Response To Defendants' Statement.</u>

<u>Public Use and Maintenance of Tennessee Avenue</u>

<u>Defendants' Paragraph 1</u>: In 1943, Plaintiff purchased property along Tennessee Avenue south of 63rd Street and the deed by which she took title stated that her interest was subject to the right of public travel over the east thirty-three feet of her property. (Ex. B, p. 17; Ex. L) Plaintiff's property was also subject to an easement held by Northern Illinois Gas over the east thirty-three feet of the property, where Tennessee Avenue was located. (Ex. W, p. 56)

<u>RESPONSE</u>: The Plaintiffs agree that in 1943 Plaintiff Grace Olech and her husband, Thaddeus Olech, purchased property along what is now Tennessee Avenue south of 63rd Street, but Plaintiffs state affirmatively that the Olechs laid Tennessee Avenue. Phyllis Zimmer testified that her parents, the Olechs, paid to have the street put in with gravel. (Pl. Ex. 1, p. 20) The Plaintiffs' also agree that the Olechs' property was subject to an easement held by Northern Illinois Gas over the east thirty-three feet of the property, where Tennessee Avenue is now located. The Plaintiffs deny that the deed by which the Olechs took title stated that their "interest" was subject to the right of public travel over the east thirty-three feet of the property. The deed stated that the grantor "conveys and warrants" to the Olechs the property at issue "subject to right of public travel over the East Thirty-three (33) feet thereof." (Pl. Ex. 2) The Plaintiffs' expert witness in the field of real estate law, Steven B. Bashaw, opined that "subject to" language in a deed is a limitation on the liability of the grantor in the conveyance, and that the deed in this case did not create a right to public travel. (Pl. Ex. 3, pp. 93-94) The Defendants' expert witness, Gerald M.

> Gorski, agreed with Bashaw on this point, and testified
> that the use of the words "subject to" was to protect
> the grantors on their warranty, did not amount to a
> reservation of a right to public travel, and did not
> create any affirmative rights. (Pl. Ex. 4, pp. 16-18)

**Defendants' Paragraph 2:** Tennessee Avenue was paved by Downers Grove Township and Mrs. Olech never paid to have any portion of Tennessee Avenue paved. (Ex. B, p. 11)

**RESPONSE:** The Plaintiffs agree with Defendants' Paragraph 2.

**Defendants' Paragraph 3:** Mrs. Olech had seen vehicles traveling on Tennessee Avenue to the Arabian Knights Horse Farm and she never made any attempt to stop them from being there, nor did she ever make any attempt to preclude people from traveling on Tennessee Avenue. (Ex. B, pp. 19-21)

**RESPONSE:** The Plaintiffs agree with Defendants' Paragraph 3.

**Defendants' Paragraph 4:** Phyllis Zimmer believed that her family owned Tennessee Avenue and based that belief on "just from our family living there, from my aunt and uncle and my aunt and my dad." (Ex. F, p. 20)

> **RESPONSE:** The Plaintiffs agree that Phyllis Zimmer believed that
> her family owned Tennessee Avenue but deny that her
> belief is based "just" on her family living there.
> Phyllis Zimmer also testified that her parents, the
> Olechs, paid to have the street put in with gravel.
> (Pl. Ex. 1, p. 20) In addition, since her deposition,
> the Plaintiffs hired Joseph M. DeCraene, a surveyor, as
> an expert witness, whose report indicates that "the
> Tennessee Avenue roadway pavement straddles the East
> property line" of the Olech property (Pl. Ex. 5), and
> who prepared a survey demonstrating that fact. (Pl. Ex.
> 6) The DeCraene survey indicates that the paved portion
> of Tennessee Avenue extends from 3.6 to 4.1 feet onto
> the Olech property. (Pl. Ex. 6)

**Defendants' Paragraph 5:** During the 1980s, Tennessee Avenue was plowed in winter and Phyllis Zimmer does not know of anyone who paid for that service. (Ex. F, p. 22)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 5.

Defendants' Paragraph 6:  The Downers Grove Township Highway Department is a public entity, funded by real estate taxes, and is responsible for maintaining public streets within its jurisdiction.  (Ex. M, p. 8)

RESPONSE:  The Plaintiffs agree that Downers Grove Township is a public entity which is funded by real estate taxes, and agree that the Downers Grove Highway Department is responsible for maintaining public streets which are within its jurisdiction and which are not within the jurisdiction of municipalities or other public entities.  The Plaintiffs deny that the Downers Grove Highway Department is a public entity in its own right, and the Plaintiffs deny that the Downers Grove Highway Department is responsible for maintaining all public streets within its jurisdiction.  (Pl. Ex. 7, p. 8)

Defendants' Paragraph 7:  Ed Smith has been employed by the Downers Grove Highway Department ("Township") since 1960 and has served as the Township Highway Commissioner since April of 1981. (Ex. M, p. 6)

RESPONSE:  The Plaintiffs agree that Ed Smith has been employed by Downers Grove Township and has worked for the Downers Grove Highway Department since 1960, and that Ed Smith has been Downers Grove Township Highway Commissioner since April of 1981.  The Plaintiffs deny that the Downers Grove Highway Department is a public entity in its own right.

Defendants' Paragraph 8:  After working for the Township for a year or so, Mr. Smith became familiar with the roads that were within the jurisdiction of the township.  (Ex. M. p. 7)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 8.

Defendants' Paragraph 9:  The Township would pave, resurface, plow and install culverts and swales to control drainage on roads within its jurisdiction.  (Ex. M, pp. 10-14)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 9.

Defendants' Paragraph 10:  Most streets within the Township

- 4 -

have a sixty-six-foot right-of-way comprised of the

thirty-three-feet from the center of the road back to the property

line in each direction.  (Ex. M, p. 30)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 10.

Defendants' Paragraph 11:  The intersection of 65th and

Bentley Avenues was located within the Downers Grove Township and

the township maintained this intersection in the 1970s and 1980s,

seal-coating it and installing culverts and drainage facilities.

(Ex. M, pp. 16, 18, 55)

RESPONSE:  The Plaintiffs agree that the intersection of 65th and
          Bentley Avenues was located within Downers Grove
          Township.  The Plaintiffs agree that the township
          seal-coated the stub of 65th Street off Bentley in
          1977.  The Plaintiffs deny that the township did so in
          the 1970s and 1980s, deny that the township installed
          culverts and drainage facilities at the intersection of
          65th and Bentley Avenues, and state that the pages of
          the Smith deposition cited by the Defendants in support
          of Defendants' Paragraph 11 do not support such a claim.

Defendants' Paragraph 12:  Tennessee Avenue, south of 63rd

Street, was within the Township jurisdiction and the Township

maintained it in the 60's, 70's and 80's and Mr. Smith was aware

that the road was traveled by the public during that time.  (Ex. M,

pp. 14, 26-30; Ex. O)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 12 but
          state affirmatively that Smith was unable to say whether
          the specific acts of maintenance by the township over
          Tennessee Avenue extended as far south as the Olech
          property.  (Pl. Ex. 7, pp. 47-56)

Defendants' Paragraph 13:  The Township's maintenance of

Tennessee Avenue included paving, patching, widening, trimming

brush and installing culverts to control drainage.  (Ex. M, pp.

20-36, 51-53, 56-59)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 13 but
          state affirmatively that Smith was unable to say whether

the specific acts of maintenance by the township over
Tennessee Avenue extended as far south as the Olech
property. (Pl. Ex. 7, pp. 47-56)

Defendants' Paragraph 14: Since the early 1970s, Tennessee
Avenue was on Downers Grove Township's snow plow routes prepared by
Mr. Smith. (Ex. M, pp. 45-47)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 14 but
state affirmatively that Smith stated that he would be
"very surprised to find" the snow plow routes going back
to the 1970s (Pl. Ex. 7, p. 55); Smith did not state
that the snow plow route went as far south on Tennessee
Avenue as the Olech property; and Smith could state only
that he "would think" that when he drew up the snow plow
route for Tennessee Avenue, he intended the route to go
all the way south on Tennessee Avenue to where it
dead-ends. (Pl. Ex. 7, p. 64)

Defendants' Paragraph 15: Mr. Smith has no recollection of
any residents along Tennessee Avenue ever stopping the Township
from doing any work on Tennessee Avenue and no one ever advised Mr.
Smith that Tennessee Avenue south of 63rd Street was a private road
or that there was no sixty-six-foot right-of-way for Tennessee
Avenue. (Ex. M, pp. 16, 24, 32)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 15 but
state affirmatively that there was no sixty-six foot
right-of-way for Tennessee Avenue. On November 10,
1995, Gerald M. Gorski, Willowbrook's attorney, sent a
letter to Bernard A. Oglietti, the Village
Administrator, which indicated that Tennessee Avenue had
not been dedicated. (Pl. Ex. 8, p. 33; Pl. Ex. 9)
Gorski, Willowbrook's expert witness, opined that
Tennessee Avenue had become a public highway by
prescription (adverse use). (Pl. Ex. 4, p. 23) Gorski
testified that the geographical boundaries of a public
highway acquired by prescription are the portions of the
highway used for travel or drainage. (Pl. Ex. 4, p.
27) The paved portion of Tennessee Avenue extends onto
the Olech property 4.1 feet. (Pl. Ex. 6) The drainage
ditch adjacent to Tennessee Avenue extends an additional
9 feet onto the Olech property. (Pl. Ex. 10)

Defendants' Paragraph 16: The Downers Grove Township seal
coated Tennessee Avenue south of 63rd Street and 65th Street, west

of Bentley Avenue on October 10, 1977. (Ex. M, p. 17)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 16 but state affirmatively that Smith was unable to say whether the specific acts of maintenance by the township over Tennessee Avenue extended as far south as the Olech property. (Pl. Ex. 7, pp. 47-56)

Defendants' Paragraph 17: All of the work that the township did on Tennessee Avenue was with public funds and Mr. Smith was unaware of any resident making private payments for township work done on Tennessee Avenue. (Ex. M, p. 28)

RESPONSE: The Plaintiffs' agree with Defendants' Paragraph 17.

Defendants' Paragraph 18: When a village annexed property within the jurisdiction of the Township, the village took over maintenance of the streets in that area, but there was no formal notification process given to the Township by a municipality at the time the municipality took over maintenance of the roads in an annexed area. (Ex. M, pp. 36-37)

RESPONSE: The Plaintiffs agree that when a village annexed property within the jurisdiction of the Township, the village took over maintenance of the streets in that area. The Plaintiffs deny that there was no formal notification process given to the Township by a municipality at the time the municipality took over maintenance of the roads in an annexed area, and state affirmatively that Smith testified that some of the municipalities gave very good notification and some did not. (Pl Ex. 7, p. 37)

Defendants' Paragraph 19: The land where Tennessee Avenue and the Olech property was situated was annexed by the Village of Willowbrook in 1986. (Ex. B, p. 12; Ex. O; Ex. W, p. 76)

RESPONSE: The Plaintiffs deny the assertion in Defendants' Paragraph 19 and state that the forced annexation of the Olech property by Willowbrook occurred in 1989. (Pl. Ex. 4, pp. 21-22)

Defendants' Paragraph 20: After the annexation, the Village of Willowbrook assumed the responsibilities of maintaining,

plowing, patching and repairing Tennessee Avenue and the public
continued to use Tennessee Avenue.  (Ex. G, p. 72; Ex. K, pp. 42,
46; Ex. J, pp. 13-14, 83; Ex. Y, pp. 49-50)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 20.

Defendants' Paragraph 21:  After the Village of Willowbrook
annexed this area, John Fay, the Village Director of Community
Development, assumed that the public right-of-way was in existence
for Tennessee Avenue because the village plowed and maintained the
street and the township had maintained Tennessee Avenue for many
years before the annexation.  (Ex. C, pp. 7-8, 23-24, 124-126; Ex.
Y, pp. 49-50)

RESPONSE:  The Plaintiffs agree that John Fay testified as set
forth above, but the Plaintiffs state affirmatively that
the jury would not have to believe Fay's testimony that
he "assumed" there was a public right-of-way in
existence next to the Olech property on Tennessee
Avenue.  There was a subdivision on Tennessee Avenue
south of the Olech property called the Borman
subdivision.  (Pl. Ex. 11, p. 87)  Fay testified that
when the Borman subdivision was approved in 1983,
Willowbrook required dedication of the west portion of
Tennessee Avenue across from the Arabian Knights Horse
Farm.  (Pl. Ex. 12, p. 70)  Fay was not employed by
Willowbrook in 1983, but he testified that he became
aware of the dedication in the late 1980s.  (Pl. Ex. 12,
p. 70)  The jury could conclude from the foregoing that
Fay knew in the late 1980s that Tennessee Avenue had not
been dedicated prior to the Borman subdivision.  Fay
testified that such a conclusion would not necessarily
follow because "[w]e typically with subdivisions will
require them to dedicate to the center line just as a
matter of course just in case there is any doubt with
respect to the title of the road in question."  (Pl. Ex.
12, p. 70-71)  But the jury would not have to believe
such an explanation, and, in any event, even according
to Fay's explanation, the dedication of Tennessee Avenue
in 1983 adjacent to the Borman subdivision would have
been done to assuage a doubt with respect to the title
of the road.  Fay's testimony regarding the Borman
subdivision recited above makes it abundantly clear that
Willowbrook did not "assume" anything with respect to
the ownership of Tennessee Avenue, and the jury would
not have to believe Fay's testimony that he "assumed"
the public right-of-way was in existence for Tennessee

- 8 -

Avenue.

## The Breakdown of the Olech Well

Defendants' Paragraph 22: In May of 1995, the well on Mrs. Olech's property that supplied water to her home broke down. (Ex. B, pp. 25-26)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 22.

Defendants' Paragraph 23: When Mrs. Olech noticed this, she called her "well man," Mr. Kuehn, who inspected the well and advised Mrs. Olech that she needed a whole new system which would cost $10,000.00. (Ex. B, pp. 25-28)

RESPONSE: The Plaintiffs agree that when Mrs. Olech noticed that there was water coming up from the ground near the house, she called her well man, Mr. Kuehn, who inspected the well and advised that she needed a whole new system which would cost over $10,000.00, and the Plaintiffs state affirmatively that Kuehn advised Mrs. Olech that it would not pay to put in a new system because the Olechs were eligible to get lake water since they were near the hookup. (Pl. Ex. 13, pp. 26-28)

Defendants' Paragraph 24: Mr. Kuehn then utilized a garden hose to deliver water from the well on the neighboring Zimmer property to the Olech home. (Ex. B, p. 34)

RESPONSE: The Plaintiffs agree that Kuehn utilized a garden hose to deliver water to the Olech home but deny that the garden hose was connected to the well on the Zimmer property and state affirmatively that the hose ran from the outdoor spigot at Zimmers' house to the Olech home. (Pl. Ex. 13, p. 34)

Defendants' Paragraph 25: Through this garden hose, water from the Zimmer well entered the Olech home, filled the toilet tank, entered the hot water heater and could be accessed through faucets in the home. (Ex. B, pp. 37-39, 105, 114-115)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 25.

Defendants' Paragraph 26: Mrs. Olech did not know whether

keeping the water in the hose moving and trickling would prevent it from freezing and did not keep the flow of water trickling.  (Ex. B, p. 95)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 26 and state affirmatively that the Defendants have not disclosed any expert or other witness to testify that keeping the water in the hose moving and trickling would have prevented the water from freezing given the length of the hose and the conditions.

### Mrs. Olech Requests Connection to the Willowbrook Water System

Defendants' Paragraph 27:  Mrs. Olech then called the Village of Willowbrook and spoke with Mr. Modaff and advised him that her well broke down and that she wanted to be connected to the municipal water system.  (Ex. B, pp. 28-30)

RESPONSE:   The Plaintiffs agree with Defendants' paragraph 27 and state affirmatively that the telephone conversation took place on May 23, 1995, and that, during the telephone conversation, Modaff told Olech that Willowbrook had a two-year plan to put in a loop, and that Willowbrook was going to require all the residents on Tennessee to hook up to lake water.  Modaff also said he wanted Olech to wait with the request, but she said that she wasn't interested in the loop plan because she had an emergency.  (Pl. Ex. 13, pp. 28-30)

Defendants' Paragraph 28:  Philip Modaff holds a Master's Degree in Public Administration which he obtained in 1988 from Northern Illinois University and between June of 1991 and July 29, of 1997, Mr. Modaff was employed at the Village of Willowbrook as Director of Public Services and Assistant Village Administrator.  (Ex. D, pp. 6, 11-12)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 28.

Defendants' Paragraph 29:  Among Mr. Modaff's responsibilities was the overseeing of the installation of water mains that were not related to subdivision developments.  (Ex. D,

p. 13)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 29.

Defendants' Paragraph 30:   When Mr. Modaff received the telephone call from Mrs. Olech in which she told him that she was having problems with her well and that she wanted to connect to the village's water system, Mr. Modaff told Mrs. Olech that he would come right over and after he hung up the phone, he got into his car and drove directly to Mrs. Olech's home.   (Ex. D, pp. 54-55)

RESPONSE:   The Plaintiffs deny that Olech told Modaff that she was
having problems with her well and state affirmatively
that Olech told Modaff that her well was broken down,
and that she had an emergency.  (Pl. Ex. 13, p. 30)   The
Plaintiffs agree that Modaff told Olech that he would
come right over and after he hung up the phone, he got
into his car and drove to the Olech home.

Defendants' Paragraph 31:   According to Mrs. Olech, Mr. Modaff arrived at Mrs. Olech's property within twenty minutes of her phone call to him.   (Ex. B, pp. 30-31)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 31.

Defendants' Paragraph 32:   When Mr. Modaff met Mrs. Olech at her property, she told him that her well had "gone bad" and was "beyond repair" and she wanted to know what it would take to connect to the village water system.   (Ex. D, p. 56)

RESPONSE:   The Plaintiffs agree that when Modaff met Olech at her
property, Olech told him that her well broke down, and
that she wanted to be hooked up to lake water.  (Pl. Ex.
13, p. 32)

Defendants' Paragraph 33:   Mr. Modaff advised Mrs. Olech that the village would engineer the project at its own expense and after preparing a preliminary design would advise the residents of the cost of extending a water main down Tennessee Avenue to serve their homes.   (Ex. D, p. 57)

RESPONSE:  The Plaintiffs deny that Modaff so advised Olech at the
           meeting at her property on May 23, 1995, and state
           affirmatively that after Olech told Modaff that her well
           had broken down, she asked him to come around back to
           see the well, and he said no.  Then Modaff asked about
           the low area across Tennessee Avenue and asked Olech if
           rain water ever overflowed the street.  Olech then told
           Modaff, "You're going to hold this against me because we
           have a lawsuit and you're going to take your time."
           Modaff then left.  (Pl. Ex. 1, pp. 96-97; see also Pl.
           Ex. 13, pp. 32-33)

   Defendants' Paragraph 34:  Mr. Modaff then told Mrs. Olech

that the three residents seeking connection to the water main would

have to submit a money deposit and thereafter the village would go

forward with the final engineering design, apply for EPA permits,

advertise for bids, evaluate the bids and make a recommendation to

the village president and the board of trustees for the awarding of

a contract for the project.  (Ex. D, p. 58)

RESPONSE:  The Plaintiffs deny Defendants' Paragraph 34 and state
           affirmatively that the conversation between Olech and
           Modaff at the Olech home on May 23, 1995, was as stated
           in the response to Defendants' Paragraph 33, which
           response is incorporated herein by reference.

   Defendants' Paragraph 35:  Mr. Modaff advised Mrs. Olech that

if everything went well, it would take approximately eight weeks

for the village to extend a water main down Tennessee Avenue to

provide her with municipal water.  (Ex. D, p. 59)

RESPONSE:  The Plaintiffs deny Defendants' Paragraph 35 and state
           affirmatively that the conversation between Olech and
           Modaff at the Olech home on May 23, 1995, was as stated
           in the response to Defendants' Paragraph 33, which
           response is incorporated herein by reference.

   Defendants' Paragraph 36:  Mrs. Olech then told Mr. Modaff

that she felt that he would drag his feet because of the fact that

she had sued the village, stating "you are going to take this out

on me because I have a lawsuit pending and you are going to take

your time about it."  (Ex. B, pp. 32-33; Ex. D, p. 59)

RESPONSE:   The Plaintiffs agree that Olech said words to that
            effect to Modaff during the conversation at the Olech
            home on May 23, 1995.  (Pl. Ex. 13, pp. 32-33)

     Defendants' Paragraph 37:  Mr. Modaff then asked Mrs. Olech

and Mrs. Zimmer, who was also present, how they thought he could

shorten the time line for the project.  (Ex. D, p. 60)

RESPONSE:   The Plaintiffs deny Defendants' Paragraph 37 and state
            affirmatively that the conversation between Olech and
            Modaff at the Olech home on May 23, 1995, was as stated
            in the response to  Defendants' Paragraph 33, which
            response is incorporated herein by reference.

     Defendants' Paragraph 38:  Mrs. Zimmer responded that the

Plaintiffs would choose to engineer the project themselves.  (Ex.

D, p. 60)

RESPONSE:   The Plaintiffs deny Defendants' Paragraph 38 and state
            affirmatively that the conversation at the Olech home on
            May 23, 1995, was as stated in the response to
            Defendants' Paragraph 33, which response is incorporated
            herein by reference.

     Defendants' Paragraph 39:  Mrs. Zimmer contacted engineer Don

Eddy to learn what might be involved in engineering the water

projects.  (Ex. F, p. 105)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 39.

