# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 4935 | **DATE** | 10/10/2002 |
| **CASE TITLE** | Grace Olech, *et al.* vs. Village of Willowbrook, *et al.* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' MOTION TO RECONSIDER.** Plaintiffs' motion to reconsider [Doc. # 81-1] is granted in part and denied in part, pursuant to Rule 60(a).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | **Document Number** |
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | OCT 11 2002 | | |
| ✓ | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | | 90 |
| | Mail AO 450 form. | | | 10/10/2002 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| | JJK courtroom deputy's initials | U.S. DISTRICT COURT 02 OCT 10 PM 4:58 | Date/time received in central Clerk's Office | JJK mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT·
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GRACE OLECH, and PHYLLIS S.  )
ZIMMER, as Independent Executor  )
of the Estate of THADDEUS F. OLECH,  )
Decedent,  )
    )
    Plaintiffs,  )   No. 97 C 4935
    )
vs.  )   Magistrate Judge Schenkier
    )
VILLAGE OF WILLOWBROOK, an Illinois  )
municipal corporation, GARY PRETZER,˙  )
individually and as President of Defendant,  )
Village of Willowbrook, and PHILIP J. MODAFF,  )
individually and as Director of Public Services  )
of Defendant, Village of Willowbrook,  )
    )
    Defendants.  )

## MEMORANDUM OPINION AND ORDER ON
## PLAINTIFFS' MOTION TO RECONSIDER

The plaintiffs have filed a motion to reconsider three portions of the Court's Memorandum

Opinion and Order ("Mem. Op." or "Opinion"), dated May 23, 2002, denying summary judgment

to the defendants. Specifically, the plaintiffs contend that three sets of facts which the Court deemed

admitted and without substantial controversy pursuant to Rule 56(d) are, in fact, disputed, and should

not be deemed admissions. Although not brought pursuant to any specific federal rule, Rule 60(a)

permits the Court, pursuant to a motion or on its own initiative and "at any time," to correct

"[c]lerical mistakes in judgments, orders or other parts of the record and errors arising from oversight

or omission." For the reasons that follow, plaintiffs' motion for reconsideration (doc. # 81-1) is

granted in part and denied in part.



OCT 1 1 2002



## I.

The plaintiffs' first point of contention concerns the November 20, 1995 letter from Mr. Gorski (an attorney for the Village) to Mr. Wimmer (an attorney for the plaintiffs) (Defs.' SJ Ex. MM). In the Opinion, the Court wrote that:

> Mr. Gorski stated that the Village *was "moving off of the policy of asking for . . . dedication and adopting the unique standard applicable to this request or this situation" and that* proposal was "consistent with Village policy regarding all other property in the Village."

(Mem. Op. at 24) (emphasis added). The plaintiffs point out that the letter did not contain the words "moving off of the policy of asking for dedication and adopting the unique standard applicable to this request or this situation" (Pls.' Mot. ¶¶ 4-5). The source of these words was the defendants' statement of facts submitted in support of their motion for summary judgment, which in fact the plaintiffs disputed. (*Id.* at ¶ 5). The statement in italics above will therefore be stricken as a fact that can be deemed established by Rule 56(d), and the Court's Opinion will be amended accordingly.

## II.

The plaintiff's second point of contention concerns an October 3, 1995 letter (Defs.' SJ Ex. V; Pls.' SJ Ex. 35). In the Opinion, the Court stated that this letter had been written by Mr. Gorski (Mem. Op. at 21). The plaintiffs are correct that this letter was written by Mr. Modaff, not Mr. Gorski. Thus, that reference will be amended accordingly.

The plaintiffs also contend that the Court misspoke when it stated that the author of the October 3, 1995 letter told the plaintiffs that the Village was determined to maintain its position regarding the proposed easement and *"asked the plaintiffs to reconsider the 33-foot dedication"* (Mem. Op. at 21) (emphasis added). While the plaintiffs are correct that the October 3, 1995 letter

does not explicitly ask the plaintiffs to reconsider a "33-foot dedication," the letter did ask the plaintiffs to agree to withdraw their opposition and to "grant an easement to the Village of sufficient width . . . ." And, we note that Mr. Modaff testified in his deposition that the "village attorney's office" advised the Village "to maintain our position" that "we reiterated in the October 3, 1995 letter" (Defs.' Ex. D, at 113). The position "reiterated"[1] in the October 3, 1995 letter (the one omitting any reference to 33 feet) was the original position taken by the Village, namely, that a 33-foot dedication was required (Defs.' Ex. U (09/21/95 letter stating original request for 33-feet)). However, because the October 3 letter does not use the words "33-foot dedication," the Court will amend the Opinion to eliminate the italicized language quoted above, and to identify Mr. Modaff as the author of the letter.

### III.

The plaintiffs' third point of contention is based on facts related to the Village's request for a 33-foot dedication from Mr. Vena, the owner of the Arabian Knights Horse Farm. In the Opinion, we stated that "the Village asked Michael Vena, the property owner of the horse farm, for a 33-foot dedicated right-of-way as a condition for issuing the necessary permits for a sanitary sewer extension project that Mr. Vena needed to construct public restrooms on his property" (Mem. Op. at 20, n.15). In response to the summary judgment motion, the plaintiffs disputed that the permits Mr. Vena needed were conditioned on the dedication request.

We understood that point, but, the Court will not amend the Opinion on that basis. A written memorandum by Mr. Fay to the Village President and Trustees, dated October 17, 1995, states that " . . . it was made a condition of the sanitary sewer extension permit that the Arabian Knights Horse

---

[1]"Reiterate" means "to state or do over again . . . ." WEBSTER'S COLLEGIATE DICTIONARY, at 986 (10th Ed. 1997).

Farm would dedicate the east thirty-three feet (33') of the Tennessee Avenue right-of-way adjacent to the entirety of their property" (Defs.' SJ Ex. KK). The fact that subsequent permits needed by Mr. Vena may not have been conditioned on the dedication, after the Village recognized it lacked authority to impose that condition, does not obviate the fact that the Village initially asked Mr. Vena for a dedication of 33 feet along Tennessee Avenue as a condition of getting the permits. The plaintiffs, of course, will be free if they wish to explain why the dedication ultimately was not a condition for issuing the permits.

### IV.

Finally, in reviewing the Opinion we issued for purposes of deciding this motion (and others in this case), we discovered that Mr. Bashaw's name was also typed incorrectly. At page 11 of the Opinion, we refer to him as Mr. Robert Bashaw. His name is Steven Bashaw, and we will amend the Order to reflect that change as well.

### CONCLUSION

For the reasons given, we therefore grant plaintiffs' motion to reconsider in part and deny it in part (doc. # 81-1), pursuant to Rule 60(a). The Court will amend and clarify the portions of the Original Opinion found at pages 11, 21 and 24, as described above.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: October 10, 2002

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GRACE OLECH, and PHYLLIS S.   )
ZIMMER, as Independent Executor   )
of the Estate of THADDEUS F. OLECH,   )
Decedent,   )
  )
            Plaintiffs,   )     No. 97 C 4935
  )     Magistrate Judge Schenkier
vs.   )
  )
VILLAGE OF WILLOWBROOK, an Illinois   )
municipal corporation, GARY PRETZER,   )
individually and as President of Defendant,   )
Village of Willowbrook, and PHILIP J. MODAFF, )
individually and as Director of Public Services   )
of Defendant, Village of Willowbrook,   )
  )
            Defendants.   )

## AMENDED MEMORANDUM OPINION AND ORDER[1]

The defendants in this case, the Village of Willowbrook ("Village"), its President (Gary Pretzer), and its Director of Public Services (Philip J. Modaff) – individually and in their official capacities – have filed a motion seeking summary judgment against the plaintiffs, Grace Olech and her daughter, Phyllis Zimmer, as executor for the estate of her father, Thaddeus Olech (doc. # 68). This case, originally filed in July 1997 as a one-count equal protection claim by Ms. Olech as a "class of one," has a long history in federal court. In April 1998, the complaint was dismissed by the district judge, who held that Ms. Olech (then the only plaintiff) had not stated a viable equal protection claim because she had not alleged the kind of conduct by the Village necessary to establish "ill will" under the Seventh Circuit's ruling in *Esmail v. Macrane*, 53 F.3d 176, 178 (7th

---

[1]Pursuant to Fed. R. Civ. P. 60(a), the Court amends the following order, as indicated in the ruling on plaintiffs' motion to reconsider, issued on October 10, 2002.

Cir. 1995). *Olech v. Village of Willowbrook*, 97 C 4935, 1998 WL 196455 (N.D. Ill. Apr. 13, 1998). In November 1998, the Seventh Circuit reversed the district court's dismissal order, holding that plaintiffs had sufficiently pled that the basis for the Village's alleged differential treatment was ill will. *Olech v. Village of Willowbrook,* 160 F.3d 386 (7th Cir. 1998). The United States Supreme Court granted certiorari and, in April 2000, affirmed – albeit on a different ground than that relied on in the Seventh Circuit's ruling. *Willowbrook v. Olech,* 528 U.S. 562 (2000) (holding plaintiff could assert equal protection claim as class of one and plead claim by alleging intentional but differential treatment of similarly situated individuals without a rational basis for difference in treatment, without alleging "alternative theory" of ill will).

Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a magistrate judge for all proceedings, including the entry of final judgment (doc. ## 43, 44), and the case was reassigned to this Court on July 21, 2000 (doc. # 46). After the case was remanded by the Seventh Circuit, the parties engaged in extensive discovery, which has been completed and has now brought the parties to the summary judgment motion presently before this Court. After careful review of the parties' summary judgment submissions, including the voluminous fact statements submitted in accordance with Local Rule 56.1, the Court finds that summary judgment must be denied because there are genuine issues of material fact that must be resolved by a jury. The reasons for this conclusion follow.

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could

2

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insola v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.,* affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insola,* 216 F.3d at 598.

Rule 56(d) provides that if summary judgment cannot be rendered upon the whole case or for all the relief asked, the Court nonetheless may "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." In so doing, Rule 56(d) "serves the salutary purpose of allowing a Court to see to it that the expenditure of time by the parties and the Court on a failed summary judgment motion has not been in vain." *Kinesoft Development Corp. v. Softbank Holdings, Inc.*, 99 C 7428, 2000 WL 1898577, at *6 (N.D. Ill., Dec. 20, 2000); *see also Capital Records, Inc. v. Progress Record Distrib.*, 106 F.R.D. 25, 29 (N.D. Ill. 1985).