     Defendants' Paragraph 40:  Mrs. Olech received a follow-up

letter from Mr. Modaff, dated June 6, 1995, stating that her

request for extension of a Willowbrook water main to her property

would be presented to the Public Works Committee at the next

scheduled meeting, June 19, 1995, and, on June 19, Mr. Modaff

presented Plaintiff's request for a water main extension to the

committee.  (Ex. B, pp. 46-47; Ex. CC; Ex. DD; Ex. D, p. 53)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 40 but
            state affirmatively that the letter was addressed to the
            Olechs, the Zimmers, and Howard Brinkman, all of whom
            had requested to be hooked up (Pl. Ex. 14, p. 51; Pl.
            Ex. 15), and that Modaff presented the request for water

main extension to the committee within the context of a larger project which was being contemplated at the time. (Pl. Ex. 14, p. 53)

Defendants' Paragraph 41: Mrs. Olech told Mr. Modaff on June 20, 1995, that the Plaintiffs might hire an outside contractor to do the job, rather than allowing the village to hire a contractor to install the water main. (Ex. B, pp. 50-51)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 41.

Defendants' Paragraph 42: Mrs. Olech received a letter from Philip Modaff dated June 21, 1995, outlining the various steps that the Olechs would have to take to extend the water main if they chose to hire their own engineer, rather than allowing the village engineer to design the project. (Ex. B, pp. 49-51; Ex. EE)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 42 but state affirmatively that the letter was addressed to the Olechs, the Zimmers, and Howard Brinkman, all of whom had requested to be hooked up, and that the letter outlined the various steps that those residents would have to take under the circumstances. (Pl. Ex. 14, pp. 64-65; Pl Ex. 16)

Defendants' Paragraph 43: Mr. Modaff received a letter on June 30, 1995, from Mrs. Olech and two of her neighbors authorizing the village to begin preliminary engineering studies to determine the cost of the water main extension project. (Ex. D, p. 65; Ex. F, p. 107; Ex. HH)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 43 but state affirmatively that Defendants' Exhibit HH is not the letter. (Pl. Ex. 14, p. 65; Pl. Ex. 17)

Defendants' Paragraph 44: After receiving the written authorization on June 30, Mr. Modaff immediately contacted the village engineer, discussed the general scope of the project and asked him to prepare a preliminary estimate of the cost of the project. (Ex. D, pp. 67-68)

RESPONSE:    The Plaintiffs agree that after receiving the written
authorization on June 30, Modaff immediately contacted
the village engineer, and that they subsequently met,
discussed the general scope of the project, and Modaff
asked him to prepare a preliminary estimate of the cost
of the project. (Pl. Ex. 14, pp. 67-68)

Defendants' Paragraph 45:  The village engineer (Mr.
Cavanaugh) provided the preliminary cost estimate to Mr. Modaff and
on July 6, 1995, Mr. Modaff sent a letter to Mrs. Olech and her
neighbors advising them of the preliminary cost estimate of
$7,012.67 per residence. (Ex. D, pp. 68, 70; Ex. FF)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 45.

Defendants' Paragraph 46:  Originally, the project was
designed with the water main to be placed on the west side of the
street, but the village engineer later recognized that the water
main would be in conflict with other utilities on the west side of
Tennessee Avenue and the decision was made to place the water main
on the east side of Tennessee Avenue. (Ex. C, p. 105; Ex. D, p.
88)

RESPONSE:    The Plaintiffs agree with Defendants' Paragraph 46 and
state affirmatively that the decision to place the water
main on the east side of Tennessee Avenue was made
before Willowbrook signed the contract with the
construction engineer on August 14, 1995 (Pl. Ex. 14,
pp. 88-89), and that the Olech property is on the west
side of Tennessee Avenue. (Pl. Ex. 6)

Defendants' Paragraph 47:  Shortly after receiving the July
6, 1995, letter, Mrs. Olech delivered to Mr. Modaff a check for her
share of the cost of the project. (Ex. B, pp. 57-58)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 47.

Defendants' Paragraph 48:  On August 9, 1995, Mr. Modaff
directed a memo to the president and the board of trustees stating
that there was a need to move quickly to award the bid to a

contractor for this project due to the "impending failure of a well operated by one of the homeowners." (Ex. E, p. 23; Ex. AA)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 48 but state affirmatively that the failure of the Olech well was not "impending" on August 9, 1995; it was "complete" on May 23, 1995. (Pl. Ex. 13, p. 26)

Defendants' Paragraph 49:  Following the Village of Willowbrook's annexation of the area which included the Olech property, the village representatives assumed that the village acquired the interest in Tennessee Avenue previously held by the Downers Grove Township. (Ex. Z, pp. 21-24)

RESPONSE:   The Plaintiffs deny Defendants' Paragraph 49 and affirmatively state that the assertion therein is based on the following nonresponsive testimony of Willowbrook's attorney, Gerald M. Gorski, which would be inadmissible in evidence at trial:  "I think this is speculative on my part, it can be tied up with the testimony of others, but I think that the staff assumed, as I assume, that they had whatever rights they needed to Tennessee Avenue." (Pl. Ex. 4, p. 22)  As noted in the response to Defendants' Paragraph 21, which response is incorporated herein by reference, in the late 1980s, Fay had reason to know that Tennessee Avenue had not been dedicated, or that there was doubt with respect to the title of the road.  As noted in the response to Defendants' Paragraph 21, Fay's testimony concerning the Borman subdivision makes it abundantly clear that Willowbrook did not "assume" anything with respect to the ownership of Tennessee Avenue.

Defendants' Paragraph 50:  At the time that Mrs. Olech advised village representatives that she wanted to obtain municipal water, the village employees assumed that the village had whatever rights they needed in Tennessee Avenue to place the water main in its right-of-way. (Ex. Z, p. 22)

RESPONSE:   The Plaintiffs deny Defendants' Paragraph 50 and state affirmatively that the assertion therein is based on the following nonresponsive testimony of Willowbrook's attorney, Gerald M. Gorski, which would be inadmissible in evidence at trial:  "I think this is speculative on my part, it can be tied up with the testimony of others, but I think that the staff assumed, as I assume, that

- 16 -

they had whatever rights they needed to Tennessee
Avenue." (Pl. Ex. 4, p. 22) As noted in the response
to Defendants' Paragraph 21, which response is
incorporated herein by reference, in the late 1980s, Fay
had reason to know that Tennessee Avenue had not been
dedicated, or that there was doubt with respect to the
title of the road. As noted in the response to
Defendants' Paragraph 21, Fay's testimony concerning the
Borman subdivision makes it abundantly clear that
Willowbrook did not "assume" anything with respect to
the ownership of Tennessee Avenue.

Defendants' Paragraph 51: On August 14, 1995, the village

board passed a resolution authorizing the village president and

clerk to execute a contract with Scorpio Construction Company for

the construction of the water main extension on Tennessee Avenue.

(Ex. D, p. 73; Ex. GG; Ex. E, p. 24)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 51.

Defendants' Paragraph 52: The EPA issued a permit for the

project on August 30, 1995. (Ex. D, p. 72)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 52.

### Plaintiff Tells Mr. Modaff That The Village Has No Easements On Tennessee Avenue

Defendants' Paragraph 53: On an occasion between July 12 and

August 1, 1995, Plaintiff advised Mr. Modaff that the village had

no easement on Tennessee Avenue and that Tennessee Avenue was

private property. (Ex. D, pp. 80-81; Ex. F, pp. 111-113)

RESPONSE: The Plaintiffs deny that it was Plaintiff who so advised
Modaff and state affirmatively that it was Phyllis
Zimmer, not in her capacity as as Independent Executor
of the Estate of Thaddeus F. Olech, Decedent, who had
the conversation with Modaff on the telephone. The
Plaintiffs further state affirmatively that Phyllis
Zimmer told Modaff that Tennessee Avenue had not been
dedicated and that there were no easements because she
knew that Willowbrook was preparing the final
engineering plan, and Willowbrook had not addressed the
fact that there were no easements. (Pl. Ex. 1, pp.
111-113)

- 17 -

**Defendants' Paragraph 54**: Prior to that conversation, no one at the village had ever told the Plaintiff that she must grant the village an easement for the project. (Ex. F, pp. 112-113)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 54.

**Defendants' Paragraph 55**: Mr. Modaff was aware that Tennessee Avenue was part of the village's road system and that the village plowed and maintained it. (Ex. D, p. 28)

RESPONSE: The Plaintiffs agree that Modaff was aware that the village plowed and maintained Tennessee Avenue, and that that was what Modaff meant when he testified that Tennessee Avenue was "part of our road system." (Pl. Ex. 14, p. 28)

**Defendants' Paragraph 56**: Mr. Fay knew that the Plaintiff's property was originally platted in DuPage County by the Downers Grove Township which required sixty-six-foot street right-of-ways. (Ex. C, p. 23; Ex. M, p. 30)

RESPONSE: The Plaintiffs deny the allegation in Defendants' Paragraph 56 and state affirmatively that Fay's testimony was not that *Plaintiffs'* property was originally platted in DuPage County by Downers Grove Township which required sixty-six foot street right-of-ways, but rather that *"most of the property"* that is in that quadrant, which includes Zimmers' property, the properties that are involved in this litigation, were platted in DuPage County under Downers Grove Township requirements." (Emphasis added.) (Pl. Ex. 11, p. 23) And the testimony of Ed Smith, cited by Willowbrook, was simply that "[m]ost of our streets are 66 foot right-of-ways." (Pl. Ex. 7, p. 30) As noted in the response to Defendants' Paragraph 21, which response is incorporated herein by reference, in the late 1980s, John Fay had reason to know that Tennessee Avenue had not been dedicated, or that there was doubt with respect to the title of the road.

**Defendants' Paragraph 57**: Downers Grove Township typically obtained sixty-six-foot right-of-ways on roads within its jurisdiction. (Ex. M, p. 30)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 57.

- 18 -

Defendants' Paragraph 58: After being told by the Plaintiffs
that the village had no right-of-way on Tennessee Avenue, Mr.
Modaff spoke with the village engineer and asked him to investigate
the status of the right-of-way on Tennessee Avenue and thereafter
the village engineer returned to Mr. Modaff with the plat of survey
that the engineer had used to layout the original design of the
water extension project. (Ex. D, pp. 27-28, 84)

RESPONSE:     The Plaintiffs agree with Defendants' Paragraph 58
              except that, as noted in the response to Defendants'
              Paragraph 53, which response is incorporated herein by
              reference, it was not the Plaintiffs who told Modaff
              that the village had no right-of-way on Tennessee
              Avenue.

Defendants' Paragraph 59: After reviewing that plat of
survey, Mr. Modaff felt that he needed further clarification "on
what was available to us to construct this water main." (Ex. D, p.
84)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 59.

Defendants' Paragraph 60: Modaff believed that the issue
regarding the village's right-of-way on Tennessee Avenue was at
best clouded and was a "quirk of old township government, something
that slipped through the cracks." (Ex. D, p. 28)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 60.

Defendants' Paragraph 61: The village code requires that
public utilities be placed within dedicated right-of-ways or
dedicated utility easements. (Ex. Y, p. 45)

RESPONSE:     The Plaintiffs deny that there is such a provision in
              the village code. The Defendants have relied for this
              assertion on the following testimony of Fay on August
              31, 2001: "I can't quote them today offhand. But there
              are several sections of the village code which indicate
              that public utilities must be within dedicated
              rights-of-way or dedicated utility easements." (Pl. Ex.
              12, p. 45) The Defendants never produced such a

- 19 -

provision of the village code that is applicable outside the context of a new subdivision. Moreover, Village Attorney Gorski testified that in his opinion Willowbrook had acquired rights in Tennessee Avenue by prescription (adverse use), and that in this case, Willowbrook could have installed its water mains without acquiring any property rights by grant from the property owners. (Pl. Ex. 4, pp. 23, 30) Thus, according to the Village Attorney, Willowbrook may place public utilities in easements obtained by prescription, rather than dedicated easements.

Defendants' Paragraph 62: Mr. Modaff knew that the Village of Willowbrook typically owned right-of-way along the roads where a municipal utility line was placed and it was unusual for the village to be requested to place a utility along a road over which the village had no right-of-way. (Ex. C, pp. 17-18, 70-71)

RESPONSE: The Plaintiffs deny the allegations of Defendants' Paragraph 62. Plaintiffs' real estate law expert, who reviewed Willowbrook's Water Map which shows the locations of Willowbrook's water mains (Pl. Ex. 18) and other public records, prepared a report. (Pl. Ex. 3, p. 7; Pl. Ex. 19) In his report, Bashaw stated:

> "[D]espite the fact that there are roadways with a comprehensive water service system to serve the adjacent properties, it appears that there is no dedication of the roadways in the general area of the Olech property and no easements granted in favor of the Village of Willowbrook relating to roadway use, utilities, or public purposes."

> (Pl. Ex. 19, p. 6)

Bashaw identified the following properties on nondedicated roadways which receive water service from Willowbrook: (1) 351 61st Street, (2) 310 59th Street, (3) 6404 Western Avenue, (4) 6306 Western Avenue, (5) 6416 Clarendon Hills Road, (6) 6502 Tennessee Avenue, (7) 6446 Tennessee Avenue, (8) 6425 Bentley Avenue, (9) 364 65th Street, (10) 368 65th Street, (11) 6526 Clarendon Hills Road, and (12) 6442 Clarendon Hills Road. (Pl. Ex. 19, pp. 6-8) Bashaw's report also stated that "[m]y further examination of title to various parcels served by the Village of Willowbrook as indicated on the Village Water Map indicates that the demand by the Village of a 33 foot wide easement as a condition of water service is not consistent with the policy of the Village of Willowbrook regarding other

property in the Village . . ."  (Pl. Ex. 19, p. 8)

<u>Defendants' Paragraph 63</u>:  Mr. Modaff had never, prior to this instance, been involved in a situation where there was no right-of-way dedication or easement on a road which the village maintained and under which the village was being asked to install a public utility.  (Ex. D, pp. 30-31)

RESPONSE:    The Plaintiffs deny the allegation of Defendants'
             Paragraph 63.  First of all, the testimony which the
             Defendants have relied on in support of this paragraph
             does not support the allegation.  Modaff's testimony was
             that he had never dealt with a situation before where
             ownership was in question.  (Pl. Ex. 14, p. 30)
             Moreover, even if Modaff had testified that he had never
             before been involved in a situation where there was no
             right-of-way dedication or easement on a road which the
             village maintained and under which the village was being
             asked to install a public utility, the jury would not
             have to believe the testimony in light of Bashaw's
             findings set forth in the response to Defendants'
             Paragraph 62, which response is incorporated herein by
             reference.

<u>Defendants' Paragraph 64</u>:  It is typical of the pattern throughout the Village of Willowbrook that utility lines are placed along streets within a dedicated right-of-way and the village would typically request a dedicated right-of-way, rather than an easement, when installing utilities along roads.  (Ex. C, pp. 44-49)

RESPONSE:    The Plaintiffs deny the allegations of Defendants'
             Paragraph 64.  Bashaw's findings set forth in the
             response to Defendants' Paragraph 62, which response is
             incorporated herein by reference, make it clear that it
             is not typical of the pattern throughout Willowbrook
             that utility lines are placed along streets within a
             dedicated right-of-way, nor would the village typically
             request a dedicated right-of-way, rather than an
             easement, when installing utilities along roads.  In
             addition, neither Fay (Pl. Ex. 11, p. 71), nor Modaff
             (Pl. Ex. 14, p. 44) were aware of any instance in the
             history of Willowbrook, other than this case, outside of
             the development of new subdivisions, where a 33-foot
             easement was required of a property owner as a condition
             of extension of a water main.

- 21 -

In addition, on November 10, 1995, Village Attorney Gorski wrote a letter to Olechs' attorney which stated that the Village had moved off of its original position and would require of the Olechs only a 15-foot easement, along with a temporary construction easement of 5 feet on each side. (Pl. Ex. 25) The letter of the Village Attorney stated that "[t]his is consistent with Village policy regarding *all other property in the Village*." (Pl. Ex. 25) The jury could conclude from Gorski's letter that a 15-foot easement is typically requested when installing utilities on *any property in the village*.

**Defendants' Paragraph 65**: The reason for seeking an easement or dedication of the roadway along which a public utility such as a water main is being placed is to allow the village to have access to the utility for maintenance purposes. (Ex. C, pp. 37, 38, 41)

**RESPONSE**: The Plaintiffs agree with the general statement set forth in Defendants' Paragraph 65.

**Defendants' Paragrapy 66**: The village conducts routine maintenance and inspections of water mains, including flushing and painting hydrants and exercising valves and these efforts require equipment which must gain access to the water main through the road. (Ex. G, pp. 68-69)

**RESPONSE**: The Plaintiffs agree with Defendants' Paragraph 66.

**Defendants' Paragraph 67**: Typically, all of the appurtenances for a water main are located within the dedicated roadway, allowing the village to bring equipment and laborers into the area to service the main without trespassing. (Ex. G, pp. 71-72)

**RESPONSE**: The Plaintiffs deny the allegation of Defendants' Paragraph 67. Many of Willowbrooks water mains are located on streets over which Willowbrook has no dedications or easements. See the response to Defendants' Paragraph 62, which response is incorporated herein by reference. In fact, according to Willowbrook's own expert witness, Gorski, a dedicated roadway is not necessary for that purpose. Gorski testified that, in his opinion, Willowbrook had acquired

rights to Tennessee Avenue by prescription (adverse use as opposed to dedication) (Pl. Ex. 4, p. 23), that the geographical location of a public highway acquired by virtue of prescription is the strip of land used for travel and drainage (Pl. Ex. 4, pp. 34-35), and that Willowbrook did not need to acquire any property rights at all by grant from the property owners involved in order to install the water main along Tennessee Avenue. (Pl. Ex. 4, p. 30) Gorski testified that if a municipality has a prescriptive easement with respect to a public highway, the municipality could put pipes in the street without first going to court to get a court order that there had been a prescriptive easement. (Pl. Ex. 4, pp. 68-69) Moreover, Fay testified that there are locations in Willowbrook where Willowbrook has installed water mains on private property which is not a roadway, and that Willowbrook "typically" requires 15 foot easements in those situations. (Pl. Ex. 11, pp. 32-33)

Defendants' Paragraph 68: A sixty-six-or sixty-foot right-of-way dedication or easement allows sufficient space for village workers to access and service village utilities. (Ex. C, pp. 41, 42, 43)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 68 but state affirmatively that a 15-foot easement also allows sufficient space for village workers to access and service village utilities. Fay testified that Willowbrook typically requires 15-foot easements where it has installed water mains on private property which is not a roadway (Pl. Ex. 11, pp. 32-33), and Oglietti testified, "[W]e will find ways of getting to our utility to repair it" in those circumstances. (Pl. Ex. 20, p. 69) Moreover, Oglietti acknowledged that Willowbrook installed the water main for the Olechs in a 15-foot easement, and that, to his knowledge, Willowbrook had not experienced any difficulty maintaining its water utility in that location. (Pl. Ex. 20, pp. 70-71)

Defendants' Paragraph 69: Plaintiff's expert, Steven Bashaw, testified that sixty-six feet is the standard size of municipal roads. (Ex. W, pp. 71-72)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 69 but state affirmatively that Willowbrook's subdivision regulations, which were not applicable to Olechs' situation, call for only a sixty-foot wide street for residential, local streets. (Pl. Ex. 11, pp. 27-28, 30-31)

<u>The Village Attorney is Consulted</u>
<u>Regarding the Tennessee Avenue Right-of-Way Issue</u>

<u>Defendants' Paragraph 70</u>:  It was during the time that he was acting upon the Olechs' request for a water main extension that Mr. Modaff first discussed the village policy regarding securing an easement or dedication with the Village Administrator, Bernie Oglietti; the Village Community Development Director, John Fay; the Village Engineer, Leo Cavanaugh; and the Village Attorney, Gerald Gorski.  (Ex. D, pp. 24-26)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
          Paragraph 70 and state affirmatively that Modaff
          testified that he did not recall how he became aware of
          the alleged village policy regarding securing an
          easement or dedication (Pl. Ex. 14, p. 24) and that he
          does not recall the first time when he discussed that
          policy with another employee of Willowbrook.  (Pl. Ex.
          14, pp. 24-25)  See also the responses to Defendants'
          Paragraphs 100 and 148, which responses are incorporated
          herein by reference.

<u>Defendants' Paragraph 71</u>:  John Fay has a Master's Degree in City and Regional Planning and has taken a number of classes toward a Master's Degree in Public Administration and has served as the Director of Community Development at the Village of Willowbrook since August of 1985.  (Ex. C, pp. 4-8)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 71.

<u>Defendants' Paragraph 72</u>:  After Mrs. Zimmer raised the issue as to whether a proper sixty-six-foot right-of-way existed for Tennessee Avenue, Mr. Modaff consulted John Fay and together they consulted the DuPage County Tax Parcel Atlas which indicated the existence of a right-of-way along Tennessee Avenue.  (Ex. C, p. 53)

RESPONSE:  The Plaintiffs deny that Phyllis Zimmer raised the issue
          as to whether a "proper sixty-six-foot right-of-way
          existed for Tennessee Avenue" and state affirmatively
          that she simply told Modaff that Tennessee Avenue had
          not been dedicated and that there were no easements.