The following facts are material to the plaintiffs' equal protection claim and are derived from the parties' Rule 56.1 Statements. Although there are several genuine issues of material fact that preclude summary judgment, many of the material facts are uncontested. Because the Court's findings with respect to these uncontested facts should streamline the trial, we address them in detail below in Section II of this opinion. Pursuant to Rule 56(d), the Court finds that these facts are without "substantial controversy," and we therefore deem them established and admissible at trial to the extent they are relevant within the meaning of Fed. R. Evid. 401, and should not be barred under Fed. R. Evid. 403. "[T]he trial shall be conducted accordingly." Fed.R.Civ.P. 56(d). The genuine fact disputes will be addressed in Section III of the opinion, in conjunction with the substantive legal principles that make them material.

## II.

Plaintiff, Grace Olech, born on December 4, 1923 (Pls.' Add'l Facts ("PAF") ¶ 247), currently lives at 6440 Tennessee Avenue, which is on the west side of the street (PAF ¶ 239), south of 63rd Street (Pls.' Responsive Facts ("PRF") ¶ 1). Ms. Olech's daughter, Phyllis Zimmer, is the

representative plaintiff for her deceased father.[2] Ms. Zimmer also lives on Tennessee Avenue, south of 63rd Street (Ex. F, p. 20).

Other than the Village of Willowbrook, there are two named defendants: Philip Modaff, the former Director of Public Services ("DPS"), and Gary Pretzer, the President of the Village. Mr. Modaff holds a Master's Degree in Public Administration (Defs.' Statement of Facts ("DSOF") DSOF ¶ 28). Messrs. Pretzer and Modaff both are sued in their individual capacities. Mr. Pretzer has served as Village President since 1993 (DSOF ¶ 160). Mr. Modaff served as the DPS from June 1991 to July 29, 1997 (DSOF ¶ 28). At all relevant times, Mr. Modaff's responsibilities included oversight of water main installations that were not related to subdivision developments (DSOF ¶ 29).

There are several other Village representatives who are not named as parties in this lawsuit, but whose knowledge and/or conduct nonetheless are relevant to the issues presented in this case: John Fay, the Village Director of Community Development since August 1985 (DSOF ¶ 71);[3] Gerald Gorski, the Village Attorney since 1971 (DSOF ¶ 76);[4] Bernard Oglietti, the Village Administrator

---

[2] At the time the present lawsuit was filed in 1997, Ms. Olech's husband, Thaddeus, born on April 28, 1919, was alive and lived with Ms. Olech at the Tennessee Avenue address. Mr. Olech passed away before the filing of the original complaint on July 11, 1997, and Ms. Zimmer was named as the administrator of his estate on October 9, 1997. The Court gave Ms. Zimmer leave to join this lawsuit, in a representative capacity, in an order dated December 13, 2000. *See Olech v. Village of Willowbrook,* 138 F.Supp.2d 1036, 1039 (N.D. Ill. 2000).

[3] Mr. Fay has a Master's Degree in City and Regional Planning (DSOF ¶ 71).

[4] Mr. Gorski is an expert in the area of municipal law (DSOF ¶ 76). During the last thirty years, Mr. Gorski has represented municipalities in connection with issues regarding right-of-ways, easements, dedications, and how much property or right of way to obtain in connection with a municipality's placement of a utility (DSOF ¶ 77; PRSF ¶ 77; DRF ¶ 77). As a municipal lawyer, Mr. Gorski has dealt with issues regarding whether a municipality has a prescriptive easement in a road (DSOF ¶ 78).

since 1977 (DSOF ¶ 70);[5] and David Van Vooren, the Director of Public Services from 1987 to 1991, immediately prior to Mr. Modaff's tenure (DSOF ¶ 194; DRF ¶ 64; Ex. J., pp. 13-14).

This lawsuit arises out of a dispute in 1995 that began when the Olechs asked the Village to connect their home to the municipal water system (prior to that time, the Olechs had obtained their potable water from a well located on their property). The plaintiffs claim that the Village improperly attempted to condition the water connection on the Olechs' agreement to grant a 33-foot easement.[6] The parties ultimately agreed to a smaller easement, but the dispute over an easement led to a delay in the water connection being completed, with the result that the Olechs were without running water during the winter of 1995-96. Plaintiffs assert that the Village's conduct violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, because the Village's original insistence on a 33-foot easement intentionally and irrationally distinguished between the Olechs and other similarly-situated residential property owners in the Village. Alternatively, plaintiffs assert an equal protection violation based on the theory that the Village's dedication demand was animated by ill will, harbored from another (then-pending) lawsuit between the Village and the Olechs.

We begin by discussing the creation and use of Tennessee Avenue (Section A), the Village's practices and policies concerning extensions of water service (Section B), and litigation pending

---

[5]Mr. Oglietti has a Master's Degree in Public Administration. His duties include oversight of the day-to-day operation of all the operating departments and activities of the Village (DSOF ¶ 105).

[6]The parties' submissions use the terms "easement," "dedication," and "right of way" to refer to the rights sought by the Village in order to provide the water connection (*see, e.g.,* Pls.' Resp. at 3; Defs.' Reply at 1). Because the parties use those terms interchangeably, without attempting to draw any legal or factual distinctions between them, we will do so as well for purposes of this opinion.

between the Village and the Olechs in 1995 (Section C). We then turn to the Village's handling of the request by the Olechs for connection to the Village water system (Section D).

**A. Tennessee Avenue**.

Tennessee Avenue runs in a generally north and south direction; it intersects with 63rd Street, which runs in a generally east and west direction (PAF ¶ 237). The portion of Tennessee Avenue south of 63rd Street is a dead end street of varying widths, and there is a sign for traffic heading south on Tennessee Avenue from the 63rd Street intersection which reads "NO OUTLET" (PAF ¶ 238).

In 1943, Grace and Thaddeus Olech purchased property along the west side of what is now Tennessee Avenue, south of 63rd Street, in an area that is now located within the Village of Willowbrook (DSOF ¶ 1). The original deed by which the Olechs took title stated that the property at issue is "subject to the right of public travel over the east Thirty-Three (33) feet thereof" (DSOF ¶ 1; PRF ¶ 1 (citing Pl. Ex. 2)). That property was (and is) also subject to an easement held by Northern Illinois Gas over the thirty-three feet of the property, where Tennessee Avenue is located (DSOF ¶ 1). In 1949, the Olechs took title to a second parcel of land just north of the parcel conveyed to them in 1943. The deed conveying this second parcel to the Olechs did not contain any easements or other "subject to" language (Ex. 19, p. 2).

1. Public Use and Maintenance of Tennessee Avenue.

The land where Tennessee Avenue and the Olech property are situated was annexed by the Village of Willowbrook sometime in the late 1980s (DSOF ¶ 19).[7] Prior to annexation by the Village, the portion of Tennessee Avenue where the Olech property is located was situated within

---

[7] Although the parties dispute the year of annexation – defendants say it occurred in 1986, while plaintiffs say it occurred in 1989 (DSOF ¶ 19; PRF ¶ 19) – that dispute is not material.

the Downers Grove Township ("Township") (DSOF ¶ 56). On all roads within its jurisdiction, the Township would pave, resurface, plow and install culverts and swales to control drainage (DSOF ¶¶ 9, 13). Although Tennessee Avenue originally was laid with gravel by the Olechs (PRF ¶¶ 1, 246), the road – and in particular the portion of Tennessee Avenue south of 63rd Street adjacent to where the Olechs reside – thereafter was maintained, paved and seal coated by the Township with public funds (DSOF ¶¶ 2, 5, 13, 14, 16, 17). The plaintiffs did not pay any portion of that expense (DRF ¶ 1). When the Village annexed the Township roads, it took over maintenance of the Township streets within its area, including the portion of Tennessee Avenue south of 63rd Street, where the Olechs reside; the expenses for road maintenance and repairs continued to be covered by public funds (now those of the Village), and not by the Olechs (DSOF ¶¶ 18-20, 81-83).

The portion of Tennessee Avenue south of 63rd Street has no outlet, but it has been used by the public without interruption for many years (DSOF ¶¶ 2, 15). For example, Ms. Olech testified that she has seen vehicles traveling on Tennessee Avenue to the Arabian Knights Horse Farm ("Horse Farm"), which is located on the east side of Tennessee Avenue south of the Olech property (DSOF ¶ 3). Ms. Olech also testified that she has never made any attempt to preclude people or vehicles from traveling on this portion of the road (Id.).

## 2. Village Right-of-Ways.

When the Village annexed the land owned and maintained by the Township, it inherited the existing patterns of those streets. Most – but not all – of the streets in the Township had a 66-foot right-of-way, extending 33 feet in each direction from the center of the road to the sides of the road (DSOF ¶ 10). However, the parties now agree that neither the Township nor the Village had an established 33-foot right-of-way or easement from the middle of Tennessee Avenue extending west

8

toward the Olech property at the time the present dispute arose (DSOF ¶ 60). The parties also agree that while the language in the 1943 deed for the first Olech parcel stated that the conveyance was "subject to the right of public travel over the East Thirty-Three feet" of the property (which would include Tennessee Avenue), that language did not confer any affirmative rights on the public (PRF ¶ 1).

The Borman subdivision is located on Tennessee Avenue, south of the Olech property (PRF ¶ 21). Mr. Fay testified that when the Village approved the Borman subdivision in 1983, the Village required dedication of the western half of Tennessee Avenue, across from the Horse Farm (PRF ¶ 21). The dedication required by the Village for the Borman subdivision was the western 40 feet from the center line of Tennessee Avenue – more than the 30 feet required by the subdivision regulations (Ex. N, § 10-4-1(B); Ex. 12, p. 70). Mr. Fay became aware of this dedication in the late 1980s, when he became an employee of the Village (PRF ¶ 21).

### 3. Prescriptive Use Of Tennessee Avenue.

At the time that the Village annexed Tennessee Avenue, it had been improved, maintained and used for public travel for more than 15 years – occurrences that the parties agree established prescriptive (adverse) use by the public of the land covered by Tennessee Avenue (DSOF ¶ 87). The parties therefore agree that although no property owner ever granted an easement or dedication, the portion of Tennessee Avenue that runs through the property originally purchased by the Olechs in the 1940s had become a public road (rather than a private street) by virtue of prescriptive use; they

also agree that any rights acquired by the Township by virtue of this use passed to the Village upon annexation in the late 1980s (DSOF ¶¶ 82-84; PRF ¶¶ 82-84).[8]

The boundaries of a public highway acquired by prescription are the portions of the highway used for travel or drainage (PRF ¶ 15 (citing Pl.'s Ex. 4, p. 27)). Thus the shoulders and swales of a road are part of the prescriptive easement (DSOF ¶ 90). Mr. Gorski testified that if a municipality has a prescriptive easement with respect to a public highway, then the municipality can install utilities within that easement, including water mains, or use it for any other public purpose, without first going to court to establish the right to engage in such uses (DSOF ¶ 89; PRF ¶ 94). The plaintiffs do not dispute this point. To the contrary, the parties agree that at the time the present dispute arose, the Village had prescriptive use rights over approximately 13.1 feet extending west from the center line of Tennessee Avenue, which includes the culverts and swales along the west side of Tennessee Avenue and eastern portion of the plaintiffs' property.[9]

---

[8]The parties' agreement on this point is in accord with governing Illinois law. Section 7-1-1 of the Illinois Municipal Code provides that, upon annexation,

> The new boundary [of the municipality] shall extend to the far side of any adjacent highway and shall include all of every highway within the area annexed.