- 24 -

(Pl. Ex. 1, pp. 111-113) Although Fay testified that he and Modaff consulted the DuPage County Tax Parcel Atlas, and that the atlas indicated a right-of-way "along that entire block of Tennessee" (Pl. Ex. 11, p. 53), the DuPage County Tax Parcel Atlases produced by the Defendants do not show a right-of-way along Tennessee Avenue in front of the Olech property, although they do indicate a right-of-way on other parts of Tennessee Avenue. (Pl. Ex. 21; Pl. Ex. 22)

Defendants' Paragraph 73: After the review of the County Tax Parcel Atlas, there was further investigation by village employees as to the validity of the right-of-way on Tennessee Avenue and they consulted Village Attorney Gerald Gorski for his advice. (Ex. C, p. 69; Ex. G, pp. 48-49; Ex. Z, p. 22)

RESPONSE: The Plaintiffs' deny that there was further investigation by Willowbrook's employees as to the rights of Willowbrook in and to Tennessee Avenue (the depositions cited by the Defendants do not support such an assertion), but the Plaintiffs agree that at some point Village Attorney Gerald Gorski was consulted for his advice.

Defendants' Paragraph 74: It was when Mrs. Olech challenged the village assumption that the right-of-way existed that the village representatives consulted Village Attorney Gorski and asked him to resolve the issue. (Ex. Z, pp. 22, 23)

RESPONSE: The Plaintiffs deny that it was Olech who advised Willowbrook that Tennessee Avenue had not been dedicated and that there were no easements and state affirmatively that it was Phyllis Zimmer. (Pl. Ex. 1, pp. 111-113) See the response to Defendants' Paragraph 53, which response is incorporated herein by reference. The Plaintiffs also deny that the village "assumed" that a right-of-way existed on Tennessee Avenue. See the response to Defendants' Paragraph 21, which response is incorporated herein by reference. The Plaintiffs also deny that village representatives consulted Village Attorney Gorski when Phyllis Zimmer advised Willowbrook that Tennessee Avenue had not been dedicated and that there were no easements. See the response to Defendants' Paragraph 100, which response is incorporated herein by reference.

Defendants' Paragraph 75: When Mr. Modaff questioned what

- 25 -

easements existed with respect to the Plaintiff's property, after
the question of the right-of-way was raised, the Village Attorney,
Mr. Gorski, and his associate began to research what right-of-way
existed for Tennessee Avenue.  (Ex. D, pp. 42-43; Ex. K, p. 39)

RESPONSE:   The Plaintiffs agree that at some point Gorski and his
            associate began to research what right-of-way existed
            for Tennessee Avenue, but state affirmatively that it
            was after Willowbrook had demanded the 33-foot
            dedication from Olechs that Gorski was consulted.  See
            the response to Defendants' Paragraph 100, which
            response is incorporated herein by reference.

      Defendants' Paragraph 76:  Mr. Gorski is an expert in the
area of municipal law and has been the attorney for the Village of
Willowbrook since 1971.  (Ex. K, pp. 6-7, 67)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 76.

      Defendants' Paragraph 77:  In the last thirty years, Mr.
Gorski has, on behalf of municipalities, dealt with issues
regarding right-of-ways [sic], easements, dedications, the sizes of
right-of-ways [sic], and how much property or right-of-way to
obtain in connection with a municipality's placement of a utility
along a road hundreds, perhaps thousands of times.  (Ex. K, p. 68)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 77
            except insofar as it includes the words "the sizes of
            rights-of-ways" because those words were not included in
            the colloquy that forms the basis of Defendants'
            Paragraph 77.

      Defendants' Paragraph 78:  As a municipal lawyer, Mr. Gorski
has dealt with issues regarding whether a municipality had a
prescriptive easement in a road.  (Ex. K, p. 68)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 78.

      Defendants' Paragraph 79:  Mr. Gorski was advised that the
village staff was concerned about where the water main would be
placed and what rights it had to the property within which the

water main would be located.  (Ex. K, p. 20)

RESPONSE:   The Plaintiffs deny the allegation in Defendants'
Paragraph 79 and state affirmatively that it was part of
an unresponsive answer by Gorski which would not be
admissible in evidence at trial.  Mr. Gorski said,
"Well, again, making reference to my last answer, there
was a dialogue initially, *I take it*, between the
village and your clients that related to the extension
of water, and, at some point, the village staff became
concerned about where the water main would be put and
what its rights were to the property within which the
water main would be located."  (Pl. Ex. 8, p. 20)
Testimony such as "I take it" indicates that the answer
is not within the personal knowledge of the witness in
violation of F.R.E. 602.

Defendants' Paragraph 80:  Mr. Gorski was the attorney for

the Village of Willowbrook at the time the village annexed the

property which included the Olech residence. (Ex. Z, p. 21)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 80.

Defendants' Paragraph 81:  At the time the village annexed

the area, Mr. Gorski understood that all the Downers Grove Township

roads that were located in that area became the responsibility of

the Village of Willowbrook.  (Ex. Z, p. 21)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 81.

Defendants' Paragraph 82:  Mr. Gorski knew that the Illinois

annexation statute provided that when a municipality annexes an

area, it must assume jurisdiction over the streets located in that

area and Mr. Gorski understood that upon annexation, roads

previously maintained by the township entered the jurisdiction of

the annexing village.  (Ex. K, pp. 69-70; Ex. R; Ex. S)

RESPONSE:   The Plaintiffs agree that section 7-1-1 of the Illinois
Municipal Code provides that, upon annexation, "The new
boundary [of the municipality] shall extend to the far
side of any adjacent highway and shall include all of
every highway within the area annexed."  (65 ILCS
5/7-1-1 (West 2000).)  The Plaintiffs also state
affirmatively that the term "highway" includes, in
relevant part, "any public way for vehicular travel

- 27 -

which has been laid out in pursuance of any law of this
State, or of the Territory of Illinois, or which has
been established by dedication, or used by the public as
a highway for 15 years [prescriptive use]. . ." (605
ILCS 5/2-202 (West 2000).) The Plaintiffs deny that,
under the statutes cited by the Defendants, a
muncipality must assume jurisdiction over private
streets upon annexation of an area, or that upon
annexation, private streets which had been previously
maintained by the township, but which had not become
public ways by prescription, enter the jurisdiction of
the annexing village. Such an assertion is not
supported by the testimony of Gorski cited by the
Defendants in support of this paragraph. Gorski stated
only that any "prescriptive right" acquired by a
township passes to the municipality. (Pl. Ex. 8, pp.
69-70)

Defendants' Paragraph 83: Mr. Gorski believed that Tennessee

Avenue was a township road which became a village road after

annexation. (Ex. K, p. 46)

RESPONSE: The Plaintiffs agree that Gorski testified that, from
the time Willowbrook annexed the area, he presumed that
Willowbrook had acquired rights in and to Tennessee
Avenue by virtue of prescriptive use by the public prior
to its annexation. (Pl. Ex. 4, pp. 20-24)

Defendants' Paragraph 84: Mr. Gorski was aware that under

Illinois law the village could obtain a prescriptive easement over

roads such as Tennessee Avenue which were maintained by the

Township prior to the annexation and by the Village of Willowbrook

after the annexation. (Ex. K, pp. 42-43; 47-48; Ex. S; Ex. T)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 84.

Defendants' Paragraph 85: Mr. Gorski's office researched the

nature of the interest that the Downers Grove Township had in

Tennessee Avenue and what jurisdiction the village acquired over it

by virtue of annexation. (Ex. Z, pp. 22-23)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 85 and
state affirmatively that Mr. Gorski's office also
researched whether Willowbrook had a legal duty to
extend water service to the properties in question.
(Pl. Ex. 8, pp. 31-32; Pl. Ex. 23, p. 1)

- 28 -

Defendants' Paragraph 86: That legal research culminated in a legal memorandum prepared by Attorney Robin Jones on September 11, 1995. (Ex. Z, p.23; Ex. II)

RESPONSE: The Plaintiffs agree that that legal research, along with the research regarding whether Willowbrook had a legal duty to extend water service to the properties in question, culminated in Jones' September 11, 1995, legal memorandum. (Pl. Ex. 23)

Defendants' Paragraph 87: It was Mr. Gorski's opinion that pursuant to Illinois law, the Village of Willowbrook had acquired rights in and to Tennessee Avenue adjacent to the Olech property by virtue of a prescriptive easement because the road had been maintained, improved and used by the public for more than fifteen years. (Ex. S; Ex. Z, pp. 23, 33)

RESPONSE: The Plaintiffs agree that Defendants' Paragraph 87 accurately states Gorski's opinion.

Defendants' Paragraph 88: This opinion was based on the fact that the Downers Grove Township possessed and maintained Tennessee Avenue, enlarged it, paved it, repaved it, plowed it, maintained the swales and culverts for more than fifteen years. (Ex. Z, pp. 23-24, 26)

RESPONSE: The Plaintiffs agree that Defendants' Paragraph 88 accurately sets forth what Gorski stated was the basis of his opinion.

Defendants' Paragraph 89: Mr. Gorski was of the opinion that when a prescriptive easement is acquired over a public highway, the governing local governmental entity has a right to install water mains within that easement. This opinion was based on Illinois case law. (Ex. Z, p. 30; Ex. II; *Lincoln-Way Community High School District 210 v. Village of Frankfort* (1977) 51 Ill.App.3d 602; *Chicago Title and Trust Company v. Village of Burr Ridge*,

(2nd Dist. 1976) 41 Ill.App.3d 112; *Elmhurst National Bank v. City of Chicago*, (1959) 21 Ill.App.2d 180)

RESPONSE:   The Plaintiffs agree that Defendants' Paragraph 89
            accurately states Gorski's opinion and the bases
            therefor.

   Defendants' Paragraph 90:  The shoulders and swales of a road
are included in the jurisdiction of the road over which the public
acquires a prescriptive easement.  (Ex. K, p. 43; Ex. S; Ex. T)

RESPONSE:   The Plaintiffs agree that Defendants' Paragraph 90
            accurately states Gorski's opinion.

   Defendants' Paragraph 91:  Plaintiff's expert, Steven Bashaw,
believes that the law regarding whether a municipality can place a
water main within a roadway prescriptive easement was not clearly
established in 1995 and is not clearly established at the present
time.  (Ex. W, p. 44)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 91 but
            state affirmatively that the issue of a prescriptive
            easement in this case was beyond the scope of what
            Bashaw was requested to do.  (Pl. Ex. 3, p. 55)

   Defendants' Paragraph 92:  Plaintiff's expert, Steven Bashaw,
has not reached an opinion regarding whether the Village of
Willowbrook acquired a prescriptive easement on Tennessee Avenue.
(Ex. W, pp. 80-81)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 92.

   Defendants' Paragraph 93:  Although Mr. Gorski believed in
1995 that the Village of Willowbrook had acquired a prescriptive
easement over Tennessee Avenue, he did not recommend that the
village install the water main within that easement because he knew
that the Plaintiff had challenged the village's claim of right to
Tennessee Avenue.  (Ex. Z, pp. 30-32)

RESPONSE:   The Plaintiffs agree that Mr. Gorski believed in 1995

- 30 -

that the Village of Willowbrook had acquired a
prescriptive easement over Tennessee Avenue.  The
Plaintiffs deny the remaining portion of Defendants'
Paragraph 93 on the basis that it is not supported by
the cited pages of Gorski's deposition.  Gorski
testified unequivocally that "the Village didn't need to
acquire any property rights at all by grant from the
property owners involved in order to install the water
main along Tennessee Avenue."  (Pl. Ex. 4, p. 30)
Gorski testified that Willowbrook had demanded that the
property owners dedicate Tennessee Avenue "before I
[Gorski] was even involved in it" (Pl. Ex. 4, p. 32),
and that after Gorski became involved, "[w]e came down
to this 15-foot easement" when Olech's attorney
threatened suit.  (Pl. Ex. 4, p. 32)  Gorski also
testified that he had no idea whether Willowbrook ever
offered to install the water main in its prescriptive
easement without obtaining any grant from the property
owners.  (Pl. Ex. 4, pp. 66-67)  In fact, Willowbrook
never made such an offer.  (Pl. Ex. 24)

Defendants' Paragraph 94:  It was Mr. Gorski's judgment in

1995 that if the village had installed the water main without

establishing the prescriptive easement in court and without asking

for a dedication, the village would have been sued by Mrs. Olech.

When someone challenges a municipality's right to a prescriptive

easement, the municipality must go to court to establish it.  (Ex.

Z, pp. 62, 70)

RESPONSE:  The Plaintiffs deny the allegations in Defendants'
Paragraph 94.  Gorski testified that he had no idea
whether Olech would have agreed to the installation of
the water main in Willowbrook's prescriptive easement
without any grant from the property owners, and he had
no idea if Willowbrook ever offered to do that.  (Pl.
Ex. 4, pp. 66-67)  In fact, Willowbrook never made such
an offer.  (Pl. Ex. 24)  Gorski also testified that if a
municipality has a prescriptive easement with respect to
a public highway, the municipality can use that highway
without going to court (Pl. Ex. 4, pp. 68-69), and that
in the case of Phyllis Zimmer's property, Willowbrook,
without having gone to court, is maintaining the
drainage ditches on Tennessee Avenue adjacent to her
property and over her objection based on what
Willowbrook believes to be its prescriptive easement.
(Pl. Ex. 4, pp. 74-77)

Defendants' Paragraph 95:  It was Mr. Gorski's judgment that

if the village attempted to install a water main within what he believed to be the village's prescriptive easement, the Plaintiff would have sued the village. (Ex. Z, p. 32)

RESPONSE:   The Plaintiffs deny the allegations in Defendants' Paragraph 95. See the response to Defendants' Paragraph 94, which response is incorporated herein by reference.

Defendants' Paragraph 96: Plaintiff's expert, Steven Bashaw's area of expertise is real estate law. (Ex. W, p. 5)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 96.

Defendants' Paragraph 97: According to Mr. Bashaw, to formally establish a prescriptive easement it would be necessary to file a lawsuit which generally costs $25,000 and takes a year just to complete the discovery. (Ex. W, pp. 38-39)

RESPONSE:   The Plaintiffs agree that Bashaw testified that, to establish a prescriptive easement "as a matter of law," it would be necessary to do so. (Pl. Ex. 3, pp. 38-39)

Defendants' Paragraph 98: Mr. Gorski preferred to reach a settlement agreement with the Plaintiffs to resolve the easement impasse so as to avoid litigation that would result in a longer delay in the water extension project. (Ex. Z, pp. 32-33)

RESPONSE:   The Plaintiffs agree that Gorski preferred to "resolve the easement impasse" between Willowbrook, which had demanded 33 feet, and the property owners, who did not want to give 33 feet, by agreeing to a 15-foot easement. (Pl. Ex. 4, p. 32) The Plaintiffs deny that Gorski's purpose was to avoid litigation that would result in a longer delay in the water project because Gorski stated that "the Village didn't need to acquire any property rights at all by grant from the property owners involved in order to install the water main along Tennessee Avenue" (Pl. Ex. 4, p. 30), that if a municipality has a prescriptive easement with respect to a public highway, the municipality can use that highway without going to court (Pl. Ex. 4, p. 68), and that he had no idea whether Olech would have agreed to the installation of the water main in Willowbrook's prescriptive easement without any grant from the property owners, and he had no idea if Willowbrook ever offered to do that. (Pl. Ex. 4, pp. 66-67)

- 32 -

Defendants' Paragraph 99: Mr. Gorski believed that when the Village of Willowbrook would install a utility in an area that it knew predated its jurisdiction or subdivision powers, it would seek to rectify the situation by asking the resident for a dedication. (Ex. K, p. 51)

RESPONSE: The Plaintiffs deny the allegations of Defendants' Paragraph 99 on the basis that Gorski's testimony, cited by the Defendants in support of this paragraph, was a nonresponsive answer which would not be admissible in evidence based on its speculative nature. Gorski testified, "*If there's a policy*, it comes from that in the sense that, when they're dealing with something that predates their jurisdiction or subdivision powers, they would seek to rectify it by asking for a dedication, *I would suspect*." (Emphasis added.) (Pl. Ex. 8, p. 51.) Such testimony is inadmissible under F.R.E. 602. Moreover, Gorski sent the Olechs' attorney a letter on November 10, 1995, stating that a 15-foot easement was "consistent with Village policy regarding all other property in the Village." (Pl. Ex. 8, p. 18; Pl. Ex. 25) The jury could choose to believe that statement in the Village Attorney's letter, which would indicate that Willowbrook does not ask for a dedication under the stated circumstances but asks for a 15-foot easement. See also the response to Defendants' Paragraph 62, which response is incorporated herein by reference.

Defendants' Paragraph 100: After Mr. Modaff and Attorney Gorski discussed the questionable rights the village had on Tennessee Avenue, Mr. Gorski instructed Mr. Modaff to propose a thirty-three-foot plat of dedication to each property owner on each side of the center line of the street to remedy this technical defect. (Ex. D, pp. 90-92; Ex. G, pp. 87-88)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 100. Although the allegation is supported by testimony of Modaff, Gorski's testimony was that the demand for the 66-foot dedication came before he was involved. Gorski testified as follows:

"Rather than argue about that, I think what the Village staff did--in fact, the Village staff did this before I was even involved in it I believe. They asked,

okay, fine, let's clear it up, dedicate
it, which your clients then declined to
do. So, I mean, at the point where I
become involved in this, the conclusion
is being challenged. And this issue is
raised, as I understand it, by your
clients. I was asked to step in and
answer that issue, resolve the issue
raised by your clients.

So--and I think we came up to this
point of necessity. You [John R.
Wimmer] sent a letter to me that
threatened suit. We came down to this
15-foot easement."

(Pl. Ex. 4, p. 32)

The memorandum prepared on September 11, 1995, by
Gorski's associate, Robin N. Jones, corroborates
Gorski's testimony in this regard in that it states that
Willowbrook had already requested dedication and the
property owners had refused. (Pl. Ex. 23, p. 1)

Defendants' Paragraph 101: Village representatives were

concerned that if they did not obtain a dedication of Tennessee

Avenue, they would be placing a utility in an area where the

village had no property rights. (Ex. D, p. 29)

RESPONSE: The Plaintiffs deny the allegation of Defendants'
Paragraph 101. Although the allegation is supported by
testimony from Modaff, the jury need not believe
Modaff's testimony in that regard in light of (1)
Village Attorney Gerald M. Gorski's letter of November
10, 1995, to Olech's attorney which stated that a
15-foot easement, as opposed to a dedication of
Tennessee Avenue, along with a temporary construction
easement of 5 feet on each side "is consistent with
Village policy regarding *all other property* in the
Village" (emphasis added) (Pl. Ex. 25), (2) Fay's
testimony that there are locations in the village where
Willowbrook has installed a water main on private
property which is not a roadway, and that in those cases
Willowbrook typically requires a 15-foot easement (Pl.
Ex. 11, pp. 32-33), (3) Bashaw's report, which found 12
parcels of property, other than the Olech property,
where Willowbrook had run its water main along a street
in which Willowbrook had no dedicated rights of record
(Pl. Ex. 19), and (4) Gorski's testimony that "the
Village didn't need to acquire any property rights at
all by grant from the property owners involved in order
to install the water main along Tennessee Avenue"

- 34 -

because Willowbrook had acquired the right to use
Tennessee Avenue by prescription. (Pl. Ex. 4, p. 30)
In light of this evidence, the jury would not have to
believe Modaff's testimony that he thought that
Willowbrook had to obtain a dedication to avoid
trespassing.

Defendants' Paragraph 102: Mr. Modaff was aware at that time

that almost every street in the village had a thirty-three-foot

right of way on either side of the center line and that in most

communities where he had worked, thirty-three feet was a standard

measurement of the right-of-way from the center of residential

streets. (Ex. D, p. 32)

RESPONSE: The Plaintiffs agree that in most of the communities
where Modaff had worked, thirty-three feet was a
standard measurement of the right-of-way from the center
of residential streets. The Plaintiffs deny that at
that time almost every street in Willowbrook had a
thirty-three foot right-of-way on either side of the
center line and state that Willowbrook's subdivision
regulations, which were inapplicable to Olechs' case,
called for a 60-foot right-of-way, rather than a 66-foot
right-of-way. (Pl. Ex. 11, pp. 28-31) In addition,
Bashaw's report showed that many streets in Willowbrook
had no right-of-way. (Pl. Ex. 19)

Defendants' Paragraph 103: It was Mr. Modaff's understanding

that the village needed to obtain ownership of the road before

installing a water main along it and that this should be

accomplished through a sixty-six-foot-wide dedication, the same

width as most other streets in the village. (Ex. D, pp. 87, 89,

90)

RESPONSE: The Plaintiffs deny the allegations of Defendants'
Paragraph 103 which are really just a combination of the
allegations of Defendants' Paragraphs 101 and 102. As
to the reasons for the denial, see the responses to
Defendants' Paragraphs 101 and 102, which responses are
incorporated herein by reference.