65 ILCS 5/7-1-1 (West 2000). The term "highway" includes, in relevant part,

> . . . any public way for vehicular travel which has been laid out in pursuance of any law of this State, or of the Territory of Illinois, or which has been established by dedication, or used by the public as a highway for 15 years [prescriptive use] . . . ."

605 ILCS 5/2-202 (West 2000).

[9]The paved portion of Tennessee Avenue extends 4.1 feet onto the property originally deeded to the Olechs in the 1940s. The drainage ditch adjacent to the west side of Tennessee Avenue extends an additional 9 feet onto the Olech property (PRF ¶ 15 (citing Pls.' Exs. 6, 10)).

## B. Village Practices Regarding Water Main Extensions.

There are three general groups of facts that are relevant to the Village of Willowbrook's practices or policies regarding water main extensions that are not part of subdivision developments: its conduct prior to the plaintiffs' request for a water main extension; its conduct at the time the plaintiffs' requested an extension; and its conduct after the extension of the Village water main to the plaintiffs.[10] We will treat each general group of facts chronologically.

### 1. Village Conduct Prior To The Plaintiffs' Request.

Prior to the plaintiffs' request for a water main extension, the Village had completed water main extension projects for a number of owners of residential properties located on public roadways without requesting a dedication or an easement (hereinafter "nondedicated roadways") (DSOF ¶ 200). With respect to these water main extensions on nondedicated roadways, such as the portion of Tennessee Avenue in dispute, the following facts are without controversy.[11]

The plaintiffs' expert, Steven Bashaw, has offered undisputed opinion testimony regarding twelve residential properties located within a three block radius of the plaintiffs' property and on public roadways (Ex. 19). All of these properties have water service through connections to the Village water main. Of these twelve properties, ten are located on nondedicated roadways: that is, roadways for which there has been no dedication for use as a public road or for public improvements

---

[10]The parties agree that the Village's subdivision regulations, which require a sixty-foot right of way (running from the center line of the road to the edge of the property line), do not apply to this case, because the Village was not subdividing the plaintiffs' property (DSOF ¶¶ 107-08, 111; PRF ¶ 107).

[11]We note that the defendants cite as "undisputed" the proposition that the Village Code requires public utilities to be placed within dedicated right-of-ways or dedicated utility easements (DSOF ¶ 61). But, interpretation of the Village Code is not a factual matter – it is a matter of law for the Court. Having examined the portions of the Village Code cited, the Court finds that the Village Code does not contain the requirement that defendants assert. The Code only refers to "restoration of all rights of way" once utilities are installed; it does not require installation of utilities within right-of-ways (Ex. Z, pp. 60-62).

(but which, presumably, have become public by prescriptive use). With respect to the ten nondedicated public roadways, five have special use utility easements of various sizes ranging from 10 to 33 feet in width, and five have no easements at all (Ex. 19, pp. 6-8).[12] For only two of the twelve roadways identified are there dedications of private property for public travel or other public improvements. These two properties have dedications extending only 17 feet laterally from the center line of the roadway (*Id.*).

There is no evidence in the record that these two dedications were sought or received in connection with a request for a water main extension, or that the Village (or any other governing body) conditioned the grant of water on the dedication. There is also no evidence that any of the special use utility easements were required by the Village in order to install a water main. In short, there is no evidence regarding the history of how these twelve properties came to receive water main extensions.

The foregoing facts pertain to water main extensions associated with public roadways. In addition, the undisputed evidence is that, when the Village installed water mains on private property that was "not associated with the roadway," the Village typically required a fifteen-foot utility easement from the property owner (PRF ¶ 67-68; DRF ¶ 67-68; DRF ¶ 178) (Ex. N. § 10-4-2: (c)). These easements were required because the water mains were being placed in side yards to serve various people "beyond the side yards they were going through" (DRF ¶ 178) (Ex. K. p. 22).

---

[12]The properties with Village water service but no dedications or easements are located at: 6404 Western Avenue; 6416 Clarendon Hills Road (directly to the east of the Olechs and adjoining Tennessee Avenue); 6502 Tennessee Avenue (directly south of the Olech property, on the same side of Tennessee Avenue); 364 65th Street; and 368 65th Street (Ex. 19, pp. 7-8).

## 2. Village Conduct At The Time Of Plaintiffs' Request.

At the time the plaintiffs requested a water main extension on Tennessee Avenue, there is no evidence that there were any other residential property owners located within that vicinity on public roads, requesting a similar project from the Village. The Horse Farm, located on the east side of Tennessee to the south of the Olechs' property, requested a sewer sanitation project from the Village in September 1995, shortly after the dispute with the Olechs arose (DSOF ¶ 104). But, as we explain below (pp. 30-35, *infra*), there are genuine issues of material fact regarding the similarity of that property, and its owner's request, to that of the plaintiffs.

## 3. Village Conduct Subsequent To The Plaintiffs' Request.

In early January 2001, subsequent to the plaintiffs' request for a water main, John Kucera, who also owns residential property along Tennessee Avenue south of 63rd Street, requested a connection to the Village water main (DSOF ¶ 159; (Ex. 37)). In a letter to Mr. Kucera, the Village requested a 33-foot dedicated easement to construct the water main; but the Village also gave Mr. Kucera the option of granting a special use easement for utility purposes (rather than a general public use easement) limited to 25 feet of his property (DSOF ¶ 158; PRF ¶ 158; DRF ¶ 158). The parties have not cited any evidence indicating whether Mr. Kucera accepted either option; whether the water connection was made; and, if it was, what type of easement (if any) was provided.

## C. The Storm Water Drainage Litigation.

The undisputed facts show that even before this case commenced, the Olechs and the Village were not strangers to litigation with each other. In 1989, the Zimmers and the Olechs brought a lawsuit against the Village that arose from flooding that occurred on their property from storm water drainage problems on Tennessee Avenue (DSOF ¶ 219). John Lossin was employed by the Village

13

as the Chief Building Inspector at that time (DSOF ¶ 217). Mr. Lossin had known Mr. Zimmer since high school, and socialized with the Zimmers in the 1970s and early 1980s (PRF ¶ 218). When Mr. Lossin learned of the 1989 lawsuit, Messrs. Fay and Oglietti told him that he should be "very professional" in light of the lawsuit (DSOF ¶ 220). Mr. Lossin understood this remark to mean that he should not discuss certain matters with the Zimmers, and should not take sides in the case (DSOF ¶ 220).

A settlement of what the plaintiffs call the "storm water [drainage]" lawsuit (PRF ¶ 226) could not be reached prior to trial (DSOF ¶ 231). Mr. Gorski admitted that he responded to an inquiry by the plaintiffs' attorney regarding a monetary offer to settle the case by stating "[l]et's see what I have in my coat pocket," but said that he was "kidding around" when he made that comment (DSOF ¶ 231). Kenneth Menzel is an attorney who participated in the representation of the Village in the storm water drainage litigation (DSOF ¶ 232). Mr. Menzel testified that IRMA, the Illinois Municipal self-insurance pool, might have been disposed to consider settlement of the lawsuit, but Willowbrook did not believe that there was merit to the claim, and it did not wish to settle the case with Ms. Olech (PRF ¶ 230; PRF ¶ 145) (Pl. Ex. 32, p. 17). There is no evidence of any concrete settlement offer ever made by the Village – or, for that matter, by the Olechs or Zimmers. The storm water drainage lawsuit eventually went to trial, and (after the Olechs hooked up to the Village water main) a jury returned a verdict for the Olechs and Zimmers in the amount of $155,000.00 (PRF ¶ 226).

Mr. Menzel has testified that the Village was "frustrated" with Ms. Olech because she had not cooperated with the Village's proposed storm water drainage project (which included a request by the Village to Ms. Olech for an easement to her land to complete a drainage project) prior to the

flooding (Pls.' Ex. 32, pp. 18-20). According to Mr. Menzel, it was the Village's position that Ms. Olech's lack of cooperation in obtaining the storm water drainage easement prior to the flooding resulted in the floods that served as the basis for Ms. Olech's 1989 lawsuit against the Village (Pls.' Ex. 32, pp. 18-20).

It is undisputed that the Village was frustrated by Ms. Olech's storm water drainage lawsuit. What is vigorously disputed is whether the defendants took that frustration out on the Olechs in deciding how to proceed with the Olechs' 1995 request to connect the Village water supply. As we explain below (pp. 38-42, *infra*), each side has offered evidence which the Court finds creates a genuine dispute of material fact as to whether the defendants acted with ill will.

### D. The Present Dispute.

In May 1995, the well on Ms. Olech's property that had supplied water to her home broke down (DSOF ¶ 22). Ms. Olech was advised that the well could not be repaired, and that she would need a new system which would cost more than $10,000.00 (DSOF ¶ 23). Ms. Olech also was advised that it would not make sense to put in a new well system, because the Olechs were eligible to receive lake water through the Village water main hookup (PRF ¶ 23).

As a temporary measure, the Olechs used a garden hose to obtain water from the well on the neighboring Zimmer property (DSOF ¶ 24). Through this garden hose, water from the Zimmer well entered the Olech home, filled the toilet tank, entered the hot water heater, and flowed through faucets in the home (DSOF ¶ 25). However, in about November 1995, the water in the garden hose froze, leaving Ms. Olech without a supply of water for her home until March 1996 (PRF ¶ 190; DSOF ¶ 192).

1. <u>Ms. Olech Requests Connection to the Willowbrook Water System.</u>

On May 23, 1995, shortly after her well broke down, Ms. Olech called the Village of Willowbrook and spoke with Mr. Modaff. Ms. Olech advised Mr. Modaff that her well had broken down, and asked that her home be connected to the municipal water system as soon as possible (DSOF ¶¶ 27, 28). When Mr. Modaff suggested that Ms. Olech wait for the Village to complete a "loop" for all residents on Tennessee Avenue, Ms. Olech informed Mr. Modaff that she could not wait two years, as he suggested, because she had no water and thus was in an emergency situation (PRF ¶ 27).