Defendants' Paragraph 104: Mr. Modaff learned from Mr. Fay

that in September of 1995 the village was asking the owner of the

Arabian Knights Horse Farm on Tennessee Avenue for a

thirty-three-foot dedication along Tennessee Avenue as a condition

of allowing the sanitary sewer extension to his property. (Ex. D

p. 31)

RESPONSE: The Plaintiffs deny the allegations of Defendants'
Paragraph 104 because the evidence indicates that,
although in September of 1995, Willowbrook *requested*
the owner of the Arabian Knights Horse Farm ("Horse
Farm") on Tennessee Avenue for a thirty-three foot
dedication along Tennessee Avenue, Willowbrook never
made that dedication a condition of any permit. Fay,
who was the Willowbrook employee involved, gave
thoroughly contradictory and unbelievable testimony on
this issue. First, he testified that the dedication of
Tennessee Avenue was made a condition of the permit of a
sanitary sewer extention needed by the Horse Farm. (Pl.
Ex. 11, p. 76) Fay identified a memorandum he wrote on
October 17, 1995, to the President and Board of Trustees
in which he stated that the dedication was "made a
condition of the sanitary sewer extension permit." (Pl.
Ex. 11, p. 76; Pl. Ex. 26) Fay testified that,
typically a permit condition is noted and dealt with
prior to or at the time of issuance of the permit, and
that his recollection was that in the case of the Horse
Farm the condition was not imposed after issuance of the
permit. (Pl. Ex. 11, p. 97-98) Fay testified that, if
the dedication was made a condition of the issuance of a
permit, that would have been communicated to the owner
in writing. (Pl. Ex. 11, p. 81) Fay testified that
Willowbrook issued the sanitary sewer extension permit
(Pl. Ex. 11, p. 84), and that "[t]here should be a
permit log from 1995 that would list it." (Pl. Ex. 11,
p. 96)

After Fay's first deposition, the deposition of
Michael Vena, the owner of the Horse Farm was taken.
Vena testified that he did not receive a permit for the
extension of the sanitary sewer from Willowbrook, but
that that permit "comes from DuPage County and the
Sanitary District." (Pl. Ex. 27, p. 18) Vena stated
that he did not think Willowbrook ever stated to him in
writing that the dedication of Tennessee Avenue was a
condition of a permit. (Pl. Ex. 27, pp. 20-21)

On June 28, 2001, the Plaintiffs sent the Defendants
Plaintiffs' Second Request To Defendants For Production
Of Documents, seeking the sanitary sewer extension
permit, the permit log from 1995, and other documents
indicating that the dedication of Tennessee Avenue was a
condition of any permit issued to the Horse Farm. (Pl.
Ex. 28) The Defendants responded to that request, and

Fay was deposed a second time.

At his second deposition, Fay testified that there was no permit issued by Willowbrook for the sanitary sewer extension for the Horse Farm. (Pl. Ex. 12, p. 7) Fay testified that the sanitary sewer extension was installed before the owner of the Horse Farm signed any plat of dedication of Tennessee Avenue. (Pl. Ex. 12, pp. 68-69) Fay now stated that the dedication of Tennessee Avenue was made a condition of the issuance of the occupancy permit for certain toilet facilities erected on the Horse Farm. (Pl. Ex. 12, pp. 6-7) Fay testified that there was nothing on the occupancy permit itself which indicated that dedication of Tennessee Avenue was a condition thereof. (Pl. Ex. 12, p. 18) Fay testified that the application for the occupancy permit was made probably in late February or early March of 1996. (Pl. Ex. 12, p. 17) Fay testified that the owner of the Horse Farm had already executed the plat of dedication of Tennessee Avenue before he even applied for the occupancy permit. (Pl. Ex. 12, pp. 35-38) Fay testified that there was no written communication to the owner of the Horse Farm which indicated that dedication of Tennessee Avenue was a condition of any permit. (Pl. Ex. 12, pp. 25-26) Fay identified a permit for the erection of the toilet facilities at the Horse Farm. (Pl. Ex. 12, p. 10) Fay said that that was the only permit issued to the Horse Farm in 1995. (Pl. Ex. 12, pp. 10-11) Fay said that that permit was issued June 5, 1995. (Pl. Ex. 12, p. 11) Fay testified twice that the dedication of Tennessee Avenue was not a condition of that building permit. (Pl. Ex. 12, pp. 17-18, 44)

Based on Fay's contradictory testimony, the jury could well conclude that he was lying when he testified that dedication of Tennessee Avenue was made a condition of any permit issued to the Horse Farm. The jury could conclude that, in fact, what happened was that when Fay saw the memorandum of Robin N. Jones dated September 11, 1995 (Pl. Ex. 11, pp. 92-93), which warned about discriminating against the property owners in connection with the provision of water (Pl. Ex. 23, p. 6), he realized that he had allowed the Horse Farm to construct a sewer in Tennessee Avenue without requiring it to give Willowbrook any rights in Tennessee Avenue while Willowbrook was demanding rights from property owners on both sides of the street in connection with the Olech water main extension. The jury could conclude that Fay then went to the owner of the Horse Farm and requested a dedication to cover his malfeasance, and that Fay was lucky enough that the owner of the Horse Farm consented to dedicate the roadway.

<u>Defendants' Paragraph 105</u>: Bernard Oglietti obtained his

Master's Degree in Public Administration in 1977 from Northern
Illinois University, has served as the village administrator for
the Village of Willowbrook since 1977 and in this capacity oversees
the day-to day operation of all the operating departments and all
of the activities of the Village of Willowbrook.  (Ex. G, pp. 7-10)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 105.

Defendants' Paragraph 106:  Mr. Oglietti believed that the
Willowbrook village policy of requiring a thirty-three-foot
easement from property owners who request connection to the village
utilities along roadways over which the village maintains no rights
or interests derives from three sources.  The first is the
village's Subdivision Regulations which govern the platting and
subdividing of properties and the dedication of streets and roads.
The second is the village code and ordinances that regulate the
construction, extension and operation of the water utility through
water mains.  The third is an engineering document entitled,
"Standard Specifications" which provides guidance for developers in
the subdivision of lands and the setting aside of streets and
right-of-ways in the construction of utilities within those streets
and right-of-ways.  (Ex. G, pp. 17, 26, 32; Ex. N; Ex. P; Ex. Q)

RESPONSE:  The Plaintiffs agree that Oglietti generally testified
as set forth in Defendants' Paragraph 106, but the
Plaintiffs state affirmatively that the jury would not
have to believe that Willowbrook has a policy of
generally requiring a thirty-three-foot easement from
property owners who request connection to village
utilities along roadways over which the village
maintains no rights or interests.  Oglietti, himself,
testified that the policy is not explicitly stated in
any of those sources. (Pl. Ex. 20, pp. 35-36)  But more
to the point, there is substantial evidence that no such
general policy exists, including, but not limited to,
(1) Village Attorney Gerald M. Gorski's letter of
November 10, 1995, to Olech's attorney which stated that
a 15-foot easement, as opposed to a 33-foot easement,

along with a temporary construction easement of 5 feet
on each side "is consistent with Village policy
regarding all other property in the Village" (Pl. Ex.
25), (2) Bashaw's report which stated that "despite the
fact that there are roadways with a comprehensive water
system to serve the adjacent properties, it appears that
there is no dedication of the roadways in the general
area of the Olech property and no easements granted in
favor of the Village of Willowbrook relating to roadway
use, utilities, or public purposes" (Pl. Ex. 19, p. 6),
and which identified 12 parcels of property, other than
the Olechs, where Willowbrook had run its water main
along a street in which Willowbrook had no dedicated
rights of record (Pl. Ex. 19, pp. 6-8), and (3) Gorski's
testimony that "the Village didn't need to acquire any
property rights at all by grant from the property owners
involved in order to install the water main along
Tennessee Avenue" because Willowbrook had acquired the
right to use Tennessee Avenue by prescription. (Pl. Ex.
4, p. 30)

Defendants' Paragraph 107: Section 10-4-1(B)6 of the

village's "Design Layout Standards" set forth in the Subdivision

Regulations requires a right-of-way width of sixty feet for all

residential local streets, however, the area involved in this

litigation was originally platted under DuPage County and Downers

Grove Township standards which required a sixty-six-foot wide

right-of-way for local streets. (Ex. C, pp. 26, 28; Ex. N)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 107 but
state affirmatively that Willowbrooks' Subdivision
Regulations did not apply in this case because the
property owners were not subdividing their property.
(Pl. Ex. 11, pp. 30-31)

Defendants' Paragraph 108: Although the Subdivision

Regulations do not specifically apply to an instance where a

utility is being placed along a road over which the village has no

rights or interests, the regulations are an element that would be

referred to in addressing such a situation. (Ex. G, pp. 28-30)

RESPONSE: The Plaintiffs agree that Oglietti so testified but
state affirmatively that the jury need not believe his
testimony that regulations that do not apply to this
case should be referred to in addressing this case. For

further support of this denial, see the response to
Defendants' Paragraph 106, which response is
incorporated herein by reference.

Defendants' Paragraph 109:  Section 6-8-2(d)(6) of the

village's Water Utility Ordinance recognizes that water mains are

to be situated in public right-of-ways.  (Ex. G, pp. 32-34; Ex. P)

RESPONSE:  The Plaintiffs deny the allegation in Defendants'
Paragraph 109.  Section 6-8-2(d)(6) states simply,
"Restoration of all rights of way shall be completed
within fifteen (15) days after the licensed plumber
begins work under any permit."  (Pl. Ex. 29)  This
section requires restoration of all rights-of-way if the
water main is installed in a right-of-way; it does not
require all water mains to be installed in
rights-of-way.  In fact, it is undisputed that there are
locations in Willowbrook where Willowbrook has installed
water mains on private property in 15-foot easements as
opposed to rights-of-way.  (Pl. Ex. 11, pp. 32-33)

Defendants' Paragraph 110:  The village's decision to require

a thirty-three-foot easement or dedication from the property owner

in connection with the extension of a village utility along a

street over which the village maintained no rights or interests was

an outgrowth of the village subdivision regulations which require

all roads and streets to be within a dedicated right-of-way.  (Ex.

C, pp. 16, 17, 19; Ex. N)

RESPONSE:  The Plaintiffs deny that the village made a decision to
require a thirty-three-foot easement or dedication from
any property owner in connection with the extension of a
village utility along a street over which the village
maintained no rights or interests.  See response to
Defendants' Paragraph 106, which response is
incorporated herein by reference.  The Plaintiffs also
state affirmatively that the Subdivision Regulations are
not applicable to this case because the property owners
in this case were not subdividing their property.  (Pl.
Ex. 11, pp. 30-31)

Defendants' Paragraph 111:  When the Village of Willowbrook

approves a subdivision, it demands that the property owners

dedicate a right-of-way in which to locate all utilities.  (Ex. K,

p. 27)

RESPONSE:    The Plaintiffs' agree with Defendants' Paragraph 111 but
             state affirmatively that the property owners in this
             case were not subdividing their property. (Pl. Ex. 11,
             pp. 30-31)

        Defendants' Paragraph 112:  The village has a written policy

of seeking publically dedicated right-of-ways in conjunction with

the development of subdivisions. (Ex. K, p. 51; Ex. N)

RESPONSE:    The Plaintiffs' agree with Defendants' Paragraph 112 but
             state affirmatively that the property owners in this
             case were not subdividing their property. (Pl. Ex. 11,
             pp. 30-31)

        Defendants' Paragraph 113:  In situations where the village

would learn that a right-of-way for a road had not been properly

dedicated, its normal course of action would be to seek that

dedication in conjunction with either a subdivision or development

or a permit request for a utility connection. (Ex. C, p. 24)

RESPONSE:    The Plaintiffs agree that Willowbrook's normal course of
             action under the stated circumstances in connection with
             a subdivision request would be to seek dedication
             because that is what is required by the Subdivision
             Regulations.  The Plaintiffs deny that Willowbrook's
             normal course of action in connection with a request for
             a utility connection is to seek a dedication.  See the
             response to Defendants' Paragraph 106, which response is
             incorporated herein by reference.

        Defendants' Paragraph 114:  The village decision to seek a

dedication or easement in connection with the installation of a

utility was also an outgrowth of the transportation section of the

village's Comprehensive Plan and Chapter 4 of the Willowbrook

Subdivision Regulations entitled, "Design Layout Standards." (Ex.

C, p. 26; Ex. N)

RESPONSE:    The Plaintiffs deny that the village reached a decision
             to generally seek a dedication or easement in connection
             with the installation of a utility.  See the response to
             Defendants' Paragraph 106, which response is
             incorporated herein by reference.  The Plaintiffs also

deny the allegation in this paragraph for the reason
that Fay, upon whose testimony the Defendants have
relied for this paragraph, was asked what the
transportation section of the village's Comprehensive
Plan says that leads to this supposed policy of
requiring a 33-foot easement, and all he could say was
that the document notes the streets in the neighborhood
of the Olech property as "residential, local streets."
(Pl. Ex. 11, pp. 27-28)  Such verbiage does not create
the policy claimed.  As noted above, the Subdivision
Regulations are not applicable to this case.  (Pl. Ex.
11, pp. 30-31)

### Request for Dedication from Arabian Knights Horse Farm

**Defendants' Paragraph 115:**  Mr. Fay was involved in the

discussions at staff meetings about the decision to request a

dedication or easement from the Zimmers and Olechs in connection

with the extension of the water main.  (Ex. C, pp. 99-100)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 115.

**Defendants' Paragraph 116:**  At the time of the discussions

regarding the size of the easement or dedication that would be

requested from the Plaintiffs, Mr. Fay was dealing with a similar

issue on Tennessee Avenue at the property of the Arabian Knights

Horse Farm.  (Ex. D, pp. 29-30)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 116.  The matter of the Horse Farm was covered
extensively in the response to Defendants' Paragraph
104, and the response to that paragraph is incorporated
herein by reference.

**Defendants' Paragraph 117:**  For twenty years, Michael Vena

has been owner of the Arabian Knights Horse Farm, a horse-riding

facility open to the public.  (Ex. H, pp. 5-6)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 117.

**Defendants' Paragraph 118:**  The Arabian Knights Horse Farm is

located at 6526 Clarendon Hills Road, its western boundary is

Tennessee Avenue and patrons can utilize an entrance located on

Tennessee Avenue.  (Ex. B, pp. 19-21; Ex. H, p. 5)

RESPONSE:  The Plaintiffs agree that the Arabian Knights Horse Farm
is located at 6526 Clarendon Hills Road, and that its
western boundary is Tennessee Avenue.  The Plaintiffs
deny that patrons can utilize an entrance on Tennessee
Avenue and state affirmatively that the testimony cited
by the Defendants in support of this paragraph does not
support such an assertion.  The Defendants cited Olech's
testimony that she had seen vehicles traveling on
Tennessee Avenue on their way to the Arabian Knights
Horse Farm.  (Pl. Ex. 13, p. 21)  She did not say that
she saw patrons doing so.

Defendants' Paragraph 119:  In 1995, Arabian Knights Horse
Farm was expanding its facility to add restrooms.  (Ex. H, p. 6)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 119.

Defendants' Paragraph 120:  Mr. Vena made a request in 1995
to have the horse farm connected to the sanitary sewer system and
also to install restrooms and construct a restaurant on the
property.  (Ex. C, p. 71)

RESPONSE:  The Plaintiffs note that the testimony cited by the
Defendants in support of this Defendants' Paragraph 120
does not support it.  The Plaintiffs agree that Vena
made a request in 1995 to extend the sanitary sewer
system but state affirmatively that that request was not
made to the Village of Willowbrook.  Vena testified that
he did not receive a permit for the extension of the
sanitary sewer from Willowbrook, but that that permit
"comes from DuPage County and the Sanitary District."
(Pl. Ex. 27, p. 18)  See also the response to
Defendants' Paragraph 104, which response is
incorporated herein by reference.  The Plaintiffs agree
that Vena made a request in 1995 to install restrooms.
The Plaintiffs deny that Vena made a request in 1995 to
install a restaurant.

Defendants' Paragraph 121:  Mr. Vena needed to connect to the
public sanitary sewer system to construct restrooms on his
property.  (Ex. H, p. 6; Ex. Y, p. 85)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 121 but
state affirmatively that the public sanitary sewer
system was not Willowbrook's but was under the
jurisdiction of the DuPage County Department of Public
Works.  (Pl. Ex. 12, p. 86)

Defendants' Paragraph 122:  Mr. Fay believed that it was necessary for Arabian Knights Horse Farm to obtain a permit from the Village of Willowbrook to operate the restroom facilities and Mr. Fay discussed this matter with Mr. Vena.  (Ex. H, pp. 6, 17; Ex. Y, p. 67)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 122.

Defendants' Paragraph 123:  During the summer of 1995, the village became aware that there was some question about the validity of the right-of-way on Tennessee Avenue and, therefore, believing that the village would have to issue a permit for the Arabian Knights Horse Farm's proposed installation of restroom facilities, Mr. Fay consulted the village attorney who told him that the village should obtain from the Arabian Knights Horse Farm a dedication of a thirty-three-foot right-of-way of that portion of the property along the entire frontage of Tennessee Avenue.  Mr. Fay then made the village's issuance of a permit that he believed Mr. Vena would need conditional upon Mr. Vena's agreement to dedicate thirty-three feet of his property along Tennessee Avenue to the village.  (Ex. C, pp. 87-88; Ex. Y, pp. 17-18, 42-43, 45)

RESPONSE:  The Defendants deny the allegations of Defendants' Paragraph 123.  There is evidence that Fay knew in the late 1980s that Tennessee Avenue was not dedicated or that there was doubt with respect to the title of the road.  See the response to Defendants' Paragraph 21, which response in incorporated herein by reference.  In addition, Defendants have relied on testimony from Fay to support this paragraph.  Fay's testimony concerning the Arabian Knights Horse Farm was contradictory and thoroughly discredited, and need not be believed by the jury.  See the response to Defendants' Paragraph 104, which response is incorporated herein by reference.

Defendants' Paragraph 124:  Mr. Fay's conversations with Mr. Vena regarding the dedication of right-of-way occurred after Mr.

Modaff told Mr. Fay that the Plaintiff advised him that the village did not have any rights with respect to Tennessee Avenue. (Ex. Y, pp. 89-90)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 124.

Defendants' Paragraph 125: Prior to September 19, 1995, Mr. Fay advised Mr. Vena that to assure that the Arabian Knights Horse Farm's sanitary sewer extension project would comply with village code, it would be necessary for the Arabian Knights Horse Farm to dedicate the right-of-way along Tennessee Avenue to the Village of Willowbrook. Mr. Fay requested this thirty-three-foot dedication as a condition of the village's cooperation with the sanitary sewer extension project because Mr. Fay and village representatives had just learned that the right-of-way that they had assumed existed on Tennessee Avenue may not be valid. (Ex. Y, pp. 81-82)

RESPONSE: The Defendants deny the allegations of Defendants' Paragraph 125. Defendants have relied on testimony from Fay to support this paragraph. Fay's testimony concerning the Arabian Knights Horse Farm was contradictory and thoroughly discredited. See the response to Defendants' Paragraph 104, which response is incorporated herein by reference. In addition, there is evidence that Fay knew in the late 1980s that Tennessee Avenue was not dedicated or that there was doubt with respect to the title of the road. See the response to Defendants' Paragraph 21, which response is incorporated herein by reference.

Defendants' Paragraph 126: The reason that Mr. Fay asked Mr. Vena for a dedication of the east thirty-three feet of his property was because there had been some doubt cast upon the validity of the right-of-way on Tennessee Avenue in that area. (Ex. C, pp. 82-83)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 126 and state affirmatively that the reason why Fay asked Vena for a dedication was that Fay saw the memorandum of Robin N. Jones dated September 11, 1995, which warned about discriminating against property owners in connection with the provision of water (Pl.

Ex. 11, pp. 92-93; Pl. Ex. 23, p. 6), and realized that he had allowed the Horse Farm to construct a sewer in Tennessee Avenue without requiring it to give Willowbrook any right in Tennessee Avenue while Willowbrook was demanding rights from the property owners on both sides of the street in connection with the Olech water main extension. The jury could conclude that Fay then went to the owner of the Horse Farm and requested a dedication to cover his malfeasance, and that Fay was lucky enough that the owner of the Horse Farm consented to dedicate the roadway. For evidentiary support of this denial, see the response to Defendants' Paragraph 104, which response is incorporated herein by reference.

Defendants' Paragraph 127: Mr. Fay confirmed in writing his request that Mr. Vena dedicate the thirty-three-feet of property. (Ex. Y, p. 83; Ex. JJ)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 127 but state affirmatively that dedication was never made a condition of the issuance of any permit. See the response to Defendants' Paragraph 104, which response is incorporated herein by reference.

Defendants' Paragraph 128: Mr. Vena acknowledged the village's request for a thirty-three-foot dedication of his property adjacent to Tennessee Avenue in a letter that he sent to the village. (Ex. H, p. 9; Ex. JJ)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 128 except that they deny that Vena sent the letter to the village and state that Fay prepared the letter for Vena to sign. Vena stated that he could not remember whether he prepared the letter or "they did it for me," but he did not know what the abbreviation "AICP", used in the letter, meant. (Pl. Ex. 27, pp. 15-16) Fay testified that it was possible that he drafted the letter. (Pl. Ex. 11, p. 85)

Defendants' Paragraph 129: Mr. Fay considered the memorandum that he directed to the Board of Trustees regarding the Arabian Knights dedication and Mr. Vena's letter to the village to be written communications regarding the fact that the issuance of the permit was conditioned upon Mr. Vena's dedication of the

thirty-three feet.  (Ex. Y, pp. 30-31)

RESPONSE    The Defendants deny the allegations of Defendants'
            Paragraph 129.  John Fay's testimony concerning the
            Arabian Knights Horse Farm was contradictory and
            thoroughly discredited, and need not be believed by
            the jury.  See the response to Defendants' Paragraph 104,
            which response is incorporated herein by reference.  In
            addition, the letter signed by Vena does not indicate
            that the dedication was a condition of any permit.  (Df.
            Ex. JJ)

        Defendants' Paragraph 130:  Mr. Fay explained to Mr. Vena

that the Village wanted the dedication of Tennessee Avenue along

the frontage of Arabian Knights Horse Farm as a condition of

issuing a permit to Arabian Knights Horse Farm.  (Ex. H, pp. 9, 13,

19, 21, 37)

RESPONSE:   The Plaintiffs deny the allegation of Defendants'
            Paragraph 130 and state affirmatively that, based on the
            response to Defendants' Paragraph 104, which response is
            incorporated herein by reference, the jury could
            conclude that, although Willowbrook requested a
            dedication of Tennessee Avenue of Vena, the dedication
            was not made a condition of the issuance of any permit.
            The testimony of Vena on this point was also
            contradictory.  Vena first stated that dedication was a
            condition of Willowbrook's permit for the extension of
            the sanitary sewer to his property.  (Pl. Ex. 27, p. 9)
            Then Vena testified that he did not receive a permit for
            the extension of sanitary sewer from Willowbrook, but
            that "[i]t comes from DuPage County and the Sanitary
            District."  (Pl. Ex. 27, p. 18)  Then Vena said that it
            was a condition of the permit to "put in" public
            washrooms.  (Pl. Ex. 27, p. 19)  Fay testified twice
            that the dedication of Tennessee Avenue was not a
            condition of the building permit.  (Pl. Ex. 12, pp.
            17-18, 44)  See also the response to Defendants'
            Paragraph 104, which response is incorporated herein by
            reference.