After this phone call, Mr. Modaff drove directly to Ms. Olech's home (PRSF ¶ 30), and arrived there within twenty minutes of their phone call (DSOF ¶ 31). When Mr. Modaff met Ms. Olech at her property, she told him that her well had "gone bad" and was "beyond repair," and asked what it would take to connect to the Village water system (DSOF ¶ 32). The parties dispute the content of Mr. Modaff's response to Ms. Olech (DSOF ¶¶ 33-35; PRF ¶¶ 33-35). But the parties agree that Ms. Olech told Mr. Modaff that she felt he and the Village would take their time to hook her water up because of her pending storm water drainage litigation against the Village (PRF ¶ 33).

Thereafter, Mr. Modaff sent a letter, dated June 6, 1995, to the Olechs, the Zimmers, and Howard Brinkman, all of whom had requested a connection to the Village water supply. In that letter, Mr. Modaff stated that he would present the request for a water main extension at the next Public Works Committee meeting, scheduled for June 19, 1995 (DSOF ¶ 40; PRF ¶ 40). Mr. Modaff, in fact, presented the request at that meeting (*Id.*).

In the meantime, after the May 23, 1995 meeting between Mr. Modaff and Ms. Olech, Ms. Zimmer contacted an engineer, Don Eddy, to learn what might be involved in engineering the water

connection (DSOF ¶ 39). On June 20, 1995, Ms. Olech told Mr. Modaff that she and the other plaintiffs might hire an outside contractor to do the job, rather than allow the Village to hire a contractor to install the water connection (DSOF ¶ 41). In response, Mr. Modaff sent a letter to Ms. Olech, Ms. Zimmer, and Mr. Brinkman, dated June 21, 1995, outlining the various steps they would have to take to extend the water connection if they chose to hire their own engineer, rather than allowing the Village Engineer to design the project (DSOF ¶ 42; PRF ¶ 42).

Thereafter, Ms. Olech and two of her neighbors (Ms. Zimmer and Mr. Brinkman) sent a letter to Mr. Modaff, which he received on June 30, 1995, authorizing the Village to begin preliminary engineering studies to determine the cost of the water main extension project (DSOF ¶ 43; DRF ¶ 43 (citing Reply Ex. OO)). After receiving the written authorization, Mr. Modaff immediately contacted the Village Engineer, discussed the general scope of the project, and asked the engineer to prepare a preliminary cost estimate for the project (DSOF ¶ 44). The Village Engineer provided Mr. Modaff with a preliminary cost estimate of approximately $7,012.67 per residence (DSOF ¶ 45). By a letter, dated July 6, 1995, Mr. Modaff advised Ms. Olech and her neighbors of this estimated cost (DSOF ¶ 45). Shortly after receiving the July 6 letter, Ms. Olech delivered to Mr. Modaff a check for her share of the cost of the project (DSOF ¶¶ 47; Defs.' Ex. V).[13]

On August 9, 1995, Mr. Modaff sent a memorandum to the Village President (Mr. Pretzer) and the Village's Board of Trustees stating that there was a need to move quickly to award the bid to a contractor for this project due to the "*impending* failure of a well operated by one of the homeowners" (DSOF ¶ 48) (emphasis added). Plaintiffs assert that when he wrote the

---

[13]Ms. Zimmer and Mr. Brinkman also delivered checks for $7,012.67 to the Village to cover their shares of the project cost (Ex. NN).

memorandum, Mr. Modaff knew that the failure of the Olech well was not at that time "impending" but, rather, was "complete" as of May 23, 1995 (PRF ¶ 48). The defendants do not dispute this fact.

On August 14, 1995, the Village board passed a resolution authorizing the Village President and Clerk to execute a contract with Scorpio Construction Company ("Scorpio") for the construction of the water main extension on Tennessee Avenue (DSOF ¶ 51). The EPA issued a permit for the project on August 30, 1995 (DSOF ¶ 52).

Originally, the project was designed with the water main to be placed on the west side of the street, where the Olech property is located, but the Village Engineer later recognized that the water main would be in conflict with other utilities on the west side of Tennessee Avenue, and the decision was made to place the water main on the east side of Tennessee Avenue (DSOF ¶ 46). The decision to place the water main on the east side of Tennessee Avenue was made before the Village signed a construction contract with Scorpio to perform the work for the water connection (PRF ¶ 46).

2. Zimmer Notification.

Sometime between July 12 and August 1, 1995, Ms. Olech and Ms. Zimmer visited Mr. Modaff at his office and notified him that Tennessee Avenue had not been dedicated to the Village (PRF ¶ 53). Prior to that conversation, no one from the Village had ever told plaintiffs that they must grant the Village a dedicated right-of-way or a dedicated easement for the water main project (DSOF ¶ 54).

After Ms. Zimmer advised Mr. Modaff that the Village did not have a dedicated right of way on Tennessee Avenue, Mr. Modaff asked the Village Engineer to investigate the status of the road (DSOF ¶ 58). After reviewing a plat of survey produced by the Village Engineer, Mr. Modaff believed that he needed further clarification "on what was available to [the Village] to construct [the]

18

water main" (DSOF ¶¶ 46, 48, 51, 52, 59, 100). Mr. Modaff believed that the issue regarding the Village's right-of-way on Tennessee Avenue was at best "clouded"; was a "quirk of old township government"; and was "something that slipped through the cracks" (DSOF ¶ 60). Subsequent investigation by Village officials revealed that the Village did not have a dedicated right of way to the portion of Tennessee Avenue adjoining the plaintiffs' property at the time the Olech water main project was being discussed; but, the Village did have a "prescriptive easement" along Tennessee Avenue adjoining the Olech property by virtue of adverse use (PRF ¶ 67; DRF ¶ 67). At no time did Mr. Modaff or anyone else from the Village suggest to plaintiffs that the Village would use its prescriptive easement rights to Tennessee Avenue – which extended 13.1 feet from the center of Tennessee Avenue (*see* p. 10 and n.8, *supra*) – to construct the water main (PRF ¶ 98).

Messrs. Fay, Modaff and Oglietti then discussed whether to request a dedication or easement from the plaintiffs as a condition to connecting them to the Village water main (DSOF ¶ 115). During these conversations, Messrs. Fay, Modaff and Oglietti knew that the Village was involved in ongoing litigation with plaintiffs over the storm water drainage problem on Tennessee Avenue, which involved a dispute regarding plaintiffs' refusal to grant an easement so that the Village could construct a storm water drainage system (PRF ¶ 145 (citing Ex. 20, p. 109); Ex. C, p. 100). It is also undisputed that in August 1995, sometime after the meeting with Mr. Modaff, Ms. Zimmer told Mr. Pretzer that the plaintiffs would be willing to grant an easement to the Village "adequate or sufficient" for the water main project (PRF ¶ 171; DRF ¶ 171).

### 3. Consultation with the Village Attorney.

In late August or early September 1995, as part of his investigation into the Village's rights to Tennessee Avenue, Mr. Modaff asked Mr. Gorski to research whether any easements or right-of-

way existed for construction of the water main project requested by plaintiffs (DSOF ¶ 75). Mr. Gorski complied by having one of his staff attorneys, Robin Jones, prepare a legal memorandum (DSOF ¶¶ 85-86).[14] After reviewing this memorandum, dated September 11, 1995, Mr. Gorski concluded that, pursuant to Illinois law, the Village had acquired prescriptive rights to the portion of Tennessee Avenue adjacent to the Olech property because the road had been maintained, improved, and used by the public for more than fifteen years (DSOF ¶¶ 87, 88). Mr. Gorski believed that when a prescriptive easement is acquired over a public highway, then the governing local government entity has a right to install water mains within that easement without first obtaining a court order that there had been a prescriptive easement (DSOF ¶ 89; PRF ¶ 94). Despite this prescriptive easement, in September 1995 Mr. Gorski recommended that Mr. Modaff seek from each owner a "plat of dedication . . . on each side of the center line of the street" (DSOF ¶ 100).[15]

### 4. The Request for a Thirty-Three-Foot Dedication/Easement.

By a letter dated September 21, 1995, Mr. Modaff asked the Olechs for a thirty-three foot easement in a letter dated September 21, 1995 (DSOF ¶ 148; PRF ¶ 148; Ex. U).[16] In that letter, Mr.

___

[14]There is a genuine issue of material fact as to whether Mr. Modaff and other Village administrators requested a 33-foot dedicated right-of-way from the plaintiffs prior to consultation with Mr. Gorski. Ms. Zimmer asserts that Mr. Modaff, on behalf of the Village, requested a 33-foot dedication in a telephone conversation sometime in August 1995 (PRF ¶ 146). Mr. Gorski testified that he believed the plaintiffs had already been asked for such a dedication before he was informed of the dispute between the Village and the plaintiffs. The Jones memorandum indicates that such a dedication already had been requested but denied by plaintiffs (DSOF ¶ 100; PRF ¶ 100). But, Mr. Modaff testified that he did not request a dedication prior to consulting with Mr. Gorski, and that Mr. Gorski advised him and other Village representatives to make the dedication request of the plaintiffs (DRF ¶ 100; Ex. D, p. 90-92).

[15]It is undisputed that the report of Mr. Bashaw (which neither party cites on this point) indicates that the Village did not require or demand a similar dedication from the property owner directly east and across the street from Ms. Olech, or the owner a few doors south of the Olech property, as a condition for receiving or continuing to receive water (*See* p. 12 and n.11, *supra*).

[16]Earlier in September 1995, the Village asked Michael Vena, the property owner of the Horse Farm, for a 33-foot dedicated right-of-way as a condition for issuing the necessary permits for a sanitary sewer extension project that Mr. Vena needed to construct public restrooms on his property (DSOF ¶ 125). On September 19, 1995, Mr. Vena sent a letter to Mr. Fay acknowledging the 33-foot dedication request and enclosing a signed Plat of Dedication, wherein he

Modaff invited the plaintiffs to attend a meeting at the Village Hall to discuss issues related to "the Plat of Easement" which had been enclosed with the letter (which required 33-foot easements from the property owners along the east and west sides of Tennessee Avenue) (DSOF ¶ 149).[17] The plaintiffs did not attend the meeting (DSOF ¶ 150), but informed Mr. Modaff prior to the meeting that they objected to granting the dedication (DSOF ¶ 147). Thereafter, Mr. Modaff spoke with Messrs. Oglietti, Gorski and Fay about the matter (DSOF ¶ 147; PRF ¶ 147). In a letter dated October 3, 1995, Mr. Modaff told the plaintiffs that the Village was determined to maintain its position regarding the proposed easement (DSOF ¶ 151; Def.'s Ex. D, pp. 112-13). The plaintiffs said they would not do so (PRF ¶¶ 190, 193 (citing Pl. Ex. 39)).