        Defendants' Paragraph 131:  Mr. Vena understood that it was a

condition of securing a village permit to install and operate

public washrooms at the Arabian Knights Horse Farm that Mr. Vena

dedicate to the village the thirty-three feet of Tennessee Avenue

adjacent to the Arabian Knights Horse Farm.  (Ex. H, pp. 19, 20, 37)

- 47 -

RESPONSE:   The Plaintiffs deny the allegation of Defendants'
            Paragraph 131 for the reasons set forth in the responses
            to Defendants' Paragraph 104 and 130, which responses
            are incorporated herein by reference.

Defendants' Paragraph 132:  On September 19, 1995, Mr. Vena

sent a letter to Mr. Fay, acknowledging the Village of

Willowbrook's request for the dedication of Tennessee Avenue and

agreeing "to dedicate the east thirty-three feet (33') of Tennessee

Avenue adjacent to the entire frontage of my property located at

6526 Clarendon Hills Road."  (Ex. H, pp. 19, 20, 37; Ex. JJ)

RESPONSE:   The Plaintiffs agree that the letter was signed by Vena
            but deny that it was sent by Vena to Fay, and state
            affirmatively that Fay prepared the letter for signature
            by Vena.  See the response to Defendants' Paragraph 128,
            which response is incorporated herein by reference.
            Plaintiffs also affirmatively state that the letter does
            not indicate that the dedication was a condition of any
            permit.  (Df. Ex. JJ)

Defendants' Paragraph 133:  Mr. Fay did not ask Mr. Vena to

obtain a dedication of thirty-three feet from the property owner

across the street from Vena's property, on the west side of

Tennessee Avenue, because that property was part of the Borman

Subdivision in conjunction with which forty feet of Tennessee

Avenue was dedicated to the Village of Willowbrook in 1983.  (Ex.

Y, pp. 50-51, 70, 87)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 133.

Defendants' Paragraph 134:  Even if the sanitary sewer

extension installed for the Arabian Knights Horse Farm was placed

on the west side of Tennessee Avenue, a right-of-way on the east

side of Tennessee Avenue would still have been necessary to allow

the service line to extend from the Arabian Knights property on the

east side of the street to the sewer main on the west side of the

street.  (Ex. Y, pp. 74, 92)

RESPONSE: The Plaintiffs deny the allegation in Defendants'
Paragraph 134. A right-of-way would not have been
necessary. The service line could have been placed in
an easement. See Village Attorney Gerald M. Gorski's
letter of November 10, 1995, to Olechs' attorney which
stated that a 15-foot easement for a water main, as
opposed to a dedication of Tennessee Avenue, along with
a temporary construction easement of 5 feet on each side
"is consistent with Village policy regarding *all other
property* in the Village." (Emphasis added.) (Pl. Ex.
25) Moreover, the service line could have been put in
without any grant from the Arabian Knights Horse Farm.
Gorski testified that, in his opinion, Willowbrook had
acquired rights to Tennessee Avenue by prescription
(adverse use as opposed to dedication) (Pl. Ex. 4, p.
23), and that, if a municipality has a prescriptive
easement with respect to a public highway, the
municipality can use that highway without going to
court. (Pl. Ex. 4, p. 68) Bashaw, Plaintiffs' real
estate law expert, found 12 parcels of property, other
than the Olechs, where Willowbrook has run its water
main along a street in which Willowbrook had no
dedicated rights of record. (Pl. Ex. 19, pp. 6-8)

Defendants' Paragraph 135: Mr. Fay prepared a memo to the

village president and board of trustees on October 17, 1995,

advising them that ". . . it was made a condition of necessary

village permits that the Arabian Knights Horse Farm would dedicate

the east thirty-three (33') feet of the Tennessee Avenue

right-of-way adjacent to the entirety of their property." (Ex. C,

pp. 77-79; Ex. KK; Ex. Y, p. 41)

RESPONSE: The Plaintiffs deny the allegation of Defendants'
Paragraph 135 and submit that the Defendants have
intentionally misquoted Fay's memo. The memo did not
state that dedication was made a condition of "necessary
village permits," but rather it stated that it was made
a condition of "the sanitary sewer extension permit."
(Pl. Ex. 26) That statement in the memo was false, and
dedication of Tennessee Avenue was never made a
condition of the issuance of any permit to the Arabian
Knights Horse Farm. See response to Defendants'
Paragraph 104, which response is incorporated herein by
reference.

Defendants' Paragraph 136: At the time that Mr. Fay prepared

the October 17, 1995, memo, he was operating under the assumption

that the village was going to require a separate sanitary sewer
extension permit for the Arabian Knights Horse Farm restroom
construction project.  The need for that separate permit was
obviated, however, because Mr. Vena had already obtained a permit
for remodeling and had obtained insurance and a bond for the
construction.  (Ex. Y, pp. 51-53, 67, 77-78)

RESPONSE:    The Plaintiffs deny the allegations of Defendants'
             Paragraph 136.  As noted in the response to Defendants'
             Paragraph 104, which response is incorporated herein by
             reference, Fay's testimony in relation to the dedication
             from the Arabian Knights Horse Farm was thoroughly
             discredited and need not be believed by the jury.
             Repetition does not make it more believable.  This
             permutation of Fay's testimony is also incredible.
             Fay's memo stated that "[t]he Village Staff *in the
             processing of the permit for the sanitary sewer
             extension* could not verify" ownership of Tennessee
             Avenue.  (Emphasis added.)  (Pl. Ex. 26)  Fay testified
             that the processing of a permit occurs between the
             application for the permit and the issuance of a
             permit.  (Pl. Ex. 12, pp. 48-49)  Fay testified,
             however, that he was not sure that Vena ever applied for
             a sanitary sewer extension permit.  (Pl. Ex. 12, pp.
             53-54)  Fay's memo said that dedication "was" made a
             condition of the sanitary sewer extension permit (Pl.
             Ex. 26), but he admitted that such a permit may never
             have been applied for (Pl. Ex. 12, pp. 53-54) and was
             never issued.  (Pl. Ex. 12, p. 7)  Fay then testified
             that dedication was made a condition of the issuance of
             the occupancy permit for certain toilet facilities
             erected on the Horse Farm (Pl. Ex. 12, pp. 6-7) even
             though the owner of the Horse Farm had already executed
             the plat of dedication before he even applied for the
             occupancy permit.  (Pl. Ex. 12, pp. 35-38)  The jury
             does not have to believe such obvious mendacity.

    Defendants' Paragraph 137:  John Fay's memo to the board of
trustees dated October 17, 1995, regarding the extension of a
sanitary sewer line for the Arabian Knights property was an
application of the village's policy of requesting a
thirty-three-foot easement from property owners who request a
public utility along a road over which the village has no rights or
interests.  (Ex. G, pp. 35-36)

- 50 -

RESPONSE:   The Plaintiffs deny the allegations of Defendants'
            Paragraph 137.  Fay's memo to the board was false, and
            it was never made a condition of any permit that the
            Arabian Knights Horse Farm dedicate Tennessee Avenue.
            See response to Paragraph 104, which response is
            incorporated herein by reference.  Moreover, the village
            does not have a general policy of requesting a
            thirty-three foot easement from property owners who
            request a public utility along a road over which the
            village has no rights or interests.  See the response to
            Defendants' Paragraph 106, which response is
            incorporated herein by reference.

Defendants' Paragraph 138:  Between the time that a building

permit was issued to the Arabian Knights Horse Farm and the time

that the occupancy permit was issued, the issue regarding the

validity of the right-of-way on Tennessee Avenue arose.  Once this

question arose, the village required the thirty-three-foot

dedication from the Arabian Knights Horse Farm as a condition of

the continued validity of the building permit and the future

issuance of the occupancy permit.  (Ex. Y, pp. 47-49)

RESPONSE:   The Plaintiffs deny the allegations of Defendants'
            Paragraph 138.  The Defendants rely on the testimony of
            Fay to support these allegations.  The testimony of Fay
            regarding the Arabian Knights Horse Farm was thoroughly
            discredited and need not be believed by the jury.  See
            response to Defendants' Paragraph 104, which response is
            incorporated herein by reference.  Moreover, Fay
            testified that, typically a permit condition is noted
            and dealt with prior to or at the time of issuance of
            the permit, and that his recollection was that in the
            case of the Horse Farm the condition was not imposed
            after issuance of the permit.  (Pl. Ex. 11, p. 97-98)
            The jury need not believe Fay's testimony.

Defendants' Paragraph 139:  The Village of Willowbrook

conditioned the issuance of an occupancy permit to Mr. Vena on Mr.

Vena's agreement to dedicate thirty-three feet of his property

along Tennessee Avenue to the Village of Willowbrook.  (Ex. Y, pp.

16-17)

RESPONSE:   The Plaintiffs deny the allegation of Defendants'
            Paragraph 139.  See responses to Defendants' Paragraphs

- 51 -

104 and 130. Moreover, the owner of the Horse Farm had
already executed the plat of dedication before he even
applied for the occupancy permit. (Pl. Ex. 12, pp.
35-38) It would have made no sense to require Vena, as
a condition of issuing the occupancy permit, to do
something that he had already done.

Defendants' Paragraph 140: To obtain the occupancy permit,

the Arabian Knights Horse Farm would have to comply with all

provisions of all applicable village codes and the occupancy permit

was issued to the farm after the farm dedicated the property and

after the final inspection which confirmed that the farm was in

compliance with all applicable code provisions. (Ex. Y, pp. 32-33,

38)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 140.

Defendants' Paragraph 141: The issuance of the building

permit and the subsequent occupancy permit are related; if the

applicant does not remain in compliance with village code following

the issuance of the building permit, the occupancy permit will not

be granted. (Ex. Y, p. 84)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 141.

Defendants' Paragraph 142: The village did not have a permit

that it could issue for Mr. Vena's connection to the sanitary sewer

system, but did have a permit (the occupancy permit for the toilet

facilities) that it could issue, or withhold, for the use of the

restroom facilities. (Ex. Y, p. 86)

RESPONSE: The Plaintiffs deny the allegation of Defendants'
Paragraph 142. Fay testified that "[i]f the sanitary
sewer extension is within a right-of-way or an easement
controlled by the village, then we would require a
permit be issued with respect to that utility." (Pl.
Ex. 12, p. 91) The west side of Tennessee Avenue across
from the Arabian Knights Horse Farm was dedicated to
Willowbrook in 1983 in connection with the Borman
subdivision. (Pl. Ex. 12, p. 87) Don Eddy, the
engineer who handled the sanitary sewer extension for

the Arabian Knights Horse Farm, testified that the
sanitary sewer extension was installed on the west side
of Tennessee (Pl. Ex. 30, pp. 61-62) where Willowbrook
had a dedicated right-of-way (Pl. Ex. 30, p. 53) so the
village did have a permit that it could issue.

Defendants' Paragraph 143: The village would not have

granted Mr. Vena the occupancy permit in 1996 if he had not

dedicated the thirty-three-foot frontage along Tennessee Avenue to

the village. (Ex. Y, p. 83)

RESPONSE    The Defendants deny the allegations of Defendants'
            Paragraph 143. Defendants have relied on testimony from
            Fay to support this paragraph. Fay's testimony
            concerning the Arabian Knights Horse Farm was
            contradictory and thoroughly discredited. See the
            responses to Defendants' Paragraphs 104, 136, and 138,
            which responses are incorporated herein by reference.

Defendants' Paragraph 144: Mr. Vena executed a plat of

dedication, dedicating the thirty-three feet on the west side of

his property along the frontage of Tennessee Avenue to the Village

of Willowbrook in 1995. The dedication included the entire length

of the frontage of his property along Tennessee Avenue. (Ex. H,

pp. 8, 11-14; Ex. LL)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 144.

The Request for a Thirty-Three-Foot Dedication/Easement

Defendants' Paragraph 145: Mr. Modaff initially sought the

thirty-three-foot dedication from the Plaintiff on the advice of

counsel, and based on his belief that since the village improved

and maintained the road, including plowing snow on the road, it

seemed reasonable to him that the road should have a dedicated

right-of-way like other streets in the village. (Ex. D, p. 102)

RESPONSE:   The Plaintiffs deny the allegation of Defendants'
            Paragraph 145. First, Modaff did not seek the
            dedication on the advice of counsel. See response to
            Defendants' Paragraph 100, which response is

incorporated herein by reference. Moreover, Phyllis
Zimmer testifed that Modaff telephoned her in August
1995 and said that Willowbrook would not proceed with
the project unless the property owners granted a 33-foot
easement. (Pl. Ex. 1, p. 114) That demand was made
before Robin N. Jones, Gorski's associate, even prepared
her memorandum. (Pl. Ex. 23)

Moreover, there is ample evidence set forth below
that the reason why the demand for the dedication was
made was because Modaff and other village officials were
angry and frustrated with Olech based on the pending
state court lawsuit and for other reasons, as opposed to
the reason claimed by Modaff.

First, it should be noted that the demand for a
33-foot dedication was different from what Willowbrook
had required of others, including other properties on
nondedicated streets. See response to Defendants'
Paragraphs 62 and 106, which responses are incorporated
herein by reference.

The decision to demand a 33-foot dedication or
easement in the Olech case was made collectively by a
number of Willowbrook employees, including Oglietti,
Fay, and Modaff. Modaff testified that he recalled
conversations with, among other people, Oglietti and
Fay, and that, at some point during these conversations,
it was determined "that it was necessary to dedicate the
33 feet." (Pl. Ex. 14, pp. 27-29.) Oglietti testified
that back in 1987 he had been involved in a project
which he testified would have ameliorated storm water
drainage problems in the area of 65th and Bentley and
Tennessee Avenue. Oglietti negotiated with DuPage
County to obtain a commitment of funding from the county
for that project. (Pl. Ex. 20, pp. 98-100) On August
27, 1987, Oglietti sent a letter to Mr. and Mrs. Olech,
requesting a stormwater drainage easement that would be
necessary for the project. (Pl. Ex. 20, p. 100)
Oglietti did not hear back from the Olechs and sent them
a follow-up letter seeking their cooperation and
enclosing easement documents for their signature. (Pl.
Ex. 20, pp. 102-103) On December 11, 1987, Oglietti
sent a letter to Mr. and Mrs. Olech stating that he
assumed by their lack of response that they had chosen
not to cooperate. The letter stated, "Please be advised
that the Village of Willowbrook has decided not to
proceed with this project and *to abandon any plans to
work with the county in improving local drainage in the
area*." (Emphasis added.) (Pl. Ex. 20, pp. 105-106)
Oglietti had sent similar letters to Howard Brinkman,
who did not grant the requested easements. (Pl. Ex. 20,
pp. 99-107) Oglietti testified that in August of 1989
he became aware that the Olechs, who had refused to
grant an easement for the stormwater project that

- 54 -

Oglietti testified would ameliorate drainage in the area, had turned around and sued Willowbrook over storm water. (Pl. Ex. 20, p. 109) Oglietti was asked whether it frustrated him that the people that refused to cooperate with him and his plan to ameliorate stormwater drainage instead sued Willowbrook, and he testified that he was disappointed. (Pl. Ex. 20, p. 110) Oglietti testified that it was his opinion before the jury's verdict in the state court case that the lawsuit against Willowbrook was meritless. (Pl. Ex. 20, p. 112) That is still his opinion notwithstanding that the jury ruled in favor of the Olechs and the Zimmers. (Pl. Ex. 20, p. 112) Oglietti said that he remembered a couple of articles about the state court lawsuit in the local news media. (Pl. Ex. 20, p. 113) Oglietti testified that the articles were "regrettable" publicity for Willowbrook. (Pl. Ex. 20, p. 115)

Fay testified that he participated in the discussions that led to the decision to require a 33-foot easement as a condition of the extension of the water main. At the time those discussions were going on, Willowbrook was named as a defendant in the state court lawsuit. (Pl. Ex. 11, p. 100) Fay was involved in the state court lawsuit; his deposition was taken; and he attended court every day the case went to trial. (Pl. Ex. 11, p. 102) Fay also had also been involved in the proposed project in 1987 to improve drainage in the 6500 and 6400 blocks of Bentley and Tennessee Avenues (Pl. Ex. 11, pp. 106-107) which include the Olech property. The people who would not give easements for the project were the Olechs and Brinkman. Sometime after they refused to give Willowbrook those easements, Olechs, Brinkman, and others sued Willowbrook in connection with the stormwater problem. (Pl. Ex. 11, p. 109) Fay testified that he was significantly disappointed by that. (Pl. Ex. 11, p. 109-110) Fay testified that he saw the state court lawsuit as a "relatively frivolous" lawsuit (Pl. Ex. 11, p. 112), and that he still feels that way notwithstanding that the jury awarded the Olechs and the Zimmers $155,000.00. (Pl. Ex. 11, p. 112) Fay had read the different accounts about the state court lawsuit in the newspapers. (Pl. Ex. 11, p. 114)

Modaff was aware of the state court lawsuit because in his role as assistant village administrator, he was risk manager for Willowbrook. He maintained the files on all active claims. In addition he had been given a summary of the case by Oglietti and Tom Burn. (Pl. Ex. 14, p. 122) Modaff had talked to Oglietti about the proposed project in 1987 to attempt to alleviate storm water flooding in the area of the Olech property and surrounding neighborhood. (Pl. Ex. 14, p. 123) Modaff identified a note in his handwriting. (Pl. Ex. 14, p. 131) The note is dated October 30 and stated,

"Gerry--Health Dept.--22' ok--[unreadable] contact w/
County people--Zimmer gone to press?--less than 22' =
more cost to repair pavement."  (Pl. Ex. 14, p. 131; Pl.
Ex. 31)  Modaff testified that he did not remember
telling Gerald Gorski that 22 feet would be okay for the
easement needed to install the water main, but that that
was probably a safe assumption.  (Pl. Ex. 14, p. 132)
Modaff testified that he did not know why he wrote down,
"Zimmer gone to press?"  (Pl. Ex. 14, p. 133)  On the
other side of the note it said, "Call Sanitary District
to confirm that 22' would be ok.--Call Gerry."  Then the
note said, "Would 22' contain all utilities?"  (Pl. Ex.
31)

Kenneth Menzel, an associate for Gerald Gorski who
represented Willowbrook in the state court lawsuit,
testified that he had told the Olechs' attorney that
there was some frustration on Willowbrook's part which
stemmed from the fact that the Olechs had not cooperated
with the proposed stormwater drainage project and had
turned around and sued Willowbrook.  (Pl. Ex. 32, pp.
18-19)  Menzel stated that IRMA, the Illinois municipal
self-insurance pool, might have been disposed to
consider some sort of settlement of the state court
lawsuit, but Willowbrook did not believe that there was
any merit to the claim and did not wish to settle.  (Pl.
Ex. 32, p. 17)

John Lossin testified that he was Chief Building
Inspector for Willowbrook from approximately 1988 to
1994 or 1995.  (Pl. Ex. 33, pp. 6, 38)  Phyllis Zimmer
testified that in 1992, while he was Chief Building
Inspector for Willowbrook, Lossin told her that "[t]he
Village really hates your mother [Grace Olech]."  (Pl.
Ex. 1, p. 50)

When Modaff came out to the Olech property on May 23,
1995, and was asked to come around back to see the well,
Modaff said no, and then asked Olech about storm water
overflowing the street.  (Pl. Ex. 1, p. 96)

Defendants' Paragraph 146:  After discussions with the

village attorney and village officials, Mr. Modaff told Mrs. Zimmer

and Mrs. Olech that the clouded issue of the right-of-way on

Tennessee Avenue would not present a problem and that they could

"take care of it through dedication of the roadway."  (Ex. D, p.

28)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 146 and state affirmatively that discussions

- 56 -

with the village attorney did not take place before
Willowbrook demanded the dedication. See the response
to Defendants' Paragraph 100, which response is
incorporated herein by reference. The Plaintiffs also
state affirmatively that what Modaff told Plaintiff was
that the Village would not proceed unless a 33-foot
easement was granted. Phyllis Zimmer objected and said,
"How can you say that? My parents have an emergency,
they're elderly, and not in good health. How can you
say that?" Modaff said, "That's just the way we do it,"
and hung up. (Pl. Ex. 1, p. 114-115)

Defendants' Paragraph 147: The Plaintiffs objected to

granting the dedication, and thereafter Mr. Modaff spoke with Mr.