### 5. Mr. Pretzer's Involvement.

Sometime after Ms. Olech made her initial request for a water main extension to Mr. Modaff, Mr. Modaff informed Mr. Pretzer, the Village President, of the request and told him that the Village was moving "expeditiously" to resolve the problem (DSOF ¶ 161).[18] Mr. Pretzer testified that during this conversation he also asked Mr. Modaff if the Village was still involved in litigation with the Olechs regarding the storm water drainage problem (PRF ¶ 161; Ex. E, pp. 12-13). Mr. Modaff

---

agreed "to dedicate the east thirty-three feet (33') of Tennessee Avenue adjacent to the entire frontage of my property located at 6526 Clarendon Hills Road" (DSOF ¶ 132). On September 27, 1995, Mr. Vena signed the Plat of Dedication (DSOF ¶ 144) (Ex. LL). A dedication was not requested by the Village from the property owner across the street from Mr. Vena's property, on the west side of Tennessee Avenue, because that property was part of the Borman Subdivision; and, forty feet of Tennessee Avenue had already been dedicated in 1983 when the subdivision had been created (DSOF ¶ 133).

[17]Ms. Olech, Ms. Zimmer and Mr. Brinkman all live on the west side of Tennessee Avenue. It is not clear from the record whether the property owners on the east side of Tennessee Avenue, or others who resided on the west side of the road, received this letter (DSOF ¶ 149).

[18]According to Mr. Pretzer, sometime during this conversation, Mr. Modaff also advised him that he had responded to Ms. Olech's initial call reporting the lack of water "within 15 minutes" (Ex. E, pp. 12-13).

informed Mr. Pretzer that the storm water drainage lawsuit was still ongoing (Ex. E, p. 12; Ex. C, p. 100).

During the Village's investigation into its rights on Tennessee Avenue, Mr. Gorski advised Mr. Pretzer that "the water main extension project had been complicated because the [V]illage and the Olechs could not agree on the size of the easement" (DSOF ¶ 162). Mr. Pretzer did not participate in the decisionmaking process as to the size of the easement to be requested from plaintiffs, and he did not make the decision that a 33-foot easement would be requested for this project (DSOF ¶ 163).

According to Mr. Pretzer, Ms. Zimmer had a phone conversation with him regarding the water main extension sometime in the Fall of 1995 (DSOF ¶ 166); Ms. Zimmer remembers that the conversation took place in August 1995 (PRF ¶ 166). But, whenever this conversation occurred, there is no dispute that Ms. Zimmer asked Mr. Pretzer if the water main extension project had been delayed due to the ongoing storm water drainage litigation between her parents and the Village (Ex. E, p. 15). Mr. Pretzer responded that it had not been delayed for that reason and that the Village was "responding expeditiously and working with them to get the water main extended" (*Id.*). During this telephone conversation, Mr. Pretzer and Ms. Zimmer also discussed the size of the easement necessary to construct the water main (DSOF ¶169; PRF ¶¶ 168-69). The parties offer different versions regarding the tone of the conversation, but the parties agree that Ms. Zimmer notified Mr. Pretzer that they were willing to grant an easement of sufficient width to construct the water main (defendants state that she suggested a ten-foot easement), and Mr. Pretzer replied that the Village position was that 33-feet were necessary for the project (DSOF ¶¶ 169-70; PRF ¶¶ 168-69).

22

Before this telephone conversation with Ms. Zimmer (but after he had received the message that she had called), Mr. Pretzer spoke with Messrs. Modaff and Gorski about the issues related to the water main extension and was advised that the parties continued to disagree about the size of the easement for the project (DSOF ¶ 167). However, Mr. Pretzer did not discuss with Mr. Gorski -- at this time or any other time -- any Village policy regarding fifteen-foot utility easements in side yards (DSOF ¶ 165).

### 6. Settlement of The Water Main Easement Dispute.

In November 1995, the plaintiffs' attorney, Mr. Wimmer, notified Mr. Gorski that the hose that Ms. Olech had been using to obtain water for her home had frozen and that she was completely without water (DSOF ¶ 191; Ex. NN). In this letter, plaintiffs' attorney threatened to file a lawsuit seeking injunctive relief if the dispute was not resolved without delay, noting that the Olechs had been without running water since May 1995, despite their $7,000 payment to the Village in July 1995 for their share of the hook-up costs (PRF ¶ 190; Exs. 39, NN).

When Mr. Gorski advised Mr. Pretzer of the situation, Mr. Gorski recommended that he be allowed to negotiate a settlement with the plaintiffs' attorney; Mr. Pretzer agreed and authorized Mr. Gorski to proceed "as he saw appropriate" – indicating that he would accept Mr. Gorski's recommendation (DSOF ¶ 174). Mr. Gorski also advised Mr. Modaff of the situation and asked Mr. Modaff if he thought 10 feet was sufficient space in which to construct the water main. Mr. Modaff responded that it was not, and in the course of discussing the matter, Mr. Modaff and Mr. Gorski agreed that a 15-foot easement – the same size as those obtained for water main extensions in side yards – would be sufficient room to construct the water main (DSOF ¶¶ 176-178), if the plaintiffs

23

would also allow the Village to have an additional ten feet, five feet on each side of the construction site, to accommodate construction equipment (DSOF ¶ 181).

Accordingly, in a letter to Mr. Wimmer dated November 10, 1995, Mr. Gorski offered to settle the easement dispute between the parties and proposed that the Village construct the water main using a 15-foot permanent easement with a temporary 10-foot construction easement (DSOF ¶ 182). The parties settled the dispute on that basis (DSOF ¶ 183). In his letter, Mr. Gorski stated that the Village proposal was "consistent with Village policy regarding all other property in the Village" (DSOF ¶ 184; PRF ¶ 184).

Mr. Gorski did not recommend that the Village settle the dispute by using its prescriptive easement rights (DSOF ¶ 172). Mr. Gorski testified that he believed that the Village could have asserted its prescriptive easement at any time during the dispute (and could have installed the water main pipes within that easement) without obtaining an additional easement from the plaintiffs; but, "he reasoned that taking such action would have resulted in a lawsuit filed by the [p]laintiffs, so he preferred to settle the matter by obtaining an easement agreeable to the [p]laintiffs" (DSOF ¶ 172; DRF ¶ 172).

### III.

We begin with a summary of our reasons for denying the defendants' motion. The plaintiffs' "class of one" equal protection claim survives summary judgment because the plaintiffs have identified evidence from which a reasonable jury could conclude that: (a) plaintiffs were "intentionally treated differently than others similarly situated[;]" and (b) the Village had "no rational basis for the difference in treatment." *Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

The defendants do not dispute that they intended to demand a dedication from plaintiffs as a condition for receiving water (Defs.' Reply at 5). Thus, under a basic intent standard, the only question is whether the defendants intended to treat plaintiffs differently than other similarly situated individuals. The plaintiffs have offered evidence of twelve property owners who live along public roadways who receive Village water, but were not required to dedicate a right-of-way or an easement to receive this water (Ex. 19). The defendants do not dispute these facts (DRF ¶ 62; Defs.' Mem. at 10). In our view, this evidence is sufficient to show that there were others who were *"prima facie* identical in all relevant respects," and who were not subjected to the requirements the defendants sought to impose on the plaintiffs. *Ind. State Teachers Ass'n v. Bd. of Sch. Comm'rs,* 101 F.3d 1179, 1181-82 (7th Cir. 1996). While the defendants assert that they did not know of these prior situations, and thus did not intend to treat the Olechs differently, that is a disputed matter that must be resolved at trial. Likewise, there are genuine and material fact disputes about whether the Horse Farm was similarly situated to the Olech property that must be resolved at trial, and that preclude summary judgment.

There are also genuine disputes of material fact as to whether the Village's demand for a 33-foot dedication was rational. As the plaintiffs correctly point out, even if the dedication of public roadways for public purposes has rational appeal, the question is not whether a dedication request, in the abstract, is rational. Rather, the question is whether the specific dedication demand made here, which conditioned the supply of public water to a taxpaying property owner, was rational under the particular facts of this case. *See, e.g., Olech,* 528 U.S. at 564 (citing *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445 (1923) (government treatment of person may be rationally related to

legitimate governmental objective in abstract, but when compared to governmental treatment of others runs afoul of equal protection clause).

Finally, the plaintiffs have satisfied their summary judgment burden by identifying evidence that would support a finding of ill will. That is true whether (as defendants argue) ill will or malice is considered an essential element of a traditional "class of one" equal protection claim asserting irrational treatment, or (as plaintiffs argue) it provides an alternative means of proving a class of one equal protection claim.

## A.

We begin by addressing the role of ill will in a class of one equal protection claim. In *Olech*, the Seventh Circuit reaffirmed its earlier decisions holding that a single plaintiff may state a viable federal equal protection claim under a class of one theory. 160 F.3d at 386 (*citing Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995). In so doing, the Seventh Circuit identified ill will or malice as a central requirement of this kind of equal protection claim:

> [T]he 'vindictive action' class of equal protection cases requires proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant. If the defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action; a tincture of ill will does not invalidate governmental action.

160 F.3d at 388.

In reviewing the Seventh Circuit decision, the Supreme Court affirmed the proposition that a class of one equal protection claim is cognizable under federal law. But, unlike the Seventh Circuit, the Supreme Court did not cite ill will or malice as an essential element of such a claim. The Supreme Court held that a plaintiff may establish such a claim by proving "that she has been

26

intentionally treated differently from others similarly situated and that there is no rational basis for

the difference in treatment." 528 U.S. at 563. The Supreme Court did not ignore the question of ill

will or malice. Instead, the Supreme Court cited ill will as an "alternative" theory of proving a class

of one claim, the viability of which the Supreme Court did not address in light of its holding that

plaintiff had stated a claim under the differential treatment/irrationality theory:

> These allegations, quite apart from the Village's subjective motivations, are
> sufficient to state a claim for relief under traditional equal protection analysis.
> We therefore affirm the judgment of the Court of Appeals, but do not reach
> the alternative theory of 'subjective ill will' relied on by that court.

*Id.* at 565.