Oglietti, Mr. Gorski and Mr. Fay in an effort to determine the

quickest way to get the project done for the Plaintiffs. (Ex. D,

pp. 29, 92)

RESPONSE: The Plaintiffs agree that at various times after the
Plaintiffs' objected to granting the dedication, Modaff
spoke with Oglietti, Gorski, and Fay. The Plaintiffs
deny that Modaff's purpose in doing so was to determine
the quickest way to get the project done for the
Plaintiffs and state affirmatively that the jury would
not have to believe Modaff's self-serving testimony in
that regard. See the response to Defendants' Paragraph
145, which response is incorporated herein by reference.

Defendants' Paragraph 148: In a letter dated September 21,

1995, directed to the Olechs and other residents on Tennessee

Avenue, Mr. Modaff requested a thirty-three-foot easement from

property owners on each side of Tennessee Avenue and made this

request at the direction of the village attorney. (Ex. D, p. 116;

Ex. U)

RESPONSE: The Plaintiffs agree that with letters dated September
21, 1995, directed to the Olechs and other residents on
Tennessee Avenue, Modaff enclosed a proposed Plat of
Easement which would have required property owners on
both sides of Tennessee Avenue to grant a 33-foot
easement. (Pl. Ex. 14, p. 98; Pl. Ex. 34) The
Plaintiffs deny that this request was made at the
direction of the Village Attorney and state
affirmatively that Robin Jones' memorandum of September
11, 1995, did not recommend that Willowbrook demand a
33-foot easement from property owners on both sides of

Tennessee Avenue. Jones' memorandum stated that there was case law supporting the argument that a prescriptive easement extends to the adjacent drainage ditches. (Pl. Ex. 23, p. 5) Jones stated in her memorandum that "the best way to clarify the Village's rights is to draft an easement agreement that would run to the benefit of all public utilities, include drainage ditches, swales and culverts and include the right to expand the surface of the paved roadway." (Pl. Ex. 23, p. 6)

Defendants' Paragraph 149: In the September 21, 1995, letter, Mr. Modaff invited the Plaintiff and others to attend a meeting at the village hall for the purpose of discussing issues related to the proposed easement. (Ex. D, pp. 98-99; Ex. U)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 149 except that the letter stated that the purpose of the meeting was to discuss "the Plat of Easement" which had been enclosed with the letter, and which required 33-foot easements from property owners on both sides of Tennessee Avenue. (Pl. Ex. 34)

Defendants' Paragraph 150: Mrs. Olech and Mrs. Zimmer received the letters inviting them to attend a meeting at the village hall in September of 1995 to discuss the issues regarding the easement (Ex. B, p. 90), but did not attend the meeting. (Ex. B, p. 90; Ex. F, pp. 128-130)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 150 except that the letter stated that the purpose of the meeting was to discuss "the Plat of Easement" which had been enclosed with the letter, and which required 33-foot easements from property owners on both sides of Tennessee Avenue. (Pl. Ex. 34) Plaintiffs state affirmatively that Phyllis Zimmer telephoned Modaff prior to the meeting and told Modaff that she was speaking for her husband, her parents, and others, and that they would not be attending. Phyllis Zimmer told Modaff that "we've gone over this," and that "we're willing to give you an easement adequate, sufficient for the project." (Pl. Ex. 1, pp. 127-130)

Defendants' Paragraph 151: Mr. Modaff, the village engineer and the village attorney appeared at the village hall for the September 25 meeting, but none of the residents arrived. (Ex. D,

pp. 105-106)  Subsequent to September 25, Mr. Modaff had further
conversations with the village administrator and village attorney
during which it was decided to send a letter to the Plaintiffs
explaining the village's position.  (Ex. D, pp. 106-108; Ex. B, p.
90-92; Ex. V)  Mr. Gorski advised Mr. Modaff to continue to
maintain the village's position reiterated in the October 3, 1995,
letter.  (Ex. D, pp. 112-113)  On page 2 of the October 3, 1995,
letter, Mr. Gorski's position regarding the village's prescriptive
easement over Tennessee Avenue is explained.  (Ex. V)

RESPONSE:  The Plaintiffs agree that Modaff, the village engineer,
           and the village attorney appeared at the village hall
           for the September 25 meeting, but that none of the
           residents arrived.  The Plaintiffs state affirmatively
           that Phyllis Zimmer telephoned Modaff prior to the
           meeting and told Modaff that she was speaking for her
           husband, her parents, and others, and that they would
           not be attending.  Phyllis Zimmer told Modaff that
           "we've gone over this," and that "we're willing to give
           you an easement adequate, sufficient for the project."
           (Pl. Ex. 1, pp. 127-130)  The Plaintiffs agree with the
           remaining allegations of Defendants' Paragraph 151 but
           state affirmatively that the village's position in the
           letter of October 3, 1995, which Gorski advised Modaff
           to maintain did not set forth the dimensions in feet of
           the easement requested by the village, *i.e.*, it did
           not state that the village was requiring a 33-foot
           easement.  (Pl. Ex. 14, pp. 106-107; Pl. Ex. 35)

     Defendants' Paragraph 152:  When the issue of the rights that
the village had on Tennessee Avenue arose in 1995, Mr. Gorski
consulted an attorney from Chicago Title Insurance Company to
determine whether or not a tract book search would disclose the
source of Tennessee Avenue.  (Ex. Z, pp. 51, 55)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 152.

     Defendants' Paragraph 153:  That tract book search revealed
that the deed by which Mrs. Olech took title to her property
contained a restrictive covenant, making her property subject to

the right of public travel over its east thirty-three feet.  (Ex.
K, pp. 30-31; Ex. L; Ex. T; Ex. Z, p. 55)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 153.  The language in the deed that the
conveyance was "subject to right of public travel over
the East Thirty-three (33) feet thereof" (Pl. Ex. 2) was
not a "restrictive covenant" (Pl. Ex. 4, p. 72), and
both the Plaintiffs' expert (Pl. Ex. 3, pp. 93-94), and
the Defendants' expert (Pl. Ex. 4, pp. 16-18) agreed
that the use of the words "subject to" was to protect
the grantors on their warranty, did not amount to a
reservation of a right to public travel, and did not
create any affirmative rights.

Defendants' Paragraph 154:  The purpose of such a reservation
or restriction would be to protect the grantor in that sale from a
breach of warranty from a known condition that would violate the
terms of the warranty.  The condition referenced in the Olech deed
was the right of the public to travel across the east thirty-three
feet of her property.  (Ex. Z, p. 56)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 154.  As the Defendants' own expert testified,
"subject to" language, like that in the deed in
question, is put in deeds to protect the grantor from
conditions which are not known but suspected.  (Pl. Ex.
4, pp. 72-73)  The language just indicates that the
drafter of the deed had some concern about it (Pl. Ex.
4, p. 73), not that there was a "known" right to public
travel.

Defendants' Paragraph 155:  Mr. Gorski considered the
language in Mrs. Olech's deed to be a reservation for the right of
public travel over the east thirty-three feet of the Olech property
thereby protecting the grantor from a violation of warranties in
the conveyance.  (Ex. Z, pp. 19, 56)

RESPONSE:  The Plaintiffs agree that Defendants' Paragraph 155
accurately states what Gorski "considered" the language
to be, but state affirmatively that Gorski testified
that he did not know whether such a right of public
travel existed or not.  (Pl. Ex. 4, p. 73)  The
Plaintiffs also affirmatively state that Bashaw's
opinion is that "[i]t is well established . . . that a

- 60 -

reservation or an exception in a deed in favor of a stranger to the instrument, or running vaguely in favor of the public, or of persons in a neighborhood generally, cannot create any right, title or interest in the land conveyed." (Pl. Ex. 19, p. 5)

Defendants' Paragraph 156: By such a reservation, the grantor is conveying the property subject to the possibility that its future use may not be unrestricted and others may use the property. (Ex. W, pp. 67-68, 75)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 156. As noted in the response to Defendants' Paragraph 153, which response is incorporated herein by reference, both experts agreed that the "subject to" language in the deed did not create any rights in the public, and the Defendants have been unable to come up with any other conveyance in the chain of title which created rights to travel in the public.

Defendants' Paragraph 157: Mr. Gorski's report reflects his expert opinions in this case. (Ex. T; Ex. Z, p. 5)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 157. Mr. Gorski's report stated that it was his "opinion that the public acquired a right of public travel over sixty-six feet of Tennessee Avenue by virtue of deed restrictions and the law of prescriptive easement applicable to roads and highways." (Pl. Ex. 4, p. 5; Pl. Ex. 36) At his deposition, he backed off of these opinions and stated that (1) the deed restrictions did not create any affirmative rights (Pl. Ex. 4, pp. 17-18), and (2) that the geographical boundaries of the highway obtained by prescription would include only those portions which were used for travel or drainage, such as the roadway and the adjacent swales (Pl. Ex. 4, p. 27), and, when asked about the dimensions of the public highway acquired by prescription, Gorski replied that he did not know what the dimension was. (Pl. Ex. 4, pp. 27-28) The Plaintiffs' surveyor determined that the paved portion of Tennessee Avenue extends from between 3.6 to 4.1 feet onto the Olech property. (Pl. Ex. 6) Phyllis Zimmer measured the width of the drainage ditch and determined that the drainage ditch extends approximately 9 feet onto the Olech property from the western edge of the pavement. (Pl. Ex. 10) So the portion of the Olech property which would be subject to a public highway by prescription according to Gorski's theory would be from 12.6 feet to 13.1 feet.

Defendants' Paragraph 158: Since the defect in the

right-of-way or dedication of Tennessee Avenue was brought to the attention of the Village of Willowbrook, the village has requested a thirty-three-foot dedication from other residents along Tennessee Avenue who have requested connection to a utility, including Mr. Kucera and Mr. Vena.  (Ex. G, p. 57)

RESPONSE:  The Plaintiffs deny that there is a "defect" in the right-of-way or dedication of Tennessee Avenue and state that it was never dedicated.  (Pl. Ex. 23, p. 3)  The Plaintiffs agree that the village requested a thirty-three foot dedication from Vena, but deny that the village demanded it as a condition of connection as it did in the Olechs' case.  As to the matter of Vena and the Arabian Knights Horse Farm, see the response to Defendants' Paragraph 104, which response is incorporated herein by reference.  With respect to Kucera, at his deposition, Oglietti identified a letter to Kucera (Pl. Ex. 20, pp. 60-61) in which Oglietti told Kucera that Willowbrook would allow him to connect to the water main if he would grant the village a 33-foot easement *along only 25 feet of his property* (Pl. Ex. 37), an option not offered to the Olechs.

Defendants' Paragraph 159:  Mr. Kucera requested a connection to the village water main in 2001 and in response the village asked him for a thirty-three-foot dedication of that part of his property adjacent to Tennessee Avenue.  (Ex. G, pp. 58-59)

RESPONSE:  The Plaintiffs deny the allegation of Defendants' Paragraph 159 and state affirmatively that Willowbrook told Kucera that he would be allowed to connect to the water main if he would grant the village a 33-foot easement along only 25 feet of his property (Pl. Ex. 37), an option not offered to the Olechs.  (Pl. Ex. 37)

### Involvement of Defendant Gary Pretzer

Defendants' Paragraph 160:  Gary Pretzer has served as President of the Village of Willowbrook since 1993.  (Ex. E, pp. 9-10)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 160.

Defendants' Paragraph 161:  Mr. Pretzer was advised by Mr.

Modaff that Mrs. Olech had inquired about receiving municipal water and that the matter was being addressed expeditiously. (Ex. E, pp. 11-13)

RESPONSE:   The Plaintiffs agree with Defendants' Paragraph 161 but state affirmatively that the first thing Pretzer asked Modaff when he heard that Olech had inquired about getting municipal water was if it was the Olechs that were currently involved in litigation with Willowbrook. (Pl. Ex. 38, pp. 11-12)

Defendants' Paragraph 162: Mr. Pretzer had a conversation with Mr. Gorski in the village hall at which time Mr. Gorski advised Mr. Pretzer that the water main extension project had been complicated because the village and the Olechs could not agree on the size of the easement. (Ex. E, pp. 27-28)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 162.

Defendants' Paragraph 163: Mr. Pretzer did not participate in the decision-making process as to the size of the easement to be requested from Mrs. Olech and did not make the decision that a thirty-three-foot easement would be requested for this project. (Ex. E, pp. 45-46)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 163.

Defendants' Paragraph 164: Mr. Pretzer did not assist in developing the policy of requiring a thirty-three-foot easement from property owners in connection with the extension of water mains. (Ex. E, p. 41)

RESPONSE:   The Plaintiffs deny that there is a village policy generally requiring a thirty-three-foot easement from property owners in connection with the extension of water mains (see response to Defendants' Paragraph 106, which response is incorporated herein by reference) so the Plaintiffs agree that Pretzer did not assist in developing such a policy.

Defendants' Paragraph 165: Mr. Pretzer never discussed with

- 63 -

the village attorney the village policy regarding fifteen-foot
easments referenced in Mr. Gorski's letter of November 10, 1995.
(Ex. E, pp. 31-32; EX. MM)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 165.

     Defendants' Paragraph 166:  Mr. Pretzer's only conversation
with Phyllis Zimmer regarding the water main extension occurred
when he returned a phone call that she had made to him in the fall
of 1995.  (Ex. E, pp. 14-15)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 166
        except that the Plaintiffs assert that the telephone
        conversation between Pretzer and Phyllis Zimmer occurred
        in August of 1995.  (Pl. Ex. 10).

     Defendants' Paragraph 167:  After Mr. Pretzer received the
telephone message from Mrs. Zimmer and before he returned her call,
he spoke briefly with Mr. Modaff and Mr. Gorski, and Mr. Pretzer
was informed that the village and Plaintiff disagreed about the
size of the easement for the water main extension project.  (Ex. E,
pp. 44-45)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 167 but
        state affirmatively that it was Modaff, not Gorski, who
        informed Pretzer of the disagreement.  (Pl. Ex. 38, pp.
        44-45)

     Defendants' Paragraph 168:  When Mr. Pretzer returned Mrs.
Zimmer's call, Mrs. Zimmer asked if the water extension project was
being delayed due to ongoing litigation and Mr. Pretzer responded
that as far as he was aware, the village staff was responding
expeditiously in working to get the water main constructed.  (Ex.
E, p. 15)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
        Paragraph 168.  While Pretzer's testimony supports this
        paragraph, Phyllis Zimmer gave a different account of
        the conversation.  It is up to the jury to decide
        whether Pretzer's version or Zimmer's testimony is

true.  Zimmer testified that she told Pretzer, "My
parents have an emergency here and we're willing to
grant an easement that's adequate or sufficient for the
project," and Pretzer replied, "Well, we're requiring a
33-foot easement for the project." (Pl. Ex. 1, pp.
115-117)

Defendants' Paragraph 169: Mrs. Zimmer then asked Mr.

Pretzer about the easement and suggested that her engineer had

indicated that a ten-foot easement would be adequate. (Ex. E, p.

15)

RESPONSE:    The Plaintiffs deny the allegation of Defendants'
            Paragraph 169.  See the response to Defendants'
            Paragraph 168, which response is incorporated herein by
            reference.

Defendants' Paragraph 170: Mr. Pretzer advised Mrs. Zimmer

that he had been informed by village staff that a thirty-three-foot

easement was what the village had always worked with and such was

the practice or policy of the board prior to his becoming

president. (Ex. E, pp. 15-16)

RESPONSE:    The Plaintiffs deny the allegation of Defendants'
            Paragraph 170.  See the response to Defendants'
            Paragraph 168, which response is incorporated herein by
            reference.

### Settlement of Easement Issue

Defendants' Paragraph 171: Mr. Gorski presumed that the

village had a prescriptive easement, but knew that the Plaintiffs

had challenged the village's right to be on the road.  To resolve

this disputed issue, it would have been necessary to file a

lawsuit, which could consume at least a year, and Mr. Gorski felt

that the quickest way to obtain water for Mrs. Olech would be to

reach an agreement without going to court. (Ex. W, pp. 38-39; Ex.

Z, pp. 60-61)

RESPONSE:    The Plaintiffs agree that Gorski presumed that the

village had a prescriptive easement and that he knew
that the Plaintiffs believed that the road was private
property. The Plaintiffs deny that they were
challenging the village's right to be on the road to put
in the water main and state affirmatively that in August
Phyllis Zimmer had told Pretzer that they were willing
to grant an easement adequate or sufficient for the
project. (Pl. Ex. 1, p. 115; Pl. Ex. 10) The
Plaintiffs deny that it would have been necessary to
file a lawsuit. Zimmer had already told them that they
were willing to grant an easement adequate or sufficient
for the project. And Gorski testified that he had no
idea whether Olech would have agreed to the installation
of the water main in the prescriptive easement without
giving Willowbrook any grant of rights, and Gorski had
no idea if Willowbrook ever offered to do that. (Pl.
Ex. 4, pp. 66-67) Gorski also testified that if a
municipality has a prescriptive easement with respect to
a public highway, the municipality can use that highway
without going to court. (Pl. Ex. 4, p. 68) The
Plaintiffs also deny that Gorski felt that the quickest
way to obtain water for Mrs. Olech would be to reach an
agreement without going to court. Gorski was not
concerned about getting Olech water quickly. In fact,
Gorski directed his associate, Robin Jones, to research
the question of whether Willowbrook had a legal duty to
extend water service at all to the Olech property. (Pl.
Ex. 23, p. 1)

    <u>Defendants' Paragraph 172</u>: Plaintiff's attorney sent a

letter to Mr. Gorski threatening a lawsuit if the water main was

not installed and to avoid the lawsuit and further delays, Mr.

Gorski did not recommend that the village attempt to enforce what

Mr. Gorski believed was a valid prescriptive easement on Tennessee

Avenue. (Ex. Z, p. 32, 61-62; Ex. NN)

<u>RESPONSE</u>:   The Plaintiffs agree that Plaintiff's attorney sent a
letter to Mr. Gorski threatening a lawsuit if the water
main was not installed. The Plaintiffs deny that Gorski
did not recommend that the village attempt to enforce
what Gorski believed was a valid prescriptive easement
on Tennessee Avenue to avoid the lawsuit and further
delays because the village could have gone to court for
a declaration of its rights in and to Tennessee Avenue
before, during, or after the water main was put in, and
without delaying the installation of the water main. In
this regard, see the response to Defendants' Paragraph
171 which is incorporated herein by reference.

    <u>Defendants' Paragraph 173</u>: Since the village never filed

- 66 -

suit to establish the prescriptive easement, it is impossible to determine whether the water main in question would have or could have been placed within the bounds of that purported prescriptive easement. (Ex. Z, pp. 57-58)

RESPONSE:    The Plaintiffs deny the allegation of Defendants'
             Paragraph 173. Gorski testified that the geographical
             boundaries of the highway obtained by prescription would
             include those portions which were used for travel or
             drainage, such as the roadway and the adjacent swales.
             (Pl. Ex. 4, p. 27) While Gorski did not know what the
             dimensions of the paved portion of the road and adjacent
             drainage ditches were (Pl. Ex. 4, pp. 27-28), it is not
             "impossible" to find out. In addition, Gorski testified
             that "the Village didn't need to acquire any property
             rights at all by grant from the property owners involved
             in order to install the water main along Tennessee
             Avenue." (Pl. Ex. 4, p. 30)

Defendants' Paragraph 174: Mr. Gorski recommended to Mr. Pretzer that Gorski be allowed to negotiate a settlement with the Olech's attorney and Mr. Pretzer told Mr. Gorski that he would accept his recommendation and that Gorski should move forward as he saw appropriate. (Ex. E, p. 28)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 174.

Defendants' Paragraph 175: Mr. Gorski advised Mr. Modaff that he was in contact with Mrs. Olech's attorney in an attempt to negotiate a settlement of the matter. (Ex. D, p. 113)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 175.

Defendants' Paragraph 176: Mr. Gorski advised Mr. Modaff of Mrs. Zimmer's position that all the village needed was a ten-foot easement and Mr. Modaff responded that ten feet would not allow sufficient space for the excavation equipment and for the vehicles to maneuver to construct the water main. (Ex. D, pp. 113, 117)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 176.

Defendants' Paragraph 177: Mr. Gorski asked Mr. Modaff to

tell him the minimum space that would be needed to construct and maintain the water main. (Ex. D, p. 113; Ex. K, pp. 21, 23)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 177.

Defendants' Paragraph 178: In response, Mr. Modaff told Mr. Gorski that there were places in the village where water mains were placed in side yards and that in those situations the village obtained easements that were fifteen feet wide. (Ex. K, p. 22; Ex. N §10-4-2:(c))

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 178. While the allegation is supported by testimony from Gorski, Modaff testified that in his conversations with Gorski regarding the size of the easement that would be needed for installation of the main, Gorski did not discuss with him the fact that there were other locations in the village where there were 15-foot permanent easements for maintenance of the water main. (Pl. Ex. 14, p. 118) Thus, there is a question of fact on this point.

Defendants' Paragraph 179: Where a water main travels through a side-yard easement where there are no connections, valves or hydrants, there is no reason to have access to the main so the village does not require a thirty-three-foot dedication in those locations. (Ex. G, pp. 38-40; Ex. N § 10-4-2:(c))

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 179. Oglietti testified that there are occasions when Willowbrook needs to have access to a water main in side yards such as when the pipe breaks. (Pl. Ex. 20, p. 69) The Plaintiffs also deny that the reason why Willowbrook does not require a thirty-three-foot dedication in side yards is for the reason stated. As Bashaw's report makes clear, Willowbrook often does not demand a 33-foot dedication when the main is in a road. See response to Defendants' Paragraph 62, which response is incorporated herein by reference. See also the response to Defendants' Paragraph 106, which response is incorporated herein by reference.