Since the Supreme Court opinion in *Olech*, the Seventh Circuit addressed class of one equal

protection claims in three separate opinions: *Hilton v. City of Wheeling,* 209 F.3d 1005, 1008 (7th

Cir. 2000); *Alberio v. City of Kankakee,* 246 F.3d 927 (7th Cir. 2001); and *Purze v. Village of

Winthrop Harbor,* 286 F.3d 452 (7th Cir. 2001). We address these cases in chronological order.

In *Hilton,* the Seventh Circuit stated the Supreme Court in *Olech* had "recited the standard

formula that the equal protection clause forbids intentional differences in treatment for which there

is no rational basis," but had left "[t]he role of motive . . . unclear . . . ." 209 F.3d at 1008. The

*Hilton* panel acknowledged that the Supreme Court's opinion characterized ill will as an

"alternative" theory for a class of one equal protection claim. *Id.* But, seizing upon Justice Breyer's

concurring opinion, the Seventh Circuit rejected any separation between the rationality inquiry and

the inquiry into the existence of "improper motive" or "ill will." The *Hilton* panel reasoned that if

a mere allegation of intent – what it termed an "unexplained difference in treatment" – was enough

to state (and ultimately to prove) an equal protection claim, then "the federal courts would be drawn

deep into the local enforcement of petty state and local laws." *Id.* Based on this rationale, the *Hilton* panel "gloss[ed]" the term "'no rational basis' in the unusual setting of 'class of one' equal protection cases to mean that . . . the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.* The *Hilton* panel further stated that cases such as *Olech* are "vindictive action" cases, that require "proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant." *Id.*

Thereafter, in *Alberio,* the Seventh Circuit explained that the Supreme Court had "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he or she] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 246 F.3d at 932. The *Alberio* panel went on to state that "[u]nder our circuit precedent," there is another path to proving a class of one equal protection claim: "an individual *also* may state a claim under the Equal Protection Clause if he can show that state government took an action that 'was a spiteful effort to get him for reasons wholly unrelated to any legitimate state objective.'" *Id.* (emphasis added). As did the Supreme Court in *Olech,* the *Alberio* panel treated proof of ill will as an alternative means to establishing an equal protection claim. The *Alberio* court did not cite *Hilton,* or discuss the contrary analysis offered in that opinion.

In *Purze v. Village of Winthrop Harbor,* 286 F.3d 452 (7th Cir. 2002), the Seventh Circuit – as it did in *Hilton* – elided the traditional equal protection elements of intent and irrationality with a requirement of "ill will." In *Purze,* the appeals court stated that a plaintiff must show that the defendant(s) "deliberately sought to deprive [the plaintiffs] of the equal protection of the laws for

reasons of a personal nature unrelated to the duties of the defendants' position." *Id.* at 455. In so stating, the *Purze* court cited *Hilton*, but did not cite *Alberio* or discuss the contrary analysis offered in that opinion.

The defendants argue that *Hilton* (and presumably *Purze*, which was decided after the present motion was briefed) should control the elements plaintiffs must prove; the plaintiffs, not surprisingly, argue that *Alberio* should control. But, neither side addresses the clear conflict between *Hilton* and *Purze* on the one hand, and *Alberio* on the other hand. One might suggest that there must be no real conflict because one judge joined in both *Hilton* and *Alberio*, and because the judge who wrote the *Alberio* decision then joined in *Purze*. However, we must be guided by what the opinions say, and not merely who joined in them. And, the opinions reflect a clear difference as to what is necessary to prove an equal protection claim that the Court cannot simply ignore.

In the face of this conflict, the Court must choose the path that it believes is most faithful to the Supreme Court's decision in *Olech*. We read the Supreme Court decision in *Olech* in the way that the panel in *Alberio* read that case: as holding that ill will is not a necessary element of a traditional equal protection claim, even in the "class of one" setting. Although the panels in *Hilton* and *Purze* read "ill will" as a necessary element of a class of one equal protection claim, the Supreme Court held that proof of motive is *not* essential to proving irrationality. *See Olech,* 528 U.S. at 565 (a finding that the Village's decision in this case was "irrational and wholly arbitrary" is sufficient and the court need not reach the "alternative theory of 'subjective ill will'"). While Justice Breyer's concurring opinion indicates that he disagrees, his concurrence was not necessary to create a majority (the other eight justices joined in the per curiam opinion without any qualification). Thus, we do not

believe Justice Breyer's concurring opinion cannot be read as a limitation on the precedent established by the majority opinion.

In this case, however, the legal debate about ill will does not drive the determination on summary judgment. We find that the plaintiffs have identified evidence sufficient to maintain their equal protection claim under either a traditional irrational basis/intent test (as recognized by the Supreme Court in *Olech*), or under an "ill will" theory – whether as a necessary part of a core equal protection claim (as stated in *Hilton*), or as an alternative theory (as stated in *Alberio*).

## B.

We set forth below material fact disputes that create genuine issues for trial. In so doing, the Court expresses no view as to how the jury will resolve those fact disputes.[19]

### 1.

The first area of factual dispute concerns whether the defendants intentionally treated the plaintiffs differently than other similarly situated property owners. There are genuine disputes of material fact with respect to the three categories of property that might be characterized as "similarly situated" to the plaintiffs' property: (a) the twelve properties discussed in Mr. Bashaw's report, which were connected to the Village water supply prior to the plaintiffs' request for a connection; (b) the Horse Farm owner, who requested a sewer sanitation project at the time of plaintiffs' request;

---

[19]In addition, we are aware that the evidence offered by the parties with respect to these disputes may not be the entire universe of evidence available to either side to prove or defend this case. Nothing in this opinion is intended to suggest that other evidence, not offered by the parties for purposes of this motion, will be excluded at trial. All evidence, including the evidence discussed in this opinion, is subject to the standards of admissibility at trial.

and (c) Mr. Kucera, a residential property owner who resided on Tennessee Avenue, south of the Olech property, who requested water subsequent to the plaintiffs' request.[20]

a.

In his report, Mr. Bashaw identified the following properties on public roadways which receive water service from Willowbrook: (1) 351 61st Street; (2) 310 59th Street; (3) 6404 Western Avenue; (4) 6306 Western Avenue; (5) 6416 Clarendon Hills Road; (6) 6502 Tennessee Avenue; (7) 6446 Tennessee Avenue; (8) 6425 Bentley Avenue; (9) 364 65th Street; (10) 368 65th Street; (11) 6526 Clarendon Hills Road; and (12) 6442 Clarendon Hills Road (PRF ¶ 62). The defendants do not dispute (because they cannot) that all of these properties are residential and are situated adjacent to public (primarily nondedicated) roadways – like the plaintiff's property. The defendants also do not dispute that all 12 properties receive water through Village water main extensions, and that none of them were asked to provide (and none of them provided) a dedicated right-of-way or easement as a condition for receiving water.

Thus, with respect to the similarly situated element, the primary dispute is with respect to what inference to draw from these uncontested facts. The defendants argue that plaintiffs were not similarly situated to those 12 property owners because in those twelve cases the Village *assumed* that it had a right-of-way to the public roads and installed water mains without knowing that there was no right-of-way; whereas, the Village *knew* that it did not have a right of way on Tennessee Avenue because Ms. Zimmer affirmatively notified them of this fact (DSOF ¶¶ 21, 196, 199, 200, 204; DRF ¶¶ 62, 64, 67, 106, 200, 209). According to defendants, once the Village knew that its rights to

---

[20]The parties agree that property with water mains running through a side yard, but which do not adjoin a public roadway, are not similarly situated to the plaintiffs' property (DRF ¶¶ 67-68).

Tennessee Avenue were unclear, it proceeded with its dedication request (DSOF ¶ 59), pursuant to Village policy (DSOF ¶¶ 62, 64). Thus, claim the defendants, the Village's lack of knowledge made the plaintiffs dissimilar from the twelve property owners identified by Mr. Bashaw – or, at least shows they did not intend to treat plaintiffs differently.

The defendants' "lack of knowledge" theory rests upon the credibility of their assertions that the Village had a policy of requiring dedications in situations such as those presented by the plaintiffs here, and these defendants did not know the properties identified in the Bashaw report received water without providing dedications. The credibility of those assertions is not for the Court to resolve on summary judgment, but for the jury to determine at trial. We identify below some of the issues that are presented by defendants' theory.

*First,* there is a fact issue concerning the Village's assertion that it had a policy of requiring dedication of property as a condition of extending water service to residential property that was not in a subdivision. The Bashaw report identifies concrete similarities between the plaintiffs' property and the 12 residential properties at issue. As indicated, they all adjoin a public road; they all receive Village water; and if they have easements or dedications, those easements and dedications were not given to the Village as a condition for receiving water (Ex. 19, pp. 6-7). The Bashaw report is based on research of the Village water map and other tract searches (*Id.*, pp. 1-3). Based on this research, Mr. Bashaw testified that "despite the fact that there are roadways with a comprehensive water service system to serve the adjacent properties, it appears that there is no dedication of roadways in the general area of the Olech property and no easements granted in favor of the Village of Willowbrook relating to roadway use, utilities, or public purposes" (PRF ¶ 210) (Pl. Ex. 19, p. 4).

The Bashaw report raises a genuine issue as to whether there was, in fact, a Village policy of requiring dedications as a precondition for extension of water service to properties located adjacent to public roadways. A jury might reasonably conclude that the existence of 12 situations in which no such dedication was required or given shows that such a policy did not exist, reasoning that if there was such a policy, the Village would not routinely assume that the policy was being met but would consult readily available public records to verify that was so. Indeed, when the Village approved a subdivision, it routinely required dedications of all roadways within those subdivisions. That evidence could suggest to the jury that when dealing with subdivisions, the Village either checked to see if there were dedications or instead operated on the assumption there was no dedication of rights and thus demanded such rights.

In either event, this is not what the Village appears to have done in connection with the properties identified in the Bashaw Report. In addition, Messrs. Fay and Modaff both testified that they were unaware of any instance in Village history, other than the development of new subdivisions, where a dedicated 33-foot easement or right-of-way was required of a property owner as a condition of extension of a water main (PRF ¶ 64). These facts could lead a jury to reasonably conclude that the Village did not have a policy of requiring dedications for non-subdivision properties located on public roadways.