Defendants' Paragraph 180: The incidence of servicing a water main in a side yard is much less frequent than servicing

water mains located within the public right-of-way along a road.
(Ex. G, pp. 68-70)

RESPONSE:    The Plaintiffs agree that the incidence of servicing a
             water main in a side yard is much less frequent than
             servicing water mains located along a road.   The
             Plaintiffs affirmatively state that there are several
             nondedicated roads where Willowbrook has run its water
             main.   See response to Defendants' Paragraph 62, which
             response is incorporated herein by reference.

Defendants' Paragraph 181:  Mr. Gorski then asked Mr. Modaff
if fifteen feet would be sufficient to accommodate all the
construction for the Tennessee Avenue water main and Mr. Modaff
responded that he would need an additional five feet on each side
to accommodate the construction equipment.  (Ex. K, p. 22)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 181.

Defendants' Paragraph 182:  To compromise and settle the
matter with the Plaintiffs, Mr. Gorski recommended that the village
agree to accept a fifteen-foot permanent easement which would
minimally serve the public works department's needs to service the
water main.  (Ex. C, p. 126; Ex. Z, pp. 61-62)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 182.

Defendants' Paragraph 183:  To avoid litigation, it was
eventually decided by the village to settle on a fifteen-foot
easement with a five-foot temporary construction easement.  (Ex. D,
p. 117; Ex. K, pp. 28-29)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 183.

Defendants' Paragraph 184:  In a letter sent to Olechs'
attorney, Mr. Wimmer, on November 10, 1995, Mr. Gorski intended to
relate that the village was "moving off of the policy of asking for
that dedication and adopting the unique standard applicable to this
request or this situation."  (Ex. K, pp. 18, 28; Ex. MM)

- 69 -

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
          Paragraph 184.  The jury is entitled to believe that
          what Gorski intended to relate in the November 10, 1995,
          letter to Mr. Wimmer was what he said in the letter, and
          not Gorski's subsequent unbelievable explanation that he
          did not intend what he said.  Gorski's letter did not
          state that the village had a "policy" of asking for
          dedication.  (Pl. Ex. 25)  Concerning the fifteen foot
          easement, and the temporary construction easement of
          five feet on each side, Gorski wrote, "This is
          consistent with Village policy regarding all other
          property in the Village."  (Pl. Ex. 25)  What is
          consistent with "all other property in the Village" is
          not a unique standard applicable to this situation.

     Defendants' Paragraph 185:  Mr. Gorski conceded that the

language of the letter, "may not be as clear as it should," but it

was intended to relate what he learned from his conversation with

Mr. Modaff.  (Ex. K, p. 25)

RESPONSE:  The Plaintiffs deny the allegation in Defendants'
          Paragraph 185.  Modaff testified that in his
          conversations with Gorski regarding the size of the
          easement that would be needed for installation of the
          main, Gorski did not discuss with him the fact that
          there were other locations in the village where there
          were 15-foot permanent easements for maintenance of the
          water main.  (Pl. Ex. 14, p. 118)  The Plaintiffs also
          deny that Gorski intended to relate anything other than
          what his words, as Village Attorney, said.  See the
          response to Defendants' Paragraph 184, which response is
          incorporated herein by reference.

     Defendants' Paragraph 186:  When Mr. Gorski referred in the

November 10 letter to the fifteen feet, he was referring to the

fifteen-foot water easement that Mr. Modaff made reference to as

having been located elsewhere in the village in side yards.  (Ex.

K, p. 22; Ex. MM)

RESPONSE:  The Plaintiffs deny the allegation in Defendants'
          Paragraph 186.  Modaff testified that in his
          conversations with Gorski regarding the size of the
          easement that would be needed for installation of the
          main, Gorski did not discuss with him the fact that
          there were other locations in the village where there
          were 15-foot permanent easements for maintenance of the
          water main.  (Pl. Ex. 14, p. 118)  The Plaintiffs also
          deny that Gorski intended to relate anything other than

what his words, as Village Attorney, said. See the response to Defendants' Paragraph 184, which response is incorporated herein by reference.

Defendants' Paragraph 187: When Mr. Gorski used the phrase in the last sentence of the letter, "all other property in the village," he was referring to what the village would have required of any resident who wished to place a water main in a side yard. (Ex. K, pp. 22-23)

RESPONSE: The Plaintiffs deny the allegation in Defendants' Paragraph 187. See the responses to Defendants' Paragraphs 184 and 185, which responses are incorporated herein by reference. The Plaintiffs also deny that Gorski intended to relate anything other than what his words, as Village Attorney, said. "All other property in the Village" means "all other property," not "side yards only."

Defendants' Paragraph 188: Mr. Gorski believed that the fifteen-foot easement was consistent with village policy relating to the minimum width of an easement that the village would need to locate a water main in a side yard. (Ex. K, p. 26)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 188 and state that the jury is entitled to believe that the Village Attorney meant what he said when he wrote that the fifteen foot easement was "consistent with Village policy regarding *all other property in the Village*." (Emphasis added.) (Pl. Ex. 25)

Defendants' Paragraph 189: The fifteen-foot easement referred to in Mr. Gorski's letter was what was generally required by Willowbrook in connection with the installation of a water main on private property other than a roadway. (Ex. C, p. 34)

RESPONSE: The Plaintiffs deny the allegation in Defendants' Paragraph 189. The fifteen-foot easement referred to in Gorski's letter was, as stated by the Village Attorney, "consistent with Village Policy regarding *all other property in the Village*." (Emphasis added.) (Pl. Ex. 25)

Defendants' Paragraph 190: Mr. Pretzer recalls learning that

- 71 -

Mrs. Olech was getting water from a connection to the Zimmer home and never heard that the Olechs had no running water in their home. (Ex. E, pp. 38, 42-43)

RESPONSE: The Plaintiffs deny the allegation in Defendants' Paragraph 190. Gorski identified a letter that he received from Olech's attorney. (Pl. Ex. 8, pp. 24-25) The letter dated November 6, 1995, stated, among other things, that "[t]he Olechs are obtaining their potable water by means of an outdoor delivery system using the Zimmers' well," and that "[l]ast weekend the system froze, and the Olechs were without water." (Pl. Ex. 39) The jury may infer that the Village Attorney informed his client about the letter, especially because the letter threatened litigation. (Pl. Ex. 39)

Defendants' Paragraph 191: Mr. Fay learned that the residents seeking the water extension were related and that one may have been obtaining water through a hose from a neighbor's property. (Ex. C, p. 130)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 191 and state affirmatively that Fay had heard that the Olechs were obtaining water for their house via an overground hose from the Zimmer house. (Pl. Ex. 11, p. 130)

Defendants' Paragraph 192: After the hose which was used to deliver water from the Zimmer to the Olech property froze, Mrs. Olech did not attempt to replace the hose. (Ex. B, pp. 94, 126)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 192 and state affirmatively that Mrs. Olech testified that she did not attempt to put a second hose on the spigot at the Zimmer property to deliver water to her house because that would freeze up too. (Pl. Ex. 13, p. 94)

Defendants' Paragraph 193: Mrs. Zimmer has no recollection of speaking to anyone at the Village of Willowbrook regarding the fact that the hose which conveyed water from the Zimmer home to the Olech home had froze. (Ex. F, p. 88)

RESPONSE: The Plaintiffs agree with Defendants' paragraph 193 but state affirmatively that Gorski identified a letter that he received from Olech's attorney. (Pl. Ex. 8, pp. 23-24; Pl. Ex. 39) The letter, dated November 6, 1995,

stated, among other things, that "[t]he Olechs are
obtaining their potable water by means of an outdoor
delivery system using the Zimmers' well," and that
"[l]ast weekend the system froze, and the Olechs were
without water." (Pl. Ex. 39)

### The Properties at Bentley and 65th Street

Defendants' Paragraph 194: Dave Van Vooren served as
Director of Public Works and Assistant Village Administrator for
the Village of Willowbrook between 1987 and 1991. (Ex. J, pp.
13-14)

RESPONSE: The Plaintiffs agree with Defendant's Paragraph 194.

Defendants' Paragraph 195: Requests by residents for the
extension of municipal water service to their homes between 1987
and 1991 would have come under Mr. Van Vooren's jurisdiction if the
request was not made in connection with the development of a
subdivision. (Ex. J, p. 26)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 195.

Defendants' Paragraph 196: Mr. Van Vooren assumed that the
Village of Willowbrook had a valid right-of-way on roads that the
Village plowed and maintained. (Ex. J, p. 82)

RESPONSE: The Plaintiffs deny the allegation of Defendants'
Paragraph 196. The Plaintiffs agree that Van Vooren
testified as set forth in Defendants' Paragraph 196 but
state affirmatively that the jury would not have to
believe his testimony that he "assumed" that Willowbrook
had a valid right-of-way on roads that it plowed and
maintained in light of other evidence set forth below.
First of all, Fay, the Director of Community
Development, had reason to know in the late 1980s that
Tennessee Avenue was not dedicated, or that there was
doubt with respect to the title of Tennessee Avenue (see
the response to Defendants' Paragraph 21, which response
is incorporated herein by reference), and Van Vooren
testified that Willowbrook plowed and maintained
Tennessee Avenue. (Pl. Ex. 40, p. 83-84) Moreover, Van
Vooren sent Phyllis Zimmer a letter (Pl. Ex. 1, p. 46)
in 1987 about a culvert adjacent to the Zimmer property
on Bentley Avenue north of 65th Street. (Pl. Ex. 41)

- 73 -

In the letter Van Vooren stated that "[t]he Village has
*determined* that the existing culvert is situated
within the *dedicated right-of-way for Bentley
Avenue*." (Emphasis added.) (Pl. Ex. 41) Van Vooren
testified that Willowbrook plowed and maintained Bentley
Avenue. (Pl. Ex. 40, p. 83-84) Making a determination
with respect to a dedicated right-of-way is different
from "assuming" the existence of a dedicated
right-of-way. See also response to Defendants'
Paragraph 199, which response is incorporated herein by
reference.

Defendants' Paragraph 197: While Mr. Van Vooren was Director

of Public Services and a request for a water main extension was

received, as long as the street where the water main would be

installed was within the corporate limits of the Village of

Willowbrook, he would make no further investigation as to whether

or not the village had a right-of-way over the road before

proceeding with the installation of the water main. (Ex. J. pp.

30-31)

RESPONSE:   The Plaintiffs deny the allegation of Defendants'
Paragraph 197. Although Van Vooren testified as set
forth in Defendants' Paragraph 197, the jury would not
have to believe his testimony. In this regard, see the
response to Defendants' Paragraph 196, which is
incorporated herein by reference. In addition, Van
Vooren's testimony in this regard was contradicted by
Fay, who testified when an extension of utilities along
a roadway is requested, the procedure is to consult the
DuPage County Tax Parcel Atlas. Fay was asked, "And is
there a procedure which is generally followed by the
Village of Willowbrook when an extension of utilities
along the roadway is requested to determine if the
Village already has rights or interests in the roadway?"
and Fay replied, "Typically, it's assumed that we
have--the right-of-way is in place and the right-of-way
is good simply by looking at the DuPage County Tax
Parcel Atlas, which would indicate the locations of all
rights-of-way and property lines." (Pl. Ex. 11, pp.
50-51) See also the response to Defendants' Paragraph
199, which response is incorporated herein by reference.

Defendants' Paragraph 198: Mr. Van Vooren did not request

that property owners seeking a water main extension grant any

easement or dedication to the village as a condition of the

extension of the water main because he assumed the village had a right-of-way on roads that the village plowed and maintained. (Ex. J, pp. 75-76)

RESPONSE:    The Plaintiffs agree that Van Vooren did not request that property owners seeking a water main extension grant any easement or dedication to the village as a condition of the extension of the water main. The Plaintiffs deny that he did not do so because he "assumed" that the village had a right-of-way on roads that the village plowed and maintained. As set forth in the responses to Defendants' Paragraphs 196 and 197, which responses are incorporated herein by reference, the jury need not believe Van Vooren's testimony that he "assumed" that the village had a right of way on roads that the village plowed and maintained. It is more plausible to conclude that Willowbrook did not request that property owners seeking a water main extension grant any easement or dedication to the village as a condition of the extension of the water main based on Village Attorney Gerald Gorski's theory concerning Willowbrook's prescriptive rights. As Gorski, himself, testified, when a roadway becomes a public highway pursuant to prescription, the local governmental entity has a right to install water mains within the public highway obtained by prescription (Pl. Ex. 4, p. 30), and that a village could put pipes in a street in such a situation without first going to court to get a court order that there had been a prescriptive easement. (Pl. Ex. 4, pp. 68-69) See also the response to Defendants' Paragraph 199, which response is incorporated herein by reference.

Defendants' Paragraph 199:    The village does water main extensions in various locations of the village every year and typically assumes that a valid right-of-way exists for the road where the main will be installed. (Ex. C, p. 64)

RESPONSE:    The Plaintiffs agree that the village does water main extensions in various locations of the village every year. The Plaintiffs deny that the village typically "assumes" that a valid right-of-way exists for the road where the main will be installed. See the responses to Defendants' Paragraphs 196 and 197. In addition, Fay testified that if property is subdivided, Willowbrook's subdivision regulations require that the village obtain a right-of-way. (Pl. Ex. 11, p. 52) That testimony indicates that the village does not "assume" that a valid right-of-way exists.

Defendants' Paragraph 200:  In the water main extension projects where the village did not request a dedication or easement of the property owners in the area, the village assumed that it owned a right-of-way along the roads in question.  (Ex. C, pp. 136-137, 141, 154, 155)

RESPONSE:  The Plaintiffs deny the allegation of Defendants' Paragraph 200.  First of all the testimony cited by the Defendants in support of this paragraph states only that the village "assumed" that it owned a right-of-way on Western Avenue, and, as Bashaw's report makes clear, Willowbrook has extended its water main along the following nondedicated roads:  61st Street, 59th Street, Western Avenue, Clarendon Hills Road, Tennessee Avenue, Bentley Avenue, and 65th Street.  (Pl. Ex. 19, pp. 6-8) The testimony, therefore, does not support the claim that the village "assumed" that it owned a right-of-way in connection with water main extension projects where the village did not request a dedication or easement. More importantly, however, the jury need not believe Fay's testimony that the village "assumed" that it owned right-of-ways on Western Avenue.  See the responses to Defendants' Paragraphs 196, 197, 198, and 199, which responses are incorporated herein by reference.  In addition, the jury need not believe anything that Fay testifies to in light of the fact that his testimony was thoroughly impeached.  See response to Defendants' Paragraph 104, which response is incorporated herein by reference.

Defendants' Paragraph 201:  While he was employed by the Village of Willowbrook, Mr. Van Vooren was involved in the water main extension project at Bentley Avenue and 65th Street in the Village of Willowbrook.  (Ex. J, p. 16)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 201.

Defendants' Paragraph 202:  Bentley Avenue and 65th Street were on the village's snowplow route while Mr. Van Vooren was Director of Public Services.  (Ex. J, p. 83)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 202.

Defendants' Paragraph 203:  The village also maintained the storm water system and did resurfacing work on Bentley Avenue.

- 76 -

(Ex. J, p. 83)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 203.

Defendants' Paragraph 204: In connection with the water main extension project at Bentley Avenue and 65th Street in 1991, the Village of Willowbrook did not request an easement or dedication from any of the property owners involved because it was assumed by village representatives that since the village maintained the streets in question the right-of-way along Bentley was valid and properly dedicated. (Ex. C pp. 21, 22, 57, 63, 64, 76; Ex. G, p. 47; Ex. J, pp. 20-21)

RESPONSE: The Plaintiffs agree that in connection with the water main extension project at Bentley Avenue and 65th Street in 1991, the Village of Willowbrook did not request an easement or dedication from any of the property owners involved. The Plaintiffs deny that it did not do so because it was "assumed" by village representatives that, since the village maintained the streets in question, the right-of-way along Bentley was valid and properly dedicated. See responses to Defendants' Paragraphs 196, 197, 198, and 199, which responses are incorporated herein by reference. It is more plausible to conclude that Willowbrook did not request an easement or dedication from the property owners involved based on Village Attorney Gerald Gorski's theory concerning Willowbrook's prescriptive rights. As Gorski, himself, testified, when a roadway becomes a public highway pursuant to prescription, the local governmental entity has a right to install water mains within the public highway obtained by prescription. (Pl. Ex. 4, p. 30), and a village could put pipes in a street in such a situation without first going to court to get a court order that there had been a prescriptive easement. (Pl. Ex. 4, pp. 68-69)

Defendants' Paragraph 205: If Mr. Van Vooren had learned at any time during the extension of the water main along Bentley Avenue and 65th Street that the village did not have a right-of-way, Mr. Van Vooren would have asked the residents for a thirty-three-foot right-of-way dedication and such a request would have been consistent with village policy. (Ex. J, pp. 76, 77,

- 77 -

80-81)

RESPONSE:   The Plaintiffs deny the allegations of Defendants'
Paragraph 205.  As noted above in the responses to
Defendants' Paragraphs 196, 197, 198, and 199, which are
incorporated herein by reference, the jury need not
believe that the village just "assumed" that it had a
valid right-of-way in Bentley Avenue and 65th Street,
and were ignorant of the actual facts.  And, it is more
plausible to conclude that Willowbrook did not request
an easement or dedication from the property owners
involved based on Village Attorney Gerald Gorski's
theory concerning Willowbrook's prescriptive rights.  As
Gorski, himself, testified, when a roadway becomes a
public highway pursuant to prescription, the local
governmental entity has a right to install water mains
within the public highway obtained by prescription (Pl.
Ex. 4, p. 30), and a village could put pipes in a street
in such a situation without first going to court to get
a court order that there had been a prescriptive
easement.  (Pl. Ex. 4, pp. 68-69)  Moreover, Van
Vooren's testimony that "such a request would have been
consistent with village policy" need not be believed by
the jury because of Van Vooren's other testimony
concerning that "policy" which indicated that he had
absolutely no knowledge of such a policy.  Van Vooren
was asked, "And where is that policy stated?" and he
replied, "I don't have any idea."  (Pl. Ex. 40, p. 81)
He was asked, "Did you did anyone ever tell you that
that was the policy of the Village of Willowbrook?" and
he replied, "Not that I recall."  (Pl. Ex. 40, p. 81)
Van Vooren was asked, "Did you ever read anywhere that
that was the policy of the Village of Willowbrook?" and
he replied, "I can't recall that did I or that I
didn't."  (Pl. Ex. 40, p. 81)  Van Vooren was asked,
"Have you ever had any discussions about what that
policy is with anyone prior to today's date?" and he
replied, "No."  (Pl. Ex. 40, p. 82)  Van Vooren also
testified that he could not recall if he ever executed
that policy.  (Pl. Ex. 40, p. 82)  Since Van Vooren did
not recall reading that that was the policy, had never
had any discussions with anyone about what the policy
was, was never told that that was Willowbrook's policy,
and had never executed that policy, the jury would be
entitled to conclude that he did not know what he was
talking about.

Defendants' Paragraph 206:  Plaintiff's expert, Steven

Bashaw, has never been employed by a municipality and has never

represented a municipality in a real estate transaction.  (Ex. W,

p. 8)

- 78 -

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 206 but
state affirmatively that Bashaw had been involved a
number of times in litigation with a municipality over a
real estate issue.  (Pl. Ex. 3, p. 9)

Defendants' Paragraph 207:  Mr. Bashaw has never handled an
equal protection claim or a civil rights claim as an attorney and
has never testified as an expert witness in such a case.  (Ex. W,
p. 13)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 207 and
state affirmatively that Bashaw's area of expertise is
real estate law (Pl. Ex. 3, pp. 5-9), and that he has
previously testified as an expert in that field.  (Pl.
Ex. 3, pp. 14-17)

Defendants' Paragraph 208:  Mr. Bashaw does not consider
himself an expert in equal protection law and has never, as an
expert witness, analyzed a set of facts to determine whether a
governmental entity treated a person differently than others
similarly situated.  (Ex. W, p. 96)

RESPONSE:  The Plaintiffs agree that Bashaw does not consider
himself an expert in equal protection law but state
affirmatively that Bashaw is an expert in real estate
law.  (Pl. Ex. 3, p. 5-9)  The Plaintiffs also agree
that Bashaw has not, as an expert witness, analyzed a
set of facts to determine whether a governmental entity
treated a person differently than others similarly
situated, but Plaintiffs state affirmatively that in
this case Bashaw applied his expertise in real estate
law to determine whether certain other properties on
roadways with Willowbrook's water service system were
similarly situated to the Olech property in that the
roadway was not dedicated and there were no easements
for the water utility, and to determine whether
Willowbrook required dedications or easements from those
property owners.  (Pl. Ex. 19, pp. 6-9)

Defendants' Paragraph 209:  Mr. Bashaw is not familiar with
any standards that apply to municipalities regarding the
appropriate response to requests made by residents for installation
of water mains and does not consider himself an expert in that
area.  (Ex. W, pp. 106-107)

RESPONSE:    The Plaintiffs agree with Defendants' Paragraph 209 but
             state affirmatively that in this case Bashaw applied his
             expertise in real estate law to determine whether
             certain other properties on roadways with Willowbrook's
             water service system were similarly situated to the
             Olech property in that the roadway was not dedicated and
             there were no easements for the water utility, and to
             determine whether Willowbrook required dedications or
             easements from those property owners. (Pl. Ex. 19, pp.
             6-9)

Defendants' Paragraph 210:  As part of his research as an

expert witness in this case, Mr. Bashaw undertook tract searches of

other properties in Willowbrook that had been part of the Downers

Grove Township prior to annexation by the village. (Ex. W, pp.