*Second,* there is a fact issue concerning the Village's assertion that it did not know that the 12 properties identified in the Bashaw report received water service without providing easements. The evidence indicates that the existence *vel non* of dedicated rights can be determined by consulting readily available public records. The relative ease of making this determination may lead a reasonable jury to disbelieve the defendants' assertion that they did not know of the lack of dedicated

33

rights with respect to *any* of the 12 properties in the Bashaw report – particularly because, when extending water on subdivision developments, the Village learned on at least one occasion of the absence of dedicated rights. Further, with respect to Tennessee Avenue in particular, Mr. Fay testified that in the late 1980s, he became aware that the Village did not have dedicated rights to the west portion of Tennessee Avenue across from the Horse Farm when the Village required a dedication of the Borman subdivision (PRF ¶ 21) (Pl. Ex. 12, p. 70). The Borman property is located just to the south of the Olech property on Tennessee Avenue. This fact could lead a reasonable jury to disbelieve the defendants' assertion that they did not know of the lack of dedication of the Olech property when the request for a water hookup first was made in May 1995.

### b.

The factual issues with respect to the Horse Farm are less complicated. "To prevail on an equal protection claim, the plaintiff must demonstrate that the government treated unequally individuals who were *prima facie* identical in all relevant respects . . . ." *Alberio v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir. 2001) Although there is a similarity regarding location (*i.e.,* both the plaintiffs' property and the Horse Farm adjoin Tennessee Avenue south of 63rd Street), there is a genuine dispute about whether that property is "similarly situated" to the plaintiffs' property. The Horse Farm is used for commercial rather than residential purposes and, accordingly, the Horse Farm is subject to Village permit regulations that do not apply to residential properties. Those permit regulations were used by the Village to condition the installation of a sewer sanitary extension project on the property owner's dedication of 33-feet of land adjoining Tennessee Avenue. There is no evidence that the plaintiffs, who own residential property, were similarly required to comply with those or any similar regulations before they had the right to receive public water. Thus, there

are genuine issues of material fact regarding whether the Horse Farm was similarly situated to plaintiffs' property.

c.

Finally, no one disputes that Mr. Kucera, a residential property owner who lived on Tennessee Avenue south of the Olech residence, is similarly situated to the plaintiffs in all relevant respects. Although his January 2001 request for a water main extension came later in time than the plaintiffs' request, the Village's response is material insofar as it reflects the Village's policy and practice (or absence of one) regarding water main extensions. However, the fact statements submitted by the parties only reveal what the Village originally sought from Mr. Kucera by way of a dedication. Although the Village requested a 33-foot dedication from Mr. Kucera, it did not demand one, nor did it condition the requested water main extension on it. Rather, it offered Mr. Kucera, at the time of the request, a 25-foot easement option – an option not initially, nor for some time, proposed to plaintiffs. And, the evidence submitted by the parties does not show what dedication (if any) actually was provided. It will be for the jury to decide whether the Village's request of Mr. Kucera reflected application of a new policy, implementation of a new policy, a request driven by the pendency of this litigation, or something else.

2.

Much of the evidence discussed above also is relevant to the question of whether the Village had a rational basis for demanding a 33-foot dedication. We are mindful that the inquiry into whether there was a rational basis for the defendants' action "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *Heller v. Doe*, 509 U.S. 312, 319 (1993). At the same time, the rational basis inquiry is not toothless: it is intended to protect "against intentional

35

and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Olech*, 528 U.S. at 564 (citations omitted).

In its opinion in this case, the Supreme Court held that the allegation that the Village "intentionally demanded a 33-foot easement as a condition of connecting [the Olechs'] property to the municipal water supply where the Village required only a 15-easement from other similarly situated property owners," together with the allegation that this demand was "'irrational and wholly arbitrary'" and that the Village ultimately withdrew it, was "sufficient to state a claim for relief under traditional equal protection analysis." *Id.* 565.[21] Thus, in assessing whether there is a triable issue on the question of the rationality of the defendants' demand for a 33-foot dedication, we focus on whether plaintiffs have identified evidence that, if accepted by the jury, could prove these allegations. For the reasons that follow, we believe that the plaintiffs have done so.

As explained above, plaintiffs have offered evidence that prior to their request for a connection to the Village water supply, the Village never had required a dedication – much less a 33-foot one – for any individual property owner adjacent to a public roadway. The plaintiffs also have pointed to evidence that the defendants knew that the Village had prescriptive rights in Tennessee Avenue, and could accomplish the water hookup without the kind of dedication that they demanded. The plaintiffs further have pointed to evidence that, although they early on expressed a willingness to provide the Village with an easement to the extent necessary to perform the connection, the defendants persisted in a demand for a 33-foot dedication for several months on the

---

[21]The parties quibble about whether plaintiffs must prove that the defendants' demand for a 33-foot dedication was without "rational basis" or was "irrational and wholly arbitrary." We do not perceive any distinction between these formulations of the standard; nor did the Supreme Court in *Olech*, judging by the fact that the Supreme Court used the terms interchangeably in that opinion. *See also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998) (explaining that conduct can be classified as arbitrary "only when it is irrational, when it is without a rational basis or explanation").

ground that such an extension was necessary – and then ultimately decided that it was not and agreed to a far more limited easement.

The plaintiffs also point to the November 10, 1995 letter from Mr. Gorski to Mr. Wimmer, stating that the ultimate compromise reached by the parties in this case – a 15-foot permanent easement with a ten foot temporary construction easement – was "consistent with Village Policy regarding *all other property* in the Village" (PRF ¶ 64) (Pl. Ex. 25) (emphasis added). The parties dispute the meaning of Mr. Gorski's choice of language, namely, what the words "all other property" meant.[22] But, one reasonable inference from Mr. Gorski's letter is that "all other property" means "all property" in the Village – including property like that belonging to the plaintiffs. Under this interpretation, a reasonable jury could infer that the Village did not demand 33-foot easements from owners of residential property adjoining public roadways, but instead only required 15-foot easements – as it did in side yards and as it ultimately did with the Olechs.

In the face of this evidence, defendants point to other pieces of evidence that they assert demonstrate that the demand for a 33-foot dedication was entirely rational. However, the evidence cited by defendants is the subject of genuine dispute, and thus cannot support summary judgment.

*First,* defendants point to evidence that "the standard right-of-way for residential streets within municipalities was 33 feet from each side of the center line" (Defs.' Mem. at 4-5). However, as explained above, there is evidence from which a jury reasonably could conclude that this standard never was applied to individual residential property in Willowbrook that was adjacent to public roadways.

---

[22]Mr. Gorski testified that "all other property" referred to property that did not adjoin a road, but had water mains located in side yards (DSOF ¶¶ 185-189). The plaintiffs contend – and we agree – that the jury could read the words to mean that "all other property" included property adjoining public roads (PRF ¶¶ 64, 185-189).

*Second*, defendants argue that it was rational to demand a dedication in order to avoid litigation or other disputes with the plaintiffs – a concern that they point out was not merely hypothetical, given that the Village already was in litigation with the Olechs over the storm water drainage problem (Defs.' Mem. at 4). While a jury might accept this explanation, a reasonable jury might also find that the expressed concern is not credible in light of the fact that even before the 33-foot dedication was requested, the plaintiffs offered to provide an easement to the extent necessary to perform the work – and that the defendants ultimately accepted an easement far more limited than the original 33-dedication originally demanded.[23]

*Third*, defendants argue that the 33-foot dedication demand was rational because it was based on advice of counsel (Defs.' Mem. at 13-14). But there is a significant factual dispute here as to whether the legal research and recommendation by counsel preceded the request for a 33-foot dedication, or occurred after the demand already had been made (*see* pp. 20 n. 13, *supra*).[24] Indeed, Mr. Gorski testified that Messrs. Fay, Modaff and Oglietti made the decision to demand a dedication, and that they made that demand before they asked him to investigate what rights the Village had to Tennessee Avenue (PRF ¶ 100). The research memorandum prepared by Robin Jones supports this testimony, indicating that the Village had already requested but been denied dedication by the plaintiffs (PRF ¶ 100 (Ex. 23, p. 1)). While Mr. Modaff recalls the sequence of events differently,

---

[23]In addition, as we explain below, a jury might view the defendants' active consideration of the pending litigation with the Olechs as evidence not of the rationality of the request for dedication, but rather as ill will as a reason that the request was made.

[24]There is no dispute that in October 1995, after the dedication was demanded, Mr. Gorski advised Mr. Modaff to maintain the Village's position regarding a dedication – although the parties dispute whether Mr. Gorski recommended a 33-foot dedication (PRF ¶ 151).

it is for the jury – and not the Court – to resolve that significant discrepancy, as well as the other fact disputes we have identified.

**3.**

Finally, we discuss the issue of ill will. We discuss this issue separately from the other elements necessary to establish an equal protection clause because, as we have stated, we believe that the Supreme Court's decision in *Olech* holds that the plaintiffs need not establish ill will to prevail on their claim under a traditional equal protection theory. We do believe, however, that ill will is – at the very least – a viable "alternative theory," under Seventh Circuit precedent. Thus, we identify certain material facts that are genuinely disputed with regard to the ill will issue, and that require a trial.

The defendants argue that the ill will standard in this Circuit requires more than "facts which could allow a court to speculate, or even infer, that illegitimate animus motivated the defendant" (Defs.' Mem. at 11) (citing *Alberio v. City of Kankakee,* 246 F.3d 927. 932 (7th Cir. 2001); *Hilton v. City of Wheeling,* 209 F.3d 1005, 1008 (7th Cir. 2001)). The defendants further argue that "[w]here plaintiffs' proof offers nothing more than [a] self-serving conclusion" then defendant "acted solely out of vindictiveness for plaintiffs' having brought other litigation," and summary judgment is appropriate (Defs.' Mem. at 11). The plaintiffs do not quarrel with this standard, nor does the Court. However, we find that there are genuinely disputed facts from which a jury reasonably could infer ill will.[25]

---

[25]The plaintiffs attribute various statements made by Mr. Lossin to the Zimmers at various times during the storm water drainage litigation, while he was employed by the Village of Willowbrook. Mr. Lossin flatly denied such statements in his deposition testimony, and the defendants argue that (1) because Mr. Lossin is no longer an employee of the Village, his statements cannot be used as admissions against the Village, and (2) the plaintiffs' assertions about what Mr. Lossin said are hearsay, especially because he allegedly made them on his own time and therefore outside the scope of his employment (DRF ¶¶ 222-225) (citing *Krause v. City of LaCrosse,* 946 F.3d 995 (7th Cir. 2001)). We agree

*First,* the parties dispute whether Mr. Modaff's decision to demand a 33-foot dedication as a condition to the water main extension was based on ill will. The parties agree that on May 23, 1995, when Ms. Olech told Mr. Modaff that her well had broken down, Mr. Modaff asked Ms. Olech if she had storm water drainage problems on her property near Tennessee Avenue (PRF ¶ 33).[26] The parties also agree that when Mr. Modaff asked this question, Ms. Olech responded that she believed the Village was going to drag its feet on constructing the water main extension because it was upset with her for suing the Village over storm water drainage problems on her property near the road (DSOF ¶ 36) (Ex. 1, pp. 96-97; Ex. 13, pp. 32-33; Ex. D, p. 59)).