89-90)  Like the Olech property, these properties were

"homesteaded," or developed, in piecemeal fashion and not in

conjunction with subdivisions. (Ex. W, pp. 83, 87)  These

properties "do not have dedications, and yet appear to have water,"

but Mr. Bashaw does not know why that occurred or whether any of

the residents on these properties advised the Village of

Willowbrook that there was no right-of-way on the road in the

area. (Ex. W, pp. 83-84)  Mr. Bashaw does not know whether any

village official or employee working on those water main projects

knew whether the village had a right-of-way on the roads in those

areas. (Ex. W, pp. 84-85)  Mr. Bashaw does not know when these

other residents obtained municipal water. (Ex. W, p. 107)  It is

the opinion of Mr. Bashaw that the village should have obtained

dedications from these other residents in connection with the water

main extensions. (Ex. W, p. 91)  To place water service in an area

without a dedication or easement would constitute a trespass. (Ex.

W, p. 62)

RESPONSE:  The Plaintiffs agree that as part of his research as an
           expert witness in this case, Bashaw undertook tract

- 80 -

searches of other properties in Willowbrook that had
been part of Downers Grove Township prior to annexation
by the village, and that, like the Olech property, these
properties were "homesteaded," or developed in piecemeal
fashion and not in conjunction with subdivisions.  The
Plaintiffs also affirmatively state that Bashaw had
reviewed the Village of Willowbrook "Water Map" (Pl. Ex.
19, p. 3; Pl. Ex. 18), and that "despite the fact that
there are roadways with a comprehensive water service
system to serve the adjacent properties, it appears that
there is no dedication of roadways in the general area
of the Olech property and no easements granted in favor
of the Village of Willowbrook relating to roadway use,
utilities, or public purposes" (Pl. Ex. 19, p. 4).  The
Plaintiffs agree that Bashaw found properties that do
not have dedications and yet have water.  The Plaintiffs
agree that Bashaw does not know why that occurred or
whether any of the residents on these properties advised
the Village of Willowbrook that there was no
right-of-way on the road in the area.  The Plaintiffs
agree that Bashaw does not know whether any village
official or employee working on those water main
projects knew whether the village had a right-of-way on
the roads in those areas.  The Plaintiffs agree that
Bashaw does not know when these other residents obtained
municipal water but state affirmatively that Van Vooren,
who worked at Willowbrook from 1987 to 1991, stated that
he was involved in the Bentley Avenue and 65th Street
water main.  (Pl. Ex. 40, p. 16-17)  Fay testified on
May 22, 2001, that the Don May water extension plan on
65th Street and Western was done several years ago.
(Pl. Ex. 11, pp. 136-138)  The Plaintiffs also state
affirmatively that Oglietti testified that Willowbrook's
policy regarding what was required from a property owner
in connection with the extension of village utilities
along roadways over which the village maintains no
rights or interests has been consistent since
Willowbrook was incorporated in 1960.  (Pl. Ex. 20, pp.
54-55)  The Plaintiffs agree that Bashaw is of the
opinion that the village should have obtained
dedications or easements from these other residents in
connection with the water main extensions and is of the
opinion that to place water service in an area without a
dedication or easement would constitute a trespass, but
Plaintiffs state affirmatively that Defendants' expert
witness, Gorski, is of the opinion that, when a roadway
becomes a public highway pursuant to prescription, the
local governmental entity has a right to install water
mains within the public highway obtained by prescription
(Pl. Ex. 4, p. 30), and that a village could put pipes
in a street in such a situation without first going to
court to get a court order that there had been a
prescriptive easement.  (Pl. Ex. 4, pp. 68-69)

<u>Defendants' Paragraph 211</u>:  The expertise that Mr. Bashaw

- 81 -

employed to determine that the village did not obtain dedications from these other residents was his knowledge of how to perform a title search. (Ex. W, , p. 97)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 211.

Defendants' Paragraph 212: Mr. Bashaw utilized his expertise to determine that the residents on these properties obtained municipal water without granting any dedication or easement to the Village of Willowbrook, but did not utilize any expertise to conclude that the Village of Willowbrook intentionally treated Mrs. Olech different [sic] from these other property owners. (Ex. W, pp. 82, 86, 97, 111-112)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 212.

Defendants' Paragraph 213: Mr. Bashaw has not read any depositions of any Village of Willowbrook employees or officials and therefore has no knowledge of the village's explanation for not obtaining an easement or dedication in conjunction with the extension of water mains to these other properties. (Ex. W, pp. 84-86, 111-112)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 213.

Defendants' Paragraph 214: After determining that these other residents did not grant dedications to the Village of Willowbrook, Mr. Bashaw did not employ any expertise, beyond the ability of the average juror, to conclude that the Village of Willowbrook had treated Mrs. Olech differently than others similarly situated. (Ex. W, pp. 82-83)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 214. Bashaw's testimony indicated that he used his expertise to do more than determine that these other residents did not grant dedications to the Village of Willowbrook. Bashaw stated that he reviewed the

village Water Map (Pl. Ex. 18), the public records, and
the situs of the properties. (Pl. Ex. 3, pp. 82-83)
Bashaw concluded that "despite the fact that there are
roadways with a comprehensive water service system to
serve the adjacent properties, it appears that there is
no dedication of the roadways in the general area of the
Olech property and no easments granted in favor of the
Village of Willowbrook relating to roadway use,
utilities, or public purposes." (Pl. Ex. 19, p. 6)
Bashaw identified the other properties by Permanent
Parcel Number and address. (Pl. Ex. 19, pp. 6-8) The
Plaintiffs agree, however, that Bashaw testified that
his statement that Willowbrook treated Olech differently
from the others is not an expert opinion, but rather an
observation based on the facts he gained by use of his
expertise. (Pl. Ex. 3, p. 82)

Defendants' Paragraph 215: Mr. Bashaw testified that once

the fact that the village did not obtain dedications from other

residents is known, a jury, could just as easily as Mr. Bashaw,

make the decision as to whether the village had treated Mrs. Olech

differently from others similarly situated. (Ex. W, pp. 82-83)

RESPONSE: The Plaintiffs deny the allegation of Defendants'
Paragraph 215 on the basis that it is not supported by
the cited portion of Bashaw's deposition. The
Plaintiffs agree that Bashaw testified that once the
fact that the village did not obtain *easements or*
dedications from the other properties, then the
conclusion he reached that they were treated differently
from Olech is one that a juror could come up with as
easily as he. (Pl. Ex. 3, pp. 82-83)

Defendants' Paragraph 216: Mr. Bashaw is aware that the

village requested a dedication of thirty-three feet of the Arabian

Knights Horse Farm property along the frontage of Tennessee Avenue,

but does not know why the village sought the dedication. (Ex. W,

p. 89)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 216.

### The Defendants Were Not Motivated by Ill Will

Defendants' Paragraph 217: John Lossin was employed at the

Village of Willowbrook as the Chief Building Inspector from 1988

through 1994. (Ex. X, p. 6)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 217.

Defendants' Paragraph 218: Mr. Lossin has been a friend of Mrs. Zimmer and her husband for over twenty years. (Ex. X, pp. 7-8)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 218 on the basis that it is not supported by the testimony cited by the Defendants. Lossin testified that he had known Rodney Zimmer, Phyllis' husband, since high school, and that he played softball with Rodney Zimmer in the middle 1970's into the early 1980s. (Pl. Ex. 33, p. 7) Lossin said that he socialized with Rodney and Phyllis Zimmer during that time. (Pl. Ex. 33, p. 8) Lossin did not say that he had been a friend of Mrs. Zimmer and her husband for over twenty years. In fact, he said that he ran into them only one time in the last five years. (Pl. Ex. 33, p. 7)

Defendants' Paragraph 219: While Mr. Lossin was employed at the Village of Willowbrook, the Zimmers and Olechs brought a lawsuit against the village, in 1989, arising out of some flooding that had occurred on their residential properties. (Ex. X, pp. 8-9)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 219 but state affirmatively that Howard Brinkman was also a Plaintiff in that lawsuit. (Pl. Ex. 11, p. 109)

Defendants' Paragraph 220: When Mr. Lossin learned of the Olech/Zimmer lawsuit, he told John Fay, the Village Director of Community Development, that he had known the Zimmers on a social basis for years. Mr. Lossin was then told by Mr. Fay and Mr. Oglietti that he should be "very professional" in light of the lawsuit and his friendship with the Zimmers. Mr. Lossin understood this to mean that there were certain things he should not discuss with the Zimmers and that he should not take sides in the case. (Ex. X, pp. 10-11, 26-27)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 220.

Defendants' Paragraph 221:  Mr. Lossin was never told that a "gag order" had been placed on him by the village with respect to the Zimmers and Mr. Lossin was not told that he could not speak to the Zimmers.  (Ex. X, pp. 11-12, 14)

RESPONSE:  The Plaintiffs deny the allegation of Defendants' Paragraph 221.  Phyllis Zimmer testified that in 1992 Lossin told her and her husband, Rodney Zimmer, "You have a beautiful piece of property, but the Village is ruining it," and "The Village really hates your mother [Olech].  She's the one."  (Pl. Ex. 1, pp. 49-51)  Phyllis Zimmer stated that, after that, the Zimmers met Lossin and his wife at a restaurant, and Mrs. Lossin started to get choked up and cry and said that she did not want her husband [John Lossin] deposed.  Phyllis Zimmer testified that John Lossin told her that he had had a gag order put on him.  (Pl. Ex. 1, pp. 49-51)  Rodney Zimmer also testified that John Lossin told him something to the effect of "Boy, Willowbrook really hates your mother-in-law.  Boy, they're giving you a hard time, aren't they."  (Pl. Ex. 42, p. 15)  Rodney Zimmer testified that at one of the conversations with Lossin and his wife, the word "gag order" was used. (Pl. Ex. 42, pp. 21-22)

Defendants' Paragraph 222:  Mr. Lossin never told the Zimmers that a "gag order" had been placed on him by officials at the Village of Willowbrook and that he could not talk to them.  (Ex. X, p. 17)

RESPONSE:  The Plaintiffs deny the allegation of Defendants' Paragraph 222.  See response to Defendants' Paragraph 221, which response is incorporated herein by reference.

Defendants' Paragraph 223:  Mr. Lossin never told Mr. and Mrs. Zimmer that the people at the Village of Willowbrook disliked or hated Mrs. Olech.  (Ex. X, pp. 15-16; 32-33)

RESPONSE:  The Plaintiffs deny the allegation of Defendants' Paragraph 223.  See response to Defendants' Paragraph 221, which response is incorporated herein by reference.  Moreover, there is evidence that Lossin, who denied making this statement, had a motive to falsely deny it.  Lossin was currently employed by a municipality (Pl. Ex. 33, p. 5), and he admitted that it

would not be good for his professional reputation if it
came out that he had talked to the Zimmers about the
lawsuit while it was pending.  (Pl. Ex. 33, p. 37)

Defendants' Paragraph 224:  Mr. Lossin never told Mr. and

Mrs. Zimmer that they had a beautiful piece of property but that

the village was ruining it.  (Ex. X, p. 17)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 224.  See response to Defendants' Paragraphs
221 and 223, which responses are incorporated herein by
reference.

Defendants' Paragraph 225:  Mr. Lossin never told the Zimmers

that the village "really has it in for Mrs. Olech."  (Ex. X, p. 30)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 225.  Rodney Zimmer testified that at one of
the subsequent meetings at a restaurant Lossin said
Willowbrook really has it out for your mother-in-law.
(Pl. Ex. 42, p. 19)

Defendants' Paragraph 226:  John Fay never expressed to Mr.

Lossin frustration with Grace Olech or the Zimmers over the lawsuit

that they had filed against the Village of Willowbrook.  (Ex. X,

pp. 31-32)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 226.  Fay had been involved in the proposed
project in 1987 to improve drainage in the 6500 and 6400
blocks of Bentley and Tennessee Avenues.  (Pl. Ex. 11,
pp. 106-107)  The people who would not give easements
for the project were the Olechs and Brinkman.  Sometime
after they refused to give Willowbrook those easements,
Olechs, Brinkman, and others sued Willowbrook in
connection with the stormwater problem.  (Pl. Ex. 11, p.
109)  Fay testified that he was significantly
disappointed by that.  (Pl. Ex. 11, p. 109-110)  Fay
testified that he saw the state court lawsuit as a
"relatively frivolous" lawsuit (Pl. Ex. 11, p. 112), and
that he still feels that way notwithstanding that the
jury awarded the Olechs and the Zimmers $155,000.00.
(Pl. Ex. 11, p. 112)  Kenneth Menzel, an associate for
Gerald Gorski who represented Willowbrook in the state
court lawsuit, testified that he had told the Olechs'
attorney that there was some frustration on
Willowbrook's part which stemmed from the fact that the
Olechs had not cooperated with the proposed stormwater
drainage project and had turned around and sued

Willowbrook. (Pl. Ex. 32, pp. 18-19) The jury could conclude that Fay had expressed frustration and then some against Olech, and that that had led to Lossin's statement to Rodney Zimmer that "Willowbrook really hates your mother-in-law." (Pl. Ex. 42, p. 15)

Defendants' Paragraph 227: During Mrs. Olech's conversations with village representatives regarding connection of her home to the municipal water system, none of the village representatives ever mentioned her lawsuit against the village. (Ex. B, p. 66)

RESPONSE: The Plaintiffs agree with Defendants' Paragraph 227.

Defendants' Paragraph 228: No one at the Village of Willowbrook ever expressed to Mr. Fay any frustration about the Olechs and Zimmer's lawsuit against the Village of Willowbrook. (Ex. X, p. 32)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 228. First of all, the testimony cited by the Defendants in support of this paragraph was *Lossin's* testimony that no one at the Village of Willowbrook ever expressed such frustration to him, not Fay's. In any event, the jury need not believe Lossin's testimony in this regard in light of the evidence that he told the Zimmers that Willowbrook hated Olech. (Pl. Ex. 1, pp. 49-51) (Pl. Ex. 42, p. 15) See also the response to Defendants' Paragraphs 145 and 226, which responses are incorporated herein by reference.

Defendants' Paragraph 229: No one at the Village of Willowbrook ever indicated any feelings of ill will toward Mr. or Mrs. Olech in Mr. Van Vooren's presence. (Ex. J, pp. 63-64)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 229. While Van Vooren gave testimony to the effect stated in this paragraph, the jury need not believe the self-serving denials of ill will by Willowbrook employees in light of the strong evidence of ill will outlined in the response to Defendants' Paragraph 145, which response is incorporated herein by reference.

Defendants' Paragraph 230: Mr. Gorski recalls that he was authorized to make a monetary offer of settlement in Case No. 89 L

- 87 -

1517 brought by the Olechs and Zimmers against the Village of

Willowbrook.  (Ex. K, pp. 10-13)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 230.  While the testimony of Gorski supports
the allegation, it is contradicted by the testimony of
Kenneth Menzel, Gorski's associate who testified that
IRMA, the Illinois municipal self-insurance pool, might
have been disposed to consider some sort of settlement
of the state court lawsuit, but Willowbrook did not
believe that there was any merit to the claim and did
not wish to settle.  (Pl. Ex. 32, p. 17)  The jury could
choose to believe the testimony of Kenneth Menzel.

Defendants' Paragraph 231:  Mr. Gorski was "kidding around"

when he responded to Mr. Wimmer's inquiry regarding a monetary

offer to settle the case by stating, "Let's see what I have in my

coat pocket."  (Ex. K, p. 14)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 231 and state affirmatively that what Gorski
meant to convey by those words were that the Village of
Willowbrook was offering nothing.  It bears repeating:
the jury does not have to believe the repeated
protestations and rationalizations of the agents of the
Village of Willowbrook that they did not mean what they
said, that they meant the opposite of what they said,
that thet were joking, that they meant something else,
etc.

Defendants' Paragraph 232:  Kenneth Menzel is an attorney who

participated in the representation of the Village of Willowbrook in

Case No. 89 L 1517, brought by the Zimmers and Olechs against the

Village of Willowbrook.  (Ex. I, pp. 7-10)

RESPONSE:  The Plaintiffs agree with Defendants' Paragraph 232.

Defendants' Paragraph 233:  Village representatives never

expressed any ill will or personal animus to Menzel about the

plaintiffs in the Zimmer litigation.  (Ex. I, pp. 20-21)

RESPONSE:  The Plaintiffs deny the allegation of Defendants'
Paragraph 233.  While Menzel testified that he did not
believe that there was any personal animus (Pl. Ex. 32,
p. 20), he also testified that he told the Olechs'
attorney that Willowbrook was frustrated against Olech

because she had not cooperated with the proposed solution to the storm water problem and had "turned around and sued the village." (Pl. Ex. 32, p. 18-19) Moreover, the jury need not believe Menzel's protestations that village representatives never expressed any personal animus to Menzel about Olech in light of the strong evidence of ill will outlined in the response to Defendants' Paragraph 145, which response is incorporated herein by reference.

Defendants' Paragraph 234: Mr. Menzel never heard anyone at the Village of Willowbrook use any perjorative term to refer to any of the Olechs or Zimmers. (Ex. I, p. 32)

RESPONSE: The Plaintiffs deny the allegation of Defendants' Paragraph 234. Although Menzel testified that he did not "recall" perjoratives being applied to the plaintiffs in the state court lawsuit (Pl. Ex. 32, p. 32), the jury need not believe such testimony in light of the strong evidence of ill will outlined in the response to Defendants' Paragraph 145, which response is incorporated herein by reference, and the jury's understanding of human nature.

Defendants' Paragraph 235: Mr. Menzel never stated to Mr. Wimmer that there was bad blood between the village and Mr. Wimmer's clients. (Ex. I, p. 25)

RESPONSE: The Plaintiffs deny the allegation in Defendants' Paragraph 235, but they accept the allegation for purposes of this federal lawsuit because the only other witness to the conversation was Mr. Wimmer, and Mr. Wimmer will not testify in this federal lawsuit.

## Plaintiffs' Statement Of Additional Facts Pursuant To Local Rule 56.1(b)(3)(B)

Plaintiffs' Paragraph 236: In the responses to the Defendants' Paragraphs above, the Plaintiffs have set forth many facts in opposition to the Defendants' Motion For Summary Judgment. In the interests of brevity, said facts will not be repeated here but are incorporated herein by reference.

Plaintiffs' Paragraph 237: Tennessee Avenue travels in a generally north and south direction and intersects with 63rd Street

which travels in a generally east and west direction. (Pl. Ex. 10)

Plaintiffs' Paragraph 238: The portion of Tennessee Avenue south of 63rd Street is a dead end street of varying widths, and there is a sign for traffic heading onto Tennessee Avenue from 63rd Street which says, "NO OUTLET." (Pl. Ex. 10)

Plaintiffs' Paragraph 239: Plaintiff Grace Olech lives at 6440 Tennessee Avenue, which is on the west side of Tennessee Avenue. (Pl. Ex. 10; Pl. Ex. 6)

Plaintiffs' Paragraph 240: The water main installed by the Village of Willowbrook in 1996 to supply water to the Olech property is on the east side of Tennessee Avenue beyond the edge of the pavement of Tennessee Avenue. (Pl. Ex. 10)

Plaintiffs' Paragraph 241: Willowbrook installed the water main extension in March of 1996. (Pl. Ex. 1, p. 151)

Plaintiffs' Paragraph 242: On October 3, 1995, Modaff sent the Olechs a letter. (Pl. Ex. 14, pp. 106-107) In the letter, Modaff acknowledged that "[t]he owners . . . are willing to grant to the Village a water utility easement within which the extended main would be located." (Pl. Ex. 35) In the letter, Modaff stated, "We . . . request that you give consideration to the following explanation of the Village's position." (Pl. Ex. 35) In the explanation that followed, Modaff did not claim that there was a village policy whereby Willowbrook required a 33-foot dedication or easement from property owners who requested that village utilities be placed in a nondedicated street. (Pl. Ex. 35)

Plaintiffs' Paragraph 243: No representative of the Village of Willowbrook ever told Phyllis Zimmer that there was a village policy whereby Willowbrook required a 33-foot dedication or

- 90 -

easement from property owners who requested that village utilities be placed in a nondedicated road. (Pl. Ex. 10)

Plaintiffs' Paragraph 244: No representative of the Village of Willowbrook ever told Grace Olech that there was a village policy whereby Willowbrook required a 33-foot dedication or easement from property owners who requested that village utilities be placed in a nondedicated road. (Pl. Ex. 24)

Plaintiffs' Paragraph 245: Van Vooren testified that, at the time he was Director of Public Services for the Village of Willowbrook, he prefered to do water main work in the winter. (Pl. Ex. 40, pp. 71-72)

Plaintiffs' Paragraph 246: Gorski, the Defendants' expert witness, acknowledged that he had no evidence that Tennessee Avenue was laid out by the commissioners of highways of any township. (Pl. Ex. 4, p. 42)

Plaintiffs' Paragraph 247: Grace Olech was born on December 4, 1923. (Pl. Ex. 24)

Plaintiffs' Paragraph 248: Thaddeus Olech was born on April 28, 1919. (Pl. Ex. 24)

Respectfully submitted,

John R. Wimmer

John R. Wimmer

JOHN R. WIMMER
Attorney at Law
928 Warren Avenue
Downers Grove, Illinois 60515
(630) 810-0005
Attorney No. 03125600