What the parties do not agree on is Mr. Modaff's response. The plaintiffs contend that Mr. Modaff had no response, but remained silent in the face of this accusation and walked away without a word (PRF ¶¶ 33, 37-38). One (but not the only) reasonable inference from that evidence, if believed by a jury, is that Mr. Modaff was silent because he actually intended to do exactly what Ms. Olech said she feared – drag his (or the Village's) feet. Mr. Modaff, on the other hand, testified that his response to Ms. Olech was to question her on how she thought the Village could move any faster than eight weeks (the timetable he had laid out for her) in planning and constructing the water main extension (DSOF ¶ 37 (Ex. D, p. 60)). In support of this testimony, the defendants cite to various letters and conversations that the plaintiffs had with Mr. Modaff in the initial stages of the water main extension – including the payment of money by the plaintiffs to have the Village Engineer draw up plans (DSOF ¶¶ 39, 43-45). The defendants argue that if the Village intended to

---

that Mr. Lossin's alleged statements to the plaintiffs may turn out to be inadmissible hearsay at trial, but for the present motion we need not decide that issue, especially since the plaintiffs have other evidence that supports their ill will theory and serves to defeat the defendants' motion for summary judgment.

[26]The defendants do not reply to plaintiffs' assertion on this point, so we deem the plaintiffs' assertion as admitted for purposes of this motion.

drag its feet, as plaintiffs accused and still accuse it of doing, then Mr. Modaff would not have initiated plans for the water main extension project. That is a reasonable inference that the jury could draw – but a trial is needed to see whether the jury will draw that inference.

*Second*, there is Mr. Gorski's testimony that he believed that the Village had a prescriptive easement on Tennessee Avenue (DSOF ¶¶ 87, 93) and could construct the water main extension in it (DSOF ¶ 89). From this testimony, a jury might infer that there was no reason for the defendants to demand a dedication – other than to take out the Village's "frustration" with the Olechs over the storm water drainage litigation. Again, defendants argue that this is not the inference the jury would draw, as Mr. Gorski testified that it was his "judgment" and "belief" that plaintiffs would have sued the Village if it had tried to put a water main in its prescriptive easement without the plaintiffs' consent (via dedication) or a court order (which would take too long) (DSOF ¶¶ 94-95; DRF ¶ 93). Plaintiffs dispute that this was what Mr. Gorski believed. On this point, both parties' submissions are silent as to whether Mr. Gorski was advised of plaintiffs' offer to provide an easement *before* Mr. Gorski recommended that the Village request a dedication. If Mr. Gorski was so advised, then a jury reasonably might find that he did not truly believe a dedication demand was necessary (or that plaintiffs would oppose use of the prescriptive easement to perform the water connection). If Mr. Gorski was not so advised, a jury might reasonably conclude that the defendants did not give him all relevant information and thus cannot use Mr. Gorski's recommendation as a shield against a claim of ill motive.

*Third*, the fact that the Village actively considered the pending storm water drainage lawsuit is susceptible of varying inferences. A jury might reasonably conclude that the Village was being understandably cautious with the Olechs, and was trying to take steps to avoid repeat litigation. Or,

a jury might reasonably conclude that the Village's frustration with the Olechs about that litigation had boiled over, and that the Village therefore was going to "stick it to" the plaintiffs by demanding an unprecedented dedication as a condition of extending water service.

Further, a jury might infer ill will from the fact that the defendants knew the well had been broken since May 1995, and that the Olech's water supply thereafter was through use of a garden hose. A jury might reasonably conclude that other defendants knew this means of obtaining water would not be viable once temperatures stayed below the freezing point, but nonetheless waited until that occurred in November 1995 to reach a compromise – which resulted in the Olechs having no running water until March 1996.

*Fifth*, the plaintiffs have pointed to comments made by various individuals that a reasonable jury might conclude, in light of all the evidence, reflected ill will as the reason for their actions. For example, there is documentary evidence by Mr. Modaff referring to the storm water litigation that speculates whether Ms. Zimmer has "gone to press" (PRF ¶ 145). There is also an admission by Kenneth Menzel, one of Willowbrook's attorneys, who indicated that the Village was "frustrated" with the Olechs because they had not cooperated with the Village in the storm water drainage project proposed by Mr. Oglietti (which would have required plaintiffs to grant the Village an easement) prior to the flooding that resulted in the storm water drainage litigation (PRF ¶ 233). Mr. Fay further testified that the Village was "disappointed" that the Olechs, Zimmers and Brinkmans sued the Village regarding the storm water flooding because they had denied the Village the easements necessary to correct the problem before it occurred (Pl. Ex. 11, pp. 109-110). Mr. Fay also testified that he saw the storm water drainage litigation as a "relatively frivolous" lawsuit (Pl. Ex. 11, p. 112),

and he still feels that way notwithstanding that the jury awarded the Olechs and the Zimmers $155,000.00 (Pl. Ex. 11, p. 112).

The foregoing evidence is sufficient to create a triable issue on the plaintiffs' ill will theory, and to defeat defendants' motion for summary judgment.

## D.

Last, we address the issue of qualified immunity. Messrs. Modaff and Pretzer have been sued in their individual as well as official capacities. The doctrine of qualified immunity protects municipal officials performing discretionary functions from liability for civil damages if their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 816-18 (1982). *See also Elwell v. Dobucki,* 224 F.3d 638 (7th Cir. 2000). The plaintiff bears the burden of demonstrating the unlawfulness of the defendant's alleged act in light of clearly established preexisting law. *Forman v. Richmond Police Department,* 104 F.3d 950, 957-58 (7th Cir. 1997). The contours of a "clearly established right" must be sufficiently delineated so that a reasonable official would understand that the alleged misconduct violates that right. *Sivard v. Pulaski County,* 17 F.3d 185, 189 (7th Cir. 1994). The "test for qualified immunity is 'whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted.'" *Warlick v. Cross,* 969 F.2d 303, 309 (7th Cir. 1992). Where the law is unclear as to precisely what measures a government official must take to satisfy plaintiff's constitutional rights, qualified immunity should apply. *Morrell v. Mock,* 270 F.3d 1090 (7th Cir. 2001).

The individual defendants contend that they should be immune from suit in their individual capacities because there must be case law establishing that the individual defendants' particular

actions in this case violated the equal protection clause (Defs.' Mem. at 12-13). Defendants argue that there is no case law from 1995 or before which applied the equal protection clause in a situation like the present one (Defs.' Mem. at 8; Defs.' Reply at 12-13). The individual defendants further contend that, even if they violated the plaintiffs' rights to equal protection, they should be granted qualified immunity because their actions resulted from a "reasonable mistake" (Defs.' Mem. at 9)(citing *Saucier v. Katz,* 533 U.S. 194, 205 (2001)). Specifically, the individual defendants claim that "[a] reasonable official in Modaff's position could have believed that a thirty-three foot dedication or easement was a rational request in light of the fact that the Village needed a right-of-way to install the water main and that thirty-three feet was the typical right-of-way" (Defs.' Mem. at 9-10). As to Mr. Pretzer, the defendants claim that he made no decisions with respect to the easement issue, but merely followed the recommendations of the Village attorney and his staff (Defs.' Mem. at 10).

The plaintiffs correctly point out that to satisfy their burden of establishing a clearly established constitutional right (and thereby defeat a claim of qualified immunity), they only need to show that "the unlawfulness of the [d]efendants' conduct would have been apparent in light of existing law" (Pls.' Resp. at 14) (citing *Denius v. Dunlap,* 209 F.3d 944, 950 (7th Cir. 2000). Thus, we agree that plaintiffs need not "point to cases that are identical to the presently alleged constitutional violation" because "there is an almost infinite variety of factual scenarios that may be brought into the courtroom" (Pls. Resp. at 13-14). Instead, they only need to show that the plaintiffs' right to equal protection was clearly established in 1995, and that the individual defendants' decision to demand a 33-foot dedication violated that right.

On the first point, the law establishing class of one equal protection claims was clearly established in 1995. At the time of the alleged actions, both the United States Supreme Court and the Seventh Circuit had held that a municipality could violate an individual's equal protection rights by intentional and different treatment of others who are similarly situated. *See Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. County Commission of Webster Cty.,* 488 U.S. 336 (1989); *Esmail v. Macrane,* 53 F.3d 176 (7th Cir. 1995) (deciding in April 1995, before the events giving rise to plaintiffs claim). The only question is whether the clearly established right in this Circuit required actions motivated by ill will before a constitutional violation could be established. Although the Supreme Court cases established a "basic intent" standard, *Esmail* interpreted those cases to require "ill will." However, as explained above, there are disputed fact questions that require a trial on the issue of ill will. Thus, even if the law in 1995, read most favorably to defendants, required ill will as part of a class of one equal protection claim, there is evidence for which a jury could find ill will. Qualified immunity could not be granted at this time because to do so would require the Court to resolve fact questions that are for the jury. *See Vidmar v. City of Chicago Bd. of Ed.,* 98 C 0951, 1999 WL 409929, * 4 n.4 (N.D. Ill. 1999) (citing *Marshall v. Allen,* 984 F.2d 787, 792 (7th Cir. 1993)).

The only remaining question that is whether *Saucier* applies to this case, as defendants claim (*i.e.,* defendants argue they are entitled to qualified immunity if their decisions were based on "reasonable mistakes"). We find that the "reasonable mistake" exception carved out in *Saucier* cannot be used to establish qualified immunity at this time. If a jury finds intentional "ill will" based on the disputed issues outlined above, then there can be no "reasonable mistake" defense to support a qualified immunity defense. Thus, since we have found that there are genuine issues of material

45

fact on the ill will issue, we must find that the defendants' reasonable mistake argument cannot support a qualified immunity defense at this time.[27]

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment (doc. # 68). The facts set forth in Section II of this opinion are without substantial controversy, and thus shall be deemed established for purposes of trial. Fed. R. Civ. P. 56(d). The matter is set for a status conference on June 6, 2002 at 9:00 a.m.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

Dated:    October 10, 2002,
         **Nunc Pro Tunc**
         **May 23, 2002**

---

[27]We also find, for the same reasons, that plaintiffs' punitive damages claim survives summary judgment (Defs.' Mem. at 16-17